IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SEYMOUR and JAY WINUK, as Co-Administrators to the ESTATE OF GLENN WINUK, Deceased, | ) | |
| Plaintiff, | ) | No. 06-770C |
| v. | ) | (Judge Horn) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION FOR JUDGMENT
UPON THE ADMINISTRATIVE RECORD

Pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests judgment upon the administrative record. The decision of the United States Department of Justice, Office of Justice Programs, Bureau of Justice Assistance ("BJA"), denying the plaintiffs' claim for benefits pursuant to the Public Safety Officers' Benefits Act ("PSOBA"), 42 U.S.C. § 3796 et seq., is in accordance with law and supported by substantial evidence. Accordingly, this Court should enter judgment upon the administrative record in favor of the United States.

STATEMENT OF THE CASE

Plaintiffs, Seymour and Jay Winuk, co-administrators of the decedent, Glenn Winuk's, estate, challenge the final decision of the BJA denying the claim for PSOBA death benefits filed by Mr. Winuk's parents, Seymour and Elaine Winuk. AR Tab 1.[1] The BJA found that, because no public agency certified that Mr. Winuk was a public safety officer who died in the line of duty, the Winuks were not eligible for expedited benefits pursuant to Public Law 107-37, 115

[1] "AR__" refers to the administrative record, filed on February 22, 2007.

Stat. 219, 219 (Sept. 218, 2001).[2] Further, the BJA found that Mr. Winuk was not a "public safety officer" who died in the line of duty, and, therefore, his parents were not eligible for benefits pursuant to the PSOBA. AR Tab 4.

## STATEMENT OF FACTS AND COURSE OF PROCEEDINGS

On September 11, 2001, Mr. Winuk died tragically in the collapse of the World Trade Center. AR Tab 10. Prior to his death, and since 1979, Mr. Winuk had served, in one form or another, as a member of the Jericho Fire Department. Although he was an active member of that fire department for many years, at the time of his death, Mr. Winuk held an associate membership — a nonactive membership that prevented Mr. Winuk from acting upon behalf of the fire department. AR Tabs 7, 41-42. On September 11, 2001, Mr. Winuk, who was a partner at the law firm Holland & Knight LLP, evacuated the population of his own building and was last seen running toward the World Trade Center. AR Tab 14. In March 2002, rescue workers recovered Mr. Winuk's body in what would have been the lobby of the World Trade Center south tower. AR Tab 40d. Mr. Winuk was found wearing surgical gloves, either wearing or holding a stethoscope, and beside a medical bag. Id.

In December 2003, Mr. Winuk's parents filed a claim with the BJA for death benefits pursuant to the PSOBA. In July 2004, the PSOBA office determined that the Winuks' claim

[2] In the immediate aftermath of September 11, 2001, two statutes were enacted creating a virtually identical, expedited certification-based procedure for "benefits described under [the PSOBA]": Public Law 107-37 (applicable only to 9/11); and section 611 of the USA PATRIOT Act of 2001 (applicable generally to "terrorist attack[s]") (codified unofficially at 42 U.S.C. § 3796c-1). The PSOBA office and hearing officer determinations refer to the certification procedure under section 611, instead of referring to the substantially identical Public Law 107-37, which is expressly applicable only to 9/11. The BJA Director's determination, however, refers to the certification procedure under Public Law 107-37. Despite the differences in nomenclature, in all three determinations, the certification procedure referred to is effectively identical.

failed to satisfy the requirements of either the PSOBA or Public Law 107-37. Specifically, the PSOBA office found that Public Law 107-37's provision for expedited payment of benefits did not apply because the BJA did not receive a certification that Mr. Winuk was a public safety officer employed by a public agency that responded to the September 11, 2001 terrorist attack. AR Tab 2. The PSOBA office also concluded that, because Mr. Winuk was an associate member of the Jericho Fire Department, and did not hold the same privileges or obligations as full active members, he did not meet the definition of a "public safety officer" pursuant to the PSOBA. Id.

