# Hearing Officer Claim Determination

In Re: PSOB Case Number 01-911-0421
Glenn J. Winuk, Jericho, NY Fire Department

Appeal of: Claimants Seymour and Elaine Winuk
Surviving Parents of Glenn J. Winuk

## Introduction

This hearing officer was appointed in September of 2004 to adjudicate an appeal of the adverse claim determination in PSOB Case No. 01-911-1421--Glenn J. Winuk (deceased), associate member of the Jericho Fire Department, Jericho, New York. , The claim for death benefits under the Public Safety Officers' Benefits Act, 42 USC §3796 (the PSOB Act) was brought by Glenn Winuk's surviving parents, Elaine and Seymour Winuk, inasmuch as Mr. Winuk died with no surviving spouse or children.

The Winuks' formal death benefits claim (OJP Form 3650/5A for the Sept. 11, 2001 Terrorist Attacks) was filed in December of 2003, followed by submission of the requisite Departmental Report of Public Safety Officer's Death (OJP Form 3650/6) by the Chairman of the Jericho Fire District in late March of 2004. After further documentary submissions in support of the claim (primarily by Glenn Winuk's surviving brother, Jay S. Winuk, on behalf of his claimant parents), and investigative endeavor and analysis by PSOB personnel, the adverse determination of the U.S. Justice Department's Bureau of Justice Assistance (BJA) was issued in July of 2004.

The denial determination concluded that the death of Mr. Winuk, at the time an attorney practicing law in New York City and a long time active member of the Jericho Fire Department (a volunteer firefighting organization) but who at the time of his death was in associate member status at that Department, was not covered by the PSOB Act. Therefore, his survivors were not eligible to receive the death benefits authorized under PSOB legislation for public safety officers who die as a direct and proximate result of personal injury sustained in line of duty.

The rationale of the BJA determination denying benefits was that:

(1) the evidence before it did not include a certification that Glenn Winuk was a public safety officer of the Jericho Fire Department (or the New York City Fire Department) who died in line of duty responding to the September 11 World Trade Center terrorist attack and therefore could not render his survivors eligible for expedited payment of PSOB benefits under the special provisions of Section 611 of the USA Patriot Act (42 USC § 3796c-1); and

(2) the evidence established that Glenn Winuk was at the time of his death an "associate member" of the Jericho Fire Department barred from performing any "firematic" duties for that department (based on its own by-laws) and thus could not be considered, in performing emergency medical technician (EMT) services at the site of the Twin Towers attack, to be acting as "an officially recognized or designated member of a legally organized volunteer fire department" (i.e. in this case the Jericho Fire Department) who was capable of meeting the eligibility requirements for PSOB Act death benefit coverage.

After hearing officer appointment in September 2004 (with transmission of the claim and appeal record to that point), an appeal hearing was scheduled and held on April 14, 2005 in New York City in which the claimants were represented by Attorney Andrew J. Maloney of the law firm of Kreindler and Kreindler LLP. The hearing transcript was provided in mid-May (incorporating testimony on key issues previously unexplored and several new items of documentary evidence as exhibits thereto as well as other post-appeal documents that had been supplied before hearing.) This determination is the product of the full case record as so developed.

**Facts**

On September 11, 2001, shortly before 9:00 a.m., American Airline Flight 11 crashed into the north tower of the World Trade Center. Fifteen minutes later, a second plane, United Flight 175, crashed into the south tower. The impact and resulting fire damage from both crashes caused both of the Trade Center towers to collapse.

Glenn Winuk an attorney and partner at a law firm located 1 block from the World Trade Center (Messrs. Holland and Knight LLP, 195 Broadway, NYC) and a longtime member of the Jericho New York Fire Department (over 20 years of service-- 19 of these as an active volunteer firefighter and emergency medical services technician and since early 1998, as an associate member and continuing qualified EMT, was present at his firm when the attack occurred. He helped evacuate the occupants of his office building and then borrowed EMS equipment and, at about 9:30 a.m., left and was seen running toward the World Trade Center.[1]

No word was heard from or about Mr. Winuk until his remains were discovered and positively identified six months later (March 20, 2002) in the wreckage of the South Tower lobby (the first of the Center towers to collapse from the September 11 terrorist attacks). The lobby, at the time of collapse, was being used as a staging area for rescue operations and emergency medical treatment of injured and deceased building tenants. It was also a location from which several other rescue workers' bodies were recovered. When Mr. Winuk's body was found, it was noted that he had surgical gloves on and at his side was a medical bag commonly used by first responder EMT's. [2]