The Winuks appealed this decision to an independent hearing officer who, after holding a hearing, agreed that no public agency certification had been provided. AR Tab 3 at 4. However, the hearing officer also determined that, although Mr. Winuk's associate status in the Jericho Fire Department prevented him from engaging in "firemanic" activities, he nevertheless could and did provide emergency medical services on behalf of the Jericho Fire Department. Id. at 3. The hearing officer found that those services were authorized by the Jericho Fire Department and accepted by the New York Fire Department ("FDNY"). The hearing officer then concluded that Mr. Winuk was a public safety officer who died in the line of duty on September 11, 2001. Id.

Pursuant to 28 C.F.R. § 32.24(h)[3], the Director of BJA reviewed the hearing officer's decision. On September 1, 2006, the BJA issued its final decision finding that, although Mr. Winuk "unselfishly and courageously ran toward danger and died assisting strangers in the lobby of the South Tower of the World Trade Center on September 11, 2001," Mr. Winuk was not a public safety officer within the meaning of either the Public Law 107-37 or the PSOBA. AR Tab

---

[3] On September 11, 2006, the agency promulgated new regulations. 71 Fed. Reg. 46,028 (Sept. 11, 2006). All references in this brief are to the previous regulations that governed the BJA's decision.

4 at 26. The BJA also determined that, even if Mr. Winuk had been a public safety officer, he did not die in the line of duty.

The BJA considered all of the evidence before the hearing officer and new evidence received by the agency. First, the BJA determined that the Winuks' claim did not meet the requirements of Public Law 107-37. AR Tab 4 at 8. In particular, the BJA determined that "the relevant public agency never provided a certification, within the meaning of Public Law 107-37, that the decedent was a public safety officer employed by it who died in the line of duty." Id. The BJA considered all of the relevant evidence presented by the Winuks, including two letters written by the Chief of the Jericho Fire Department and one letter from the Chairman of the Jericho Fire District. Id. (citing AR Tabs 12, 13, 40b), and found that none provided a "clear and unequivocal statement to BJA of how the public agency actually considers the individual and the individual's activity at the time he suffered his fatal injury." Id.[4] Even if one of these letters had included a proper certification, other contradictory record evidence left "at best, equivocation as to the application of Public Law 107-37 to the decedent." Id. at 9 (citing AR Tabs 7, 28); see also id. at n.32 (explaining the weight accorded to the different documentary testimony).

The BJA then determined that the Winuks' claim failed to meet the requirements of the PSOBA. Specifically, the BJA determined that Mr. Winuk was not a public safety officer pursuant to the statute. In drawing this conclusion, the BJA looked first to whether Mr. Winuk served the Jericho Fire Department (a public agency) in an official capacity. In other words, was Mr. Winuk "officially recognized or designated as functionally within or a part of the public

---

[4] The BJA explained that Public Law 107-37 required a claim to satisfy the standards for eligibility contained in the PSOBA, however, once a proper certification has been received, the BJA may rely upon that certification instead of independently finding facts. Id.

agency." Id. at 6. First, relying upon an official opinion letter from the Jericho Fire District general counsel Joseph Frank and the New York State Department of Health's confirmation that Mr. Winuk was not, at the time of his death a certified emergency medical technician ("EMT"), the BJA determined that Mr. Winuk was not a public safety officer because, as an associate member, he was not legally authorized to act on behalf of the Jericho Fire Department or certified by the state to perform emergency medical services.[5] Id. at 12-13 (citing AR Tabs 42-45). In doing so, the BJA explicitly rejected the unsupported distinction made by the hearing officer between members of the fire department who could engage in "firemanic" activities and those who could engage in emergency medical services. Based upon a review of the by-laws of the fire department, New York State law, and the opinion of New York state officials charged with administering state law, the BJA concluded that Mr. Winuk's associate membership did not authorize him to performing any activities upon behalf of the department. Id. at 14-15.