**Issues**

There appears to be no issue about whether Mr. Winuk intended to, hastened to, and did in fact proceed to the South Tower location of the 9-11 tragedy to help provide emergency medical services nor whether he arrived at that location and did prepare to and almost certainly administer (or, at the very least, place and equip himself in a position to administer) such aid to injured victims. This circumstance and the undisputed evidence behind it speaks for itself (res ipsa loquitur) -- and the agency's adverse determination in this claim takes no issue with that conclusion. All join in recognition of his heroic conduct and that

---

1. See Employer Affidavit, W. Honan, Exec. Partner, Hill and Knight LLP, 5-13-202

2. See affidavit, Lt. J. Sanders, FDNY, 4-6-05 (Hearing Exh. 4). Lt. Sanders also recalled that Mr. Winuk was wearing or holding a stethoscope and indicated that his recovered wallet contained a photo id card identifying Winuk as a member of the Jericho NY Fire Dept. (see Hearing Exh. 3 for id card found on Winuk's person).

has been evidenced by the deluge of praise, honor and recognition posthumously accorded his sacrifice by a number of official sources (several explicitly tied to "line of duty" recognition of the nature of Winuk's contribution to the South Tower rescue effort).[3]

What remains at issue--and it is critical to benefit entitlement-- is whether Glenn Winuk, an admittedly experienced, well trained, and top performing volunteer firefighter and EMT for many years was, in fact, at the time he rushed to engage and assist in 9-11 rescue operations, a "public safety officer" within the meaning of the PSOB Act (1) generally authorized to represent his home department, i.e., the Jericho Fire Department, in providing the kind of EMT public safety services that he clearly engaged in on the morning of September 11, 2005 and (2) specifically authorized to join in (as in fact he did) the New York City Fire Department's ongoing rescue and response operation that fateful morning.

**Conclusions**

Based on the body of post appeal evidence provided in this claim and clarification of the status of Glenn Winuk as a continuing member ( i.e., "associate member" at the time of his death) in the Jericho Fire Department, a legally organized volunteer fire department, of the State of New York, and review of evidence relative to the conditions of New York Law under which volunteer firemen may provide emergency assistance to paid or volunteer fire departments outside the borders of their home departments (General Municipal Law §209-i), the undersigned hearing officer has concluded that Glenn Winuk's EMT assistance to the New York City Fire Department (FDNY) in responding to the 9-11 emergency:

(i) was provided as an officially recognized member of the Jericho Fire Department within the meaning of he Public Safety Officers Benefits Act [42 USC §3796b(7)] unaffected by "associate member" restrictions which prevented him from engaging in firefighting activities ( as opposed to emergency medical technician assistance), and

(ii) his conduct in offering and contributing EMT assistance in the South Tower response effort of the New York City Fire Department met the authorizing conditions required by New York law to join in and assume the powers, privileges and immunities of FDNY firefighters engaged in that operation.

**Discussion of the Issues**

1. <u>Winuk's Status as Public Safety Officer within Meaning of PSOB Act.</u>

The PSOB determination, in explaining the evidentiary deficiencies which led to its denial of benefits, first indicated that the claimants had failed to supply a certification that

---

3 These include, for example the National EMS Memorial Service (May 2003 ceremony), International Association of Fire Chiefs Volunteer and Combination Officers Section (May 2002 letter tribute), Nassau County, New York Legislature (June 2002 citation), New York City Mayor's Office (November 2001 letter tribute), New York Senate (2005 letter tribute),Congressional recognition (March 2005 letter tribute) and Mr. Winuks' own Jericho Fire Department (memorial plaque and annual ceremony).

Glenn Winuk was a public safety officer employed by either the Jericho Fire Dept. or the New York City Fire Dept. who was "killed in line of duty in connection with a terrorist attack" and, in view thereof, was not entitled to the expedited benefits processing authorized by Section 611 of the USA Patriot Act. This appears to be a proper assessment.