Second, the BJA found that the record did not demonstrate that Mr. Winuk died in the line of duty. Id. at 19. Specifically, the BJA noted that its own regulation required Mr. Winuk to have been "authorized or obligated" to respond to the attack on the World Trade Center. 28 C.F.R. § 32.2(c)(2). Based upon the Jericho Fire Department's own general counsel's opinion letter and the laws of the state of New York, the BJA determined that Mr. Winuk was not authorized or obligated to respond. In particular, the BJA noted that, although General Municipal Law § 209-i authorizes a volunteer firefighter to assist another fire department, it only

---

[5] The BJA explicitly considered the evidence to the contrary relied upon by the hearing officer, noting that the hearing officer did not have the benefit of either the information regarding the lack of Mr. Winuk's certification or the opinion of the Jericho Fire District General Counsel and, instead, relied upon ambiguous record evidence and speculation that Mr. Winuk was, in fact, a certified EMT under state law. Id. at 11 (citing AR Tab 3). As the record demonstrates, Mr. Winuk was not, in fact, certified to provide EMT services. AR Tab 45.

authorizes active firefighters to do so. GML 209-i (citing Volunteer Firefighters' Benefit Law § 3 defining volunteer firefighter as an "active" volunteer."). And, even if Mr. Winuk had been an active firefighter, there was no reliable evidence that his services were "accepted" by the officer in command at the FDNY. GML 209-i. AR Tab 4 at 22.

Finally, the BJA specifically addressed the 2005 New York law declaring that Mr. Winuk "who at the time of his death, was an associate member of the Jericho volunteer fire department, shall be deemed to have been an active member of the Jericho volunteer fire department at the time of his death." Ch. 368, Laws of New York, eff. Aug. 2, 2005, AR Tab 40j. This law, which acknowledges that Mr. Winuk was an associate firefighter at the time of his death, purports to change that status for purposes of entitling Mr. Winuk to PSOBA benefits. The BJA accorded little weight to this effort, acknowledging that the new law could very well govern benefits under state law, but does not alter the BJA's analysis under Federal law. AR Tab 4, at 24. And, in any event, because the new law was created for the specific purpose of changing Mr. Winuk's firefighter status, it conflicts with other record evidence that demonstrates as a general matter, the limitations upon the authority of associate firefighters. Id. at 25.

On November 13, 2006, Seymour and Jay Winuk, as co-administrator's of Mr. Winuk's estate, appealed the BJA's decision to this Court.

## ISSUE PRESENTED

Whether the BJA's decision that Mr. Winuk was not a public safety officer for purposes of either the PSOBA or Public Law 107-37 is in substantial compliance with the PSOBA and its implementing regulations, is not arbitrary or capricious, and is supported by substantial evidence.

SUMMARY OF THE ARGUMENT

The record demonstrates that Mr. Winuk was not a public safety officer for purposes of either Public Law 107-37 or the PSOBA and its implementing regulations. First, because no state or local agency certified that Mr. Winuk either acted upon its behalf or died in the line of duty, there is no certification upon which BJA could have relied in awarding expedited benefits.

Second, because Mr. Winuk maintained only an "associate membership" with the Jericho Fire Department, and because the record evidence demonstrates such a membership was "nonactive" and unauthorized by the department, the BJA correctly determined that Mr. Winuk was not a "public safety officer" pursuant to the PSOBA and the agency's reasonable interpretation of that act.

Finally, even assuming that Mr. Winuk had been a public safety officer at the time of his death, the record provides no evidence, beyond mere speculation, that Mr. Winuk died in the line of duty. Accordingly, we respectfully request that the Court sustain the BJA's decision.

ARGUMENT

I. Standard Of Review

This Court reviews a motion for judgment upon the administrative record to determine whether, given all the disputed and undisputed facts, the plaintiff has met the burden of proof to show that the decision was not in accordance with the law. One Feather v. United States, 61 Fed. Cl. 619, 621 (2004). In reviewing an administrative denial of benefits pursuant to the PSOBA, this Court must confine itself to the administrative record created in the proceedings below. Porter v. United States, 64 Fed. Cl. 143, 147 (2005), aff'd without op., 176 Fed. Appx. 111 (Fed. Cir. 2006) (Table); City of Wheeling v. United States, 20 Cl. Ct. 659, 666 (1990), aff'd, 928 F.2d 410 (Fed. Cir. 1991). Such review is limited to determining: (1) whether there has been

substantial compliance with statutory and implementing regulations; (2) whether there has been any arbitrary or capricious action upon the part of the Government officials involved; and (3) whether the decision denying the claim is supported by substantial evidence. Hawkins v. United States, 469 F.3d 993, 999 (Fed. Cir. 2006); Yanco v. United States, 258 F.3d 1356, 1362 (Fed. Cir. 2001); Chacon v. United States, 48 F.3d 508, 511 (Fed. Cir. 1995). The Court "is not a 'superagency' and cannot make a redetermination of the merits based upon the administrative record." Demutiis v. United States, 48 Fed. Cl. 81, 87 (2000), aff'd as modified, 291 F.3d 1373 (2002); Durco v. United States, 14 Cl. Ct. 424, 427 (1988).