BJA cited the two letters from the Jericho Fire Chief (March 31 and May 1, 2002) which were filed with the Winuks' PSOB benefits claim. Although they both opined that Glenn Winuk "should be recognized by all as having been lost in line of duty while acting as a rescuer representing the Jericho Fire Department " (March 31) or acting as a bona fide agent of the Jericho Fire Department and "directly on its behalf while assisting FDNY with emergency scene operations in the South Tower" (May 1), it does seem debatable that these amounted to the clear and direct certification required by the Patriot Act for special expedited treatment. Nor did a letter from the Chief of the New York Fire Department (April 2, 2002) which denied that Glenn Winuk was a member of that Department contain any such certification.4

As regards the general proposition of whether Winuk had PSOB "public safety officer" status as a member of the Jericho Department, the BJA determination referred to the fact that Winuk had taken associate member status at Jericho (after 15 years of active status) and, as a result thereof, was no longer authorized to engage in "firemanic activity" for Jericho (Jericho FD By-laws Art. IX, transcript exh. 13). This was quite correct but BJA assumed, incorrectly according to claimants, that Winuk was also not authorized to engage in EMT services for and on behalf of Jericho FD. Hearing testimony indicates that this was not the case and had BJA probed further, it would have discovered that "firematic activity" denoted only firefighting duties and not EMS ( emergency medical assistance services).

Witness John Navaretta, a former New York City Fireman, former First Assistant Chief of the Jericho Department and friend and mentor of Glenn Winuk affirmed that once Glenn became an associate member at Jericho, he could no longer perform firematic duties but that his ability to undertake EMT duties would not be affected by that ban so long as he kept up his credentials. 5 Moreover, the Jericho Fire Department, through 2001, was the common central dispatch center to call out members for both its fire department and its EMT company (of which Glenn Winuk was a member) with separate pagers for each element, i.e., for firefighting and EMT rescue calls (hearing transcript, pp. 41-42). 6 Nor does it appear that there exists or existed any explicit provision in the Jericho FD by-laws barring EMT activity by associate members (as opposed to firematic activity).7 Indeed, under New York benefits law, members of volunteer fire departments, even if not trained or authorized for firematic work, may be entitled to benefits for injury sustained in providing EMT-type aid. NY State Comptroller op. # 87-15. In this case, the latter

(i) is what Glenn Winuk maintained current competency, training and certification to engage in for Jericho FD and other public safety agencies, and

4. See hearing transcript, pp. 67-68 (discussion of letter and its content, including views of FDNY Fire Commissioner questioning the accuracy of its conclusions).

5. Hearing transcript, p.54; see also, letter (9-9-05), Captain Lisa Gloffke, former NYFD EMS battalion commander, detailng distinction between firematic and EMS functions.

6. Hearing transcript, p. 41-42 . Winuk even had separate Jerico FD badges for each category of activity, one of these reading "E.M.T. Jericho Fire Dept" (exh. 17).

7. See hearing transcript, exhibit 14 ( Jericho FD by-laws which make mention only of "firematic activity" as something in which associate members may not participate).

(ii) is exclusively what he undertook to provide in the South Tower on September 11( as demonstrated by his accumulation and his use on site of EMS implements and supplies).8

In this connection, the former Commissioner of the FDNY (in service as Commissioner and actually present at the Trade Center soon after after the terrorist strike) made it clear as a hearing witness that EMT assistance (and not firefighting endeavor) was the primary undertaking of his Department in the South Tower on the morning of September 11:

"People with cuts and burns and just people needed to be carried and men that needed oxygen from helping other people, other men or women. So there were--there was--you couldn't have enough. You couldn't have enough EMT's, paramedics, especially there was more medical work to be done that day and assisting of civilians than there was actual fire duty.

We never made any effort to put that fire out. We never made any effort to--we took hoses up. Which I still don't understand why with all of that extra weight. I would have told the guy(s) just leave them downstairs. There was no effort to put the fire out. The effort was a rescue event and medical assistance effort." (T. Von Essen, hearing transcript, pp. 64-65).

With the foregoing information in hand and on record (much of it not available to or considered by BJA at the time of its adverse benefit determination), there seems no evidentiary basis in this case for denying that Glenn Winuk met the following definition of "public safety officer" under the PSOB Act:

"An individual serving a public agency in an official capacity, with or without compensation, as a . . . member of a rescue squad" [42 USC § 3796b(7)]

The "public agency" in this case is the Jericho New York Fire Department and the official capacity enjoyed by Glenn Winuk was as a member thereof (albeit "associate member") authorized and qualified to engage in rescue squad activities for that agency. 9

The issue now arises as to whether public safety officer Winuk died as the result of injury sustained "in line of duty". That would depend on whether his efforts at the World Trade Center were authorized by and met the conditions of relevant state or local rules, regulations or law as required by the PSOB Act [28 CFR § 32.2(c)(2)]10. In this case, the critical factor would be existing state legislation governing the ability of members of volunteer fire departments In New York to offer assistance to neighboring departments outside their areas of regular operation in dealing with a "fire or other emergency" in progress. (NY Municipal Law §209-i). To that issue, attention is now directed.