## II. The BJA's Decision Substantially Complies With The Statute And Implementing Regulations, Is Not Arbitrary Or Capricious, And Is Supported By Substantial Evidence

### A. The BJA Correctly Held That No Public Agency Certified, As Contemplated By Public Law 107-37, That Mr. Winuk Was An Active Firefighter Or EMT Killed In The Line Of Duty

The BJA correctly determined that, because no public agency certified Mr. Winuk's eligibility under Public Law 107-37, the Winuks' claim for expedited payment pursuant to the law must fail. Public Law 107-37 provides expedited payment of a Federal benefit when a public agency certifies that the decedent was a public safety officer employed by the agency and killed in the line of duty in connection with the September 11, 2001 terrorist attack. 115 Stat. at 219. Pursuant to the express terms of the law, "public safety officer" has the same meaning given the term in the PSOBA. Id. As a practical matter, the BJA treats such certifications as prima facie evidence that the decedent was an officially recognized or designated member of either the firefighting or emergency services agency.

Public law 107-37 does not expand the class of individuals eligible under the PSOBA. Indeed, although it authorizes the BJA to rely upon a public agency's certification in lieu of

conducting its own factual investigation, the BJA cannot do so if no certification is provided. Although the alleged certification need not be a "formulaic incantation," AR Tab 4 at 8, it must, pursuant to the plain language of the law, at the least, constitute an unambiguous affirmation made directly to the BJA of those facts that are required to be statutorily satisfied. Id.; see also BLACKS LAW DICTIONARY, 7th Ed. (defining "certification" as an attested statement). Even if the Court determines that the meaning of "certification" is ambiguous, the BJA's reasonable interpretation of the statute must be accorded deference. 42 U.S.C. § 3796c(a) ("BJA is authorized to establish such rules, regulations, and procedures as may be necessary to carry out the purposes of the Act"); Chacon v. United States, 48 F.3d 508, 512 (Fed. Cir. 1995) (deferring to the BJA's reasonable interpretation of "serving in an official capacity").

Here, the Jericho Fire Department did not certify that Mr. Winuk was a public safety officer. Specifically, the "Report of Public Safety Officer's Death" submitted by Chairman Marmann of the Jericho Fire Department, stated that Mr. Winuk was an "associate, non-active member of the Jericho Fire Department." AR Tab 7. The report provides the opportunity to classify the decedent as a firefighter or ambulance rescue squad member in the service of, among other things, a volunteer fire or ambulance squad. Id. Notably, Chairman Marmann did not classify Mr. Winuk as a firefighter or ambulance rescue squad member — nor did he classify Mr. Winuk as acting in the service of the Jericho Fire Department. Instead, Mr. Winuk was classified as "other." Id.

To the extent that Jericho Fire Department Chief John Lottes stated (in a letter to Jay Winuk, not to the BJA) that, "in my opinion, Glenn was acting as a bona fide agent of the Jericho Fire Department," the BJA noted first that Chief Lottes relied upon inapposite state law and, therefore, reasonably determined that, "I am left with, at best, equivocation as to the application

of Public Law 107-37 to the decedent . . . ." AR Tab 4 at 9. Indeed, even the hearing officer's decision, upon which the Winuks primarily rely, acknowledged that "it does seem debatable that these [supporting documents AR Tabs 13-14] amounted to clear and direct certification required . . . ." AR Tab 3 at 4. Accordingly, the BJA correctly determined that no proper certification existed. AR Tab 4 at 11-12, 25 (citing acceptable certifications); see AR Tab 23 (properly executed and accepted certification).