---

8. See Sanders affidavit, hearing exh. 4.

9. It should be noted that the original Report of Public Safety Officer's Death in this claim characterized Glenn Winuk's status as "Associate Non-Active Member of Jericho FD" (item 10) but the Department by-laws (transcript exh. 13) refer only to "Associate Membership" and do not use or define "non-active" terminology and status.

10. This PSOB regulation purports to define "line of duty" and reads, in pertinent part:
"(c) Line of duty means:
(2) Any action which an officially recognized or designated public employee member of a rescue squad or ambulance crew is obligated or authorized by rule, regulation, condition of employment or service, or law, to perform."

2. Winuk efforts at World Trade Center as "line of duty" activity under PSOB Act.

Early in prosecution of this PSOB survivor benefits claim, it was asserted that Glenn Winuk's activities met the requirements of New York State Municipal Law §209-i which provided authority for volunteer firemen to respond to emergencies outside of their jurisdiction (letter dated May 1, 2002 from Chief Lottes, Jericho FD to Winuk family which was submitted to PSOB in support and as a component of claim application).[11] The PSOB denial determination acknowledged this letter and referred to that assertion but determined that it (and other expressions of grounds for PSOB coverage) did not constitute the certification required by the Patriot Act for expedited payment of PSOB claims.[12]

The OJP determination letter did not address generally the matter of Municipal Law §209-i application in its substantive analysis of Glenn Winuk's benefit eligibility, apparently because of its assumption that Mr. Winuk's "associate member" status barred him from capacity for service as a "public safety officer" or "officially designated member of a legally organized fire department" within the meaning of the PSOB Act. However, as indicated by discussion in the preceding section and its conclusion that the evidence does indeed support Mr. Winuk's status at time of death as a current member of such an organization (Jericho Fire Department) authorized to engage in rescue or medical services on its behalf, the issue of proper permission under relevant New York State law, i.e., Municipal Law §209-i becomes critical to determination of whether his EMT assistance at the World Trade Center on September 11, 2001 to neighboring jurisdiction New York City and its firefighting units constituted "line of duty" effort there (another requirement of the PSOB Act).

Briefly summarized, General Municipal Law §209-i provides that a volunteer fireman who is aware of, present at, and wishes to lend assistance in the handling of a "fire or other emergency" that has occurred "outside the area regularly served by the fire company or fire department of which he is a member" must first report to, offer his services, and seek permission of a command officer of the department "engaged in the handling of any such fire or other emergency" and after his services are accepted, shall be entitled to participate and provide help as if he were a member of the department accepting those services (see hearing transcript, exh. 8, for full text of GML §209-i). It is clear, therefore, that whatever Glenn Winuk's status and authority as a member of the Jericho Fire Department might be, his assistance at the South Tower and his death in the course of that endeavor could not be considered the "proximate result of a personal injury sustained in the line of duty" under the PSOB Act [42 USC §3796(a)] without the out-of-jurisdiction offer/acceptance of services and legitimation required by GML §209-i.

---

11. Cover letter of Jay Winuk to BJA (Dec. 18, 2003 transmitting the Winuk benefits claim and supporting documentation

12. As stated in the BJA denial determination, "While Chief Lottes' letters to Jay Winuk assert certain propositions and provide some information, they do not qualify as a certification, as required by the Patriot Act, that Mr. Winuk was a public safety officer employed by the Jericho Fire Department who died in line of duty on September 11, 2001" It should be noted that at the appeal hearing, such a certification was submitted (transcript, exh. 2, letter from Jericho FD Board of Fire Commissioners, 4-7-05 (1st par.), but with this claim then in appeal posture, that documentation would seem too late to meet Patriot Act application and procedural processing requirements.