B. The BJA Correctly Held That Mr. Winuk Was Not A Public Safety Officer

The BJA correctly determined that Mr. Winuk was not a public safety officer as that term has been interpreted by the agency. The PSOBA defines a public safety officer as an individual serving a public agency in an official capacity as, among other things, a firefighter or member of an ambulance rescue squad. 42 U.S.C. § 3796b(8). The statute does not, however, define "serving in an official capacity." Thus, the BJA, the agency authorized by Congress to implement the statute, has stated that, to serve a public agency in an official capacity, the decedent must be an employee or volunteer, or have some similar relationship of performing services as a part of the agency. In other words, the decedent must be officially recognized or designated as functionally within or part of the public agency.

The United States Court of Appeals for the Federal Circuit has held that this interpretation is reasonable. Chacon v. United States, 48 F.3d 508, 512 (Fed. Cir. 1995) (deferring to the agency's reasonable interpretation and citing U.S. Dep't of Justice, Legal Interpretations of the Public Safety Officers' Benefits Act 9 (1981)). In applying this standard, the BJA determining official will give "substantial weight" to the factual findings made by the

public agency.[6] See Demutiis, 291 F.3d at 1379 (citing the pre-2006 version of 28 C.F.R. § 32.5 and stating that legal conclusions made by the agency regarding the eligibility of PSOBA benefits are not accorded the same weight as factual determinations, and need not be given any weight).

Here, the BJA thoroughly reviewed the record evidence, including all submissions provided upon behalf of the Winuks' claim, and concluded that the record did not demonstrate that Mr. Winuk was acting in an official capacity as part of the Jericho Fire Department. Indeed, the record uniformly demonstrates that Mr. Winuk had previously been a fully active firefighter but, at the time of his death, had become an associate member of the fire department. An associate member is, according to Chairman Marmann's report, a "nonactive" member of the department who is not authorized to perform firefighting or rescue services upon behalf of the department. AR Tab 7. This conclusion is fully supported by the department's by-laws, which state that associate members are not entitled to a vote at member meetings, nor are they "allowed to take part in firemanic activity . . . ." AR Tab 40m.

Although some record evidence arguably exists to support a distinction between "firemanic" and other activities, that evidence is merely speculative and is contradicted by the Jericho Fire Department general counsel's opinion letter, which, without reservation, stated that the by-law's restriction upon associate member's firemanic activities applied equally to an associate's emergency medical activities. Compare AR Tabs 41-42 with AR Tab 40 at 54. General counsel Frank also stated that Mr. Winuk's associate membership, regardless of whether he maintained EMT state certification, rendered him "inactive" for all purposes and, as such, was

[6] On September 11, 2006, this provision was amended to state that the deciding official "may at his discretion, consider (but shall not be bound by) the factual findings of a public agency." 71 Fed. Reg. 46,028; 28 C.F.R. § 32.5.

not authorized to act upon behalf of the Jericho Fire Department. Id. The BJA was permitted to (and did) accord substantial weight to general counsel Frank's opinion. AR Tab 4 at 13; see Cartwright v. United States, 16 Cl. Ct. 238, 240 (1989) (the weight accorded evidence in the exclusive province of BJA).

In this regard, the BJA's decision is fully consistent with this Court's decision in Messick ex. rel. Estate of Kangas v. United States, 70 Fed. Cl. 319, 331 (2006) (currently on appeal), in which this Court held a 14-year old apprentice firefighter to qualify as a public safety officer. In Messick, the decedent (although not authorized to engage in fire suppression), was uniformly recognized by the relevant public agency to be authorized to perform certain other apprentice functions upon behalf of a volunteer fire department. Here, unlike in Messick, Mr. Winuk was not authorized to act upon behalf of the Jericho Fire Department in any manner.

Indeed, to the extent that the Winuks submitted testimony that contradicted general counsel Frank's opinion, that testimony, provided by John Navaretta, Mr. Winuk's friend and former Jericho firefighter, was not provided upon behalf of the public agency. Therefore, Mr. Navaretta's conclusions (such that they are considered) are not entitled to any special weight. 28 C.F.R. § 32.5 (2001). In any event, Mr. Navaretta merely stated his personal opinion that the Jericho Fire Department's restriction upon associate members from engaging in "firemanic" activities applied only to firefighting activity and not to EMT activity. AR Tab 40 at 48. Certainly the BJA correctly accorded more weight to the Fire Department's general counsel's opinion letter than to the opinion of retired firefighter who had not been associated with the Jericho Fire Department for 15 years. Id. at 47.[7] And, as the BJA noted, AR Tab 4 at 12, not

[7] Similarly, the BJA properly accorded little weight to submissions by organizations such as the Twin Towers Fund and the EMS Memorial, neither of which is even arguably a

only is Mr. Navaretta's conclusion contradicted by the opinion of the fire department's general counsel, it is also contradicted by the opinion of the New York State Comptroller, who has stated that the ambulance service provided by a fire department is provided as part of the fire department's firemanic functions. See N.Y. St. Cptr., No. 87-76.