It should be obvious in the case at hand-- literally the worst and most deadly fire emergency ever experienced in the State of New York-- that problems of proof (or disproof) with respect to the Municipal Law 209-i offer-of-service and acceptance-of-service mandate would be enormous. In the absence of survivors present in the South Tower (responders or victims) incident to and after impact of implosion, not to speak of the confusion and desperation facing victims and first responders alike, the ability to prove by direct observation, account, or recall whether Glenn Winuk displayed his credentials and offered services to command personnel on the scene and whether those were accepted before he began his EMS participation is daunting. Nevertheless, prima facie burden of proof on that point as well as others in this claim (as, indeed, in all PSOB benefit claims) necessarily rests on the claimants' shoulders.

There is, however, a surprising supply of circumstantial and historical evidence in this record that would bear upon the critical question of whether Glenn Winuk identified himself as an out-of-jurisdiction fire department EMS operative, offered his help to a command officer overseeing South Lobby rescue operations and was cleared by that person to join other personnel desperately trying to cope with the tragedy in progress. Whether that evidence suffices to establish a prima facie case for claimants, absent their earlier inability to comply with the USA Patriot Act's expedited and simplified procedure for submission and validation of PSOB claims12.1 is, of course, critical to the outcome of claimant's' appeal. Much of this evidence, both documentary and testimonial in nature, was brought into the record at post-appeal junctures. It is virtually all positive in nature and, in the hearing officer's judgment, suffices to establish a prima facie case in favor of GML 209-i compliance which is opposed by only one contrary (and largely unexplained) offering. It consists of the following:

(a) Established Expertise and Training. Unopposed testimony that Glenn Winuk's level of competency, experience and training was such that he would never approach an emergency assistance role in a neighboring department without reporting to and seeking permission and direction from the officials in charge of the operation ( J. Navaretta, hearing transcript, pp. 52-53).

(b) Prior Mutual Aid Assistance Rendered in New York City. Testimony describing Glenn Winuk's rendering of EMT assistance in New York City on two earlier occasions--first World Trade Center bombing in 1993 and NY subway explosion in 1998 (J. Navaretta, hearing transcript, pp. 25-30), in each case demonstrating knowledge and compliance with need to check in, offer services and obtain command personnel approval.

(c) Prior Mutual Aid Assistance rendered Outside New York City. Testimony describing Winuk's rendering of EMT assistance in Suffolk County re wild fire emergency and Cove Neck, Long Island re the 1990 Avianca plane crash, again suggesting compliance with identification and command approval procedures for offering mutual aid ( J. Navaretta, hearing transcript, pp. 31-33; also hearing exh. 12 citation).

---

12.1 Claimants stressed at the hearing that Jericho FD letters submitted in support of benefit eligibility (Chief Lottes, Mar. 31 and May 1, 2002) were intended as certifications required to meet PSOB and Twin Towers Fund requirements even if they failed to achieve this result in the case of PSOB. Hearing Transcript, attorney argument, pp. 78-81, and Exh.2 ( April 7, 2005 letter from Chairman, Jericho FD Board of Fire Comm'rs).

(d) Ability to Access and Remain with other Rescue Workers Inside Heavily Secured South Tower Rescue Staging Area. Testimony describing difficulty of access to South Tower area after the terrorist strike for those not identified or determined to be qualified emergency medical care or rescue workers (FDNY Lieutenant J. Sanders, hearing exh. 4 affidavit, and FDNY Fire Comm'r Von Essen, hearing transcript p. 58-59)13

(e) Near Certainty that any South Tower FDNY Commander would accept assistance offers tendered by credentialed EMT's like Winuk. Testimony by the then New York City fire commissioner describing his own willingness and that of the FDNY South Tower commanders on 9-11 to accept any such offer of assistance ( T. Von Essen, hearing transcript, pp. 62-63 and letter to PSOB Hearing Officer, 10-21-2004.)14

(f) Clear Accoutrements of Winuk's EMT Identity and Activity at South Tower Lobby Area. This included EMT medical bag, surgical gloves and stethoscope on person, volunteer fire department ID card in wallet, and location in same area where several other rescue workers' bodies were recovered.(Sanders affidavit, hearing transcript exh. 4 and 5.)

With the foregoing testimony and record documentation as to Glenn Winuk's experience, training, dedication and past professional performance in firefighting and rescue work (which the hearing officer finds highly credible), it is hard to believe (or conceive) that he would exhibit the bad judgment of undertaking EMT services in ongoing operations of the State's largest and most professional firefighting department without first approaching command personnel in charge, establishing his qualifications, and offering his help. It is equally difficult, under the conditions and unprecedented emergency circumstances in the South Tower outlined by then Commissioner Von Essen (especially in

---

13. "The lobby of Tower Two was quickly secured not long after the planes hit and it is highly unlikely that Mr. Winuk would have been granted access unless it was officially determined by emergency officials or emergency medical care on the scene that he was a qualified rescue worker. Sanders affidavit, par. 2, transcript exh. 2.