In any event, Mr. Navaretta's reliance upon Mr. Winuk's alleged New York state EMT certification was misplaced. Specifically, Mr. Navaretta testified that, because Mr. Winuk "maintained his EMT status," he was still an "active" member of the Jericho Fire Department. Id. at 48. However, Mr. Navaretta was mistaken. According to the New York State Department of Health, Mr. Winuk had not maintained EMT certification since 1988. AR Tab 45. In other words, not only did the Jericho Fire Department prohibit Mr. Winuk from acting upon its behalf, the State of New York did not consider Mr. Winuk, at the time of his death, to be a certified EMT such that he would be eligible for benefits based upon that position.

Finally, the BJA correctly accorded little weight to the 2005 New York State law effectively changing Mr. Winuk's status to "active" at the time of his death. The New York State law is not a public agency's factual finding that could be considered or accorded any substantial weight pursuant to the 28 C.F.R. § 32.5. To the extent that the new law demonstrates anything, it demonstrates New York's recognition that Mr. Winuk's status as an associate firefighter would not carry the same authority, rights or benefits as if he had been an active firefighter. Even if the BJA were to rely upon the New York law to the exclusion of all of the other contradictory record evidence, it would effectively allow New York, or any similar state, to eviscerate BJA's statutorily authorized role in determining PSOBA benefits and replace that role with a post hoc

---

public agency. AR Tab 4 at 14-15 n.46.

determination by the state. See, e.g., Chacon, 48 F.3d at 514 (holding that a criminal pardon could not change the fact that, at the time of their death, decedents were prisoners and, therefore, not public safety officers).

In any event, New York's retroactive revision of Mr. Winuk's associate status does not reflect any intention to abolish the whole "associate" member category, nor does it reflect any intention to render all associate members active members for purposes of benefits. Therefore, it does not constitute any reliable statement upon which the BJA may rely.

New York State's attempt to rewrite history, coupled with the record's many letters of support and formal recognition, testify to the supremely selfless act performed by Mr. Winuk. Nothing in this brief should be construed as an attempt to diminish Mr. Winuk's heroism in any way. However, the record evidence memorializing Mr. Winuk appears to recognize that he was not, at the time of his death, acting on behalf of the Jericho Fire Department. We appreciate all the efforts upon Mr. Winuk's behalf, however, none of these testimonials can overcome the basic and indisputable fact that Mr. Winuk was not lawfully authorized to act as an active firefighter at the time he died. See LaBarre v. United States, 72 Fed. Cl. 111, 120 (2006) (stating that "[s]uch recognition although well deserved and appropriate, does not establish that at the time of [death, he] was 'serving a public agency in an official capacity.'").

C. The BJA Correctly Held That Mr. Winuk Did Not Die In The Line Of Duty

The BJA's determination that Mr. Winuk did not die in the line of duty is supported by substantial evidence and substantially complies with the PSOBA and the implementing regulations. BJA regulations provided that an action is "in the line of duty" if it is "obligated or authorized by rule, regulation, condition of employment or service, or law to perform" 28 C.F.R. § 32.2(c)(2).

Here, the record demonstrates that Mr. Winuk was not authorized (and certainly was not obligated) by the Jericho Fire Department to perform firefighting and emergency services on the day that he died. First, as we have demonstrated, the general counsel's opinion letter and Chairman Marmann provided unequivocal statements that associate members of the Jericho Fire Department are non-active members who do not provide firefighting and/or emergency services upon behalf of the department. AR Tabs 7, 43. Accordingly, because the public agency did not authorize Mr. Winuk's activity, he did not die in the line of duty.