14. "Question: Is it virtually certain in your mind that they (NYFD commanders, lieutenants, and other officers) would react the same way (ask for and accept assistance) if somebody presented the credentials that Glenn did?

Witness (Von Essen): No question about it. They were overwhelmed, and the amount of people that were coming down out of that building, that were injured, people overcome, just exhausted, you know, people, men, women, overweight, having palpitations, hit by a piece of debris on the stairwells that hadn't held--a lot of damage. . .People with cuts and bums and just people needed to be carried and men that needed oxygen from helping other people, other men or women. So there were--there was--you couldn't" have enough EMT's, paramedics, especially there was more medical work to be done that day and assisting of civilians than there was actual fire duty." Transcript at 63-64.

Cf. Von Essen ltr, exh.15, "In the face of the worst emergency situation our nation had ever seen, we needed all the qualified help we could get. There was no time, nor the inclination, to differentiate whether firefighters and rescuers were on or off, active or inactive."

view of the obvious and overriding rescue/medical services character of the Fire Department response at that time) to imagine that any command officer in charge of South Tower operations would exhibit the bad (indeed close to unimaginable) judgment of not accepting the services of a volunteer fire department member anxious to serve and with ID credentials on his person. Moreover, the clear (indeed obvious) indices of proof that Glenn Winuk was killed in the course of the rendering such services inside tightly controlled perimeters of access to the South Tower and an area occupied by other stricken rescue workers further bolsters what already appears to be a rather convincing case of New York Municipal Law § 209-i offer/acceptance compliance.

As against this prima facie showing, the record is clear of contradictory evidence except for one item--and that is not a negligible one. That is the letter sent to brother Jay Winuk from Fire Department Chief Daniel Nigro dated April 2, 2002 praising and recognizing Jay Winuk's heroism for lending assistance as an EMT at the World Trade Center on September 11 but asserting without explanation in a short prefatory declaration that Glenn Winuk

> "was not a member of this Department [FDNY] and not acting pursuant to this Department's direction that day"16

No reference to or understanding of possible application or involvement of GML§209-i appears in the letter and it seems strange that the Chief would offer no rationale or documentation for its negative conclusion as a matter of courtesy to the survivors of an recognized 9-11 hero like Glenn Winuk.17 The hearing record, moreover, contains testimony questioning the accuracy of this conclusion. Fire Commissioner Von Essen stated as a witness:

> "I can't put words in Chief Nigro's mouth. He was chief of operations during September 11. We made him chief of the department because we lost our chief of the department that day. Dan was never in the building. He was outside the building the whole time, and I would think that knowing how the department works, that he was getting several letters and requests for recognition of different people and then he went to the lawyers, and the lawyers said he wasn't member of the department; he was not acting officially as he didn't come in with a truck from Jericho, and said you'd better protect the city and put that down. . . I can't believe that it's accurate because he's--he's a firefighter and he knows that this person, as soon as he identifies himself as an EMT, that someone which could be considered as acting under the direction of would ask him to help." Hearing transcript, pp. 67-68.

While Chief Nigro's unsupported statement merits consideration, this hearing officer finds that Commissioner Von Essen's above testimony is convincing as rebuttal to the lack or

---

16. The letter was no more than three short sentences, two of which conveyed the news of Glen's death and expressed sympathy to his family. The declaratory statement itself was was a prelude to recognition of Glen's heroism and read, in full text:

> "Although he was not a member of this Department and was not acting pursuant to this Department's direction that day, the Department nevertheless is honored to write this letter in recognition of his heroic efforts."

No other document or basis or explanation for that conclusory assertion appears to have been submitted of record by or on behalf of the FDNY.

17. News reports of Glenn Winuk's heroic endeavor had appeared long before Chief Nigro's letter (e.g., NY Times article, sec. B1 (9-30-01), Newsday article, p. 25 (9-19-01).

unlikelihood of Departmental approval and acceptance of Glenn Winuk's EMT services.