To the extent that the Winuks rely upon GML 209-i, Compl. § 9, that law does not apply to this case. Specifically, GML 209-i provides that a "volunteer firefighter" within New York State may perform services in another fire company, provided that his services are "offer[ed]" to and "accepted" by the "officer in command." GML 209-i(1). First, GML 209-i contemplates that only "active" firefighters fall within the scope of this provision. GML 209-i(3) (citing Volunteer Firefighters' Benefits Law definition). Second, even assuming for the sake of argument that Mr. Winuk was an active firefighter (a conclusion that is flatly contradicted by the record), the FDNY, in thanking Mr. Winuk's family for his bravery, stated in no uncertain terms, that "he was not acting pursuant to the [FDNY's] direction that day." AR Tab 28.

Thus, the Winuks' contention, Compl. ¶ 25, that BJA failed to properly resolve reasonable doubt arising from the circumstances of the officer's death in favor of payment, fails to appreciate the record evidence. 28 C.F.R. § 32.4.[8] The letter from the FDNY includes a factual finding of a public agency to which BJA was then obliged to give substantial weight. The

[8] On September 11, 2006, BJA promulgated a new version of this regulation, deleting the reasonable doubt language, noting that it had often been misunderstood by the parties. 71 Fed. Reg. 46,028, 46,041.

Winuks offer nothing (aside from speculation) that can confirm one way or the other, what happened between Mr. Winuk and the FDNY on September 11, 2001. AR Tab 4 at 22-23. That Mr. Winuk's remains were found in what would have been the lobby of the South Tower, does not indicate that, on that day, his services were accepted by the commanding officer of the FDNY. In other words, an absence of evidence does not create reasonable doubt such that the issue could be resolved in favor of granting benefits.

The evidence notwithstanding, we recognize that the particular exigencies created by September 11, 2001, make difficult a final determination upon Mr. Winuk's possible offer and the FDNY's possible acceptance. Therefore, as the BJA noted, because any finding of actual offer and acceptance would be merely speculative, the BJA properly declined to speculate. And, in any event, as we have demonstrated, pursuant to GML 209-i, the FDNY was not permitted to accept any services offered by non-active volunteer firefighters.

III. The Caption Should Be Reformed

As a final, practical matter, the plaintiffs, Jay Winuk, as co-administrator's of Mr. Winuk's estate, is not a proper plaintiff in this action. Pursuant to 42 U.S.C. § 3796(a), certain parties, including the parents of the deceased (but not siblings), are eligible for PSOBA benefits and thus only they have standing to bring claims. Here, Mr. Winuk's parents, not his brother (or his estate), filed a claim with the BJA, pursuant to 28 C.F.R. §§ 32.19 to .20; Demutiis, 291 F.3d at 1375 ("A claimant seeking death benefits under the Act must file a claim with the Bureau, which will preliminarily determine eligibility for benefits."). Even if the decedent's estate or brother could properly file a claim (questions that need not be answered here), neither the estate nor Jay Winuk, as co-administrator of Mr. Winuk's estate has filed a claim and received an appealable final decision from the BJA. Accordingly, Mr. and Mrs. Seymour and

Elaine Winuk are the proper plaintiffs in this action because they are the only parties who have standing and who have exhausted their administrative remedies and may appeal the BJA's final decision to this Court. 28 C.F.R. § 32.55. In the alternative, Seymour Winuk alone, as coadministrator of the estate, is the proper plaintiff. Therefore, we respectfully request that the Court reform the caption to include only Seymour Winuk or, by leave of Court, Seymour and Elaine Winuk as plaintiffs.

CONCLUSION

For these reasons, we respectfully request that the Court grant our motion for upon the administrative record.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Acting Director

s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

s/ Claudia Burke
CLAUDIA BURKE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L St., N.W.
Washington, D.C. 20530
Tel: (202) 353-9063
Fax: (202) 514-7965

Attorneys for Defendant

Of Counsel:
RAFAEL A. MADAN
General Counsel

JASON P. COOLEY
Attorney Advisor
Office of the General Counsel
Office of Justice Programs
Department of Justice
810 7th Street, N.W.
Washington, D.C. 20531

February 21, 2007

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 21st day of February, 2007, a copy of the foregoing "DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Claudia Burke