**Findings**

Having explored and explained in the previous section, the evidentiary basis for concluding that Glenn Winuk at the time of his death (1) was a public safety officer within the meaning of the PSOB Act authorized by the volunteer fire department in which he held membership for more than two decades to provide emergency rescue and EMT services and assistance, and (2) did in fact provide such services for the New York City Fire Department on September 11, 2001 in compliance with the conditions of "offer and acceptance" established by New York State Law for rendering aid to departments outside the area regularly served by home fire departments[18], the undersigned hearing officer now makes his findings as follows.

1. Glenn Winuk, on the date of his death and while rendering (or endeavoring to render) emergency medical technician (EMT) services to injured victims in the South Tower of the World Trade Center, was a member of the Jericho Fire Department of Jericho, New York, a legally organized volunteer fire department.[19]

2. As a current associate member of the Jericho Fire Department, Glenn Winuk was not authorized to engage in firefighting activities but he was authorized to represent and to engage in medical assistance and rescue activities for the Jericho Department and its rescue squad and thus was a "public safety officer" potentially under the coverage and within the meaning of the PSOB Act and its regulations [28 CFR §32.2(j)].

3. Glenn Winuk's training, previous record of participation in mutual aid operations for other departments, and ability on September 11 to bring himself within New York Fire Department security perimeters and staging areas for rendition of rescue services at the South Tower constitute prima facie evidence that he presented himself and his credentials to FDNY command personnel directing emergency operations in the South Tower and offered assistance in those efforts.

---

18. In the pre-hearing brief submitted by claimants' attorney in this case (and in hearing argument as well), the appropriateness of expansive interpretation of the PSOB Act and of "resolution of reasonable doubt arising from the circumstances of the officer's death" in favor of payment of benefits" (the latter per PSOB Regulation 28 CFR §32.4) is pressed. See transcript, exh. 1 and testimony pp. 108-9. Here in view of the absence of available witnesses to the circumstances of Glenn Winuk's interaction with the department to whom he was attempting to provide clearly needed assistance in the South Tower, that regulatory mandate seems particularly apt--and it has been so regarded by the hearing officer in weighing the factual circumstances as to which conclusions must be drawn for case resolution and addressing doubts based on gaps in available evidence. Nevertheless, the logic of the circumstances surrounding the "emergency assistance" issues in contention seems fully capable of standing on its own feet and without benefit of special interpretive preferences.

19. In further validation of this finding of active and viable membersip in Firefighter Winuk's home department, at least for purposes of rendition of the kind of emergency medical services which cost him his life while assisting the NYPD rescue effort at the World Trade Center, the State of New York recently confirmed by legislative act, that Winuk's associate membership in the Jericho Fire Department should properly be deemed "full active employment status" with that department, accompanied by "eligibility for all benefits, commendations, awards, and other rights and privileges" associated with fully active status. Ch. 368, Laws of New York--2005, effective August 2, 2005.

4. Glenn Winuk's actual rendition of EMT services at the South Tower, as evidenced by materials and implements found with his person, coupled with the knowledge of FDNY onsite command personnel directing rescue operations of the acute need for qualified EMT assistance to respond to unmet victim needs constitutes compelling evidence that such command personnel gave permission to Glenn Winuk to lend EMT assistance within the meaning and scope of New York Municipal Law §209-i (Emergency Service by Volunteer Firemen).

5. The single document of record from the New York City Fire Department containing an unexplained and unsupported assertion by command personnel not present in the South Tower that Glenn Winuk, in providing EMT services there on September 11, was not acting under the Department's direction, is not deemed sufficiently persuasive to rebut claimants' prima facie case of compliance with New York Municipal Law §209-i

6. Glenn Winuk's death, in the course of providing EMT services for NYFD rescue operations responding to the 9/11 terrorist attack in compliance with the offer-and-assistance requirements of New York Municipal Law §209-1, was the proximate result of injury sustained in line of duty by a public safety officer under the benefit eligibility provisions of the Public Safety Officers' Benefits Act [ 42 USC §3796(a)].

**Determination**

Based on evidence presented and adduced following the initial denial of benefits in this claim, it is the hearing officer's determination that the claimants, Glenn Winuk's surviving parents, are entitled to receive PSOB death benefits under the Public Safety Officers Benefits Act, 42 U.S.C. §3796(a) and implementing regulations. The PSOB Program Office's denial of benefit eligibility should be changed to permit such payment.

SIGNATURE [signature] Date: 9-10-05