# FINAL AGENCY DETERMINATION

**PSOB Claim No. 01-911-0421**
**Glenn J. Winuk**

## Factual Background

Glenn J. Winuk (the "decedent") died September 11, 2001, at the World Trade Center. He was employed as an attorney at Holland & Knight, LLP, working about one block from the World Trade Center. That fateful September morning, after helping evacuate occupants of his law firm's building, the decedent was last seen alive "donning EMS equipment" and running toward the World Trade Center.[1] In or about March 2002, rescue workers found the decedent's body in an area that was determined to have been the lobby of the South Tower.[2] He was wearing surgical gloves, wearing or holding a stethoscope, and "[b]eside him was a medical bag that is commonly used by first responder emergency medical technicians."[3] In the decedent's wallet, which was in his pants' pocket, was a photo identification card that appears to have been issued by the Jericho (NY) Fire Department.[4]

Beginning in 1979, and continuing until his death, the decedent was a member, in various capacities, of the Jericho Fire Department. Although he was an active member of that Fire Department for many years, at the time of his death the decedent held associate membership.[5] Associate members are not active members and are not legally authorized to engage in activities on behalf of the Fire Department.[6] The decedent, similarly, was not, at the time of his death, an active member of the Jericho Fire Department or responding to the World Trade Center on its behalf.[7]

---

[1] *Aff. of William J. Honan.*

[2] *Aff. of Lieutenant Joseph Sanders, FDNY.*

[3] *Id.* With his March 3, 2006, letter to PSOB Office Director Hope Janke, claimants' counsel supplied a picture of this medical bag.

[4] *Id.*; *Hearing Officer Determination ("HOD"), Exhibit 3, p. 4.*

[5] *HOD, Exhibit 2.*

[6] *Letter from Joseph Frank, General Counsel to the Board of Fire Commissioners of the Jericho Fire District, to the United States Department of Justice, Office of Justice Programs, Office of the General Counsel (January 10, 2006) ("Jericho Fire District General Counsel Opinion Letter").*

[7] *Id.*

At times during his career (*i.e.*, March 31, 1981, through March 31, 1984; and March 31, 1985, through March 31, 1988), the decedent maintained New York State certification as an emergency medical technician ("EMT").[8] He, however, was not certified by the State of New York in any emergency medical services on September 11, 2001.

In December 2003, the decedent's parents submitted to the Bureau of Justice Assistance ("BJA") a claim seeking an award of death benefits on account of their son's death. The benefits sought are awarded pursuant to the Public Safety Officers' Benefits ("PSOB") Act proper, 42 U.S.C. § 3796(a), or pursuant to Public Law 107-37 (a parallel statute, with expedited-award provisions, limited to September 11, 2001).[9] For claimants to prevail, the provisions of the PSOB Act *or* Public Law 107-37 must be satisfied.

## Procedural Background

### Initial Determination

In July 2004, the PSOB Office determined that the decedent's death was not covered by the PSOB Act or Public Law 107-37. As to the latter, the Office found that the claim was not governed by the relevant provisions of Public Law 107-37 because BJA did not receive a "certification that [the decedent] was a public safety officer employed by any of the agencies that responded to the September 11, 2001 terrorist attack." The PSOB Office reached this conclusion

---

[8] *Memorandum from Daniel J. Clayton, Senior EMC Representative, State of New York, Department of Health, Bureau of EMS, to U.S. Department of Justice (June 14, 2006) ("Memorandum of the State Department of Health").*

[9] On September 18, 2001, an act entitled "Expedited Payment for Heroic Public Safety Officers," Pub. L. No. 107-37, 115 Stat. 219, 219, was signed into law by the President. Section 1 of that statute, as amended by section 612 of the USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272, 369 (Oct. 26, 2001), provides--

> [U]pon certification (containing identification of all eligible payees of benefits pursuant to section 1201 [of the PSOB Act]) by a public agency that a public safety officer employed by such agency was killed or suffered a catastrophic injury producing permanent and total disability as a direct and proximate result of a personal injury sustained in the line of duty as described in section 1201 of such Act in connection with the rescue or recovery efforts related to the terrorist attacks of September 11, 2001, the Director of the Bureau of Justice Assistance shall authorize payment to qualified beneficiaries, said payment to be made not later than 30 days after receipt of such certification, [death and disability] benefits described under . . . such Act (42 U.S.C. 3796 et seq.).

Public Law 107-37 goes on to provide that certain of its terms have the same definitions that those terms have under the PSOB Act. About five weeks later, the USA PATRIOT Act was signed into law. Section 611(a) of the USA PATRIOT Act re-enacted all the provisions of Public Law 107-37 into law, except that it clarified that "section 1201" meant section 1201 of the PSOB Act and it generalized "the terrorist attacks of September 11, 2001" to "a terrorist attack." Although neither Public Law 107-37 nor section 611 of the USA PATRIOT Act amends the PSOB Act, the provisions of section 611 were codified (unofficially) at 42 U.S.C. § 3796c-1, right after the unofficial codification of the PSOB Act's death and disability benefit provisions. Thus, section 3796c-1 offers a federal benefit practically identical to that offered by the PSOB Act.

notwithstanding two letters from John E. Lottes, Chief of the Jericho Fire Department. In the first letter, dated March 31, 2002, and addressed to the Deputy Director of the Twin Towers Fund, Chief Lottes stated that in his view "[the decedent] should be recognized by all as having been lost 'in the line of duty' while acting as a rescuer representing the Jericho Fire Department." In the second letter, dated May 1, 2002, and addressed to the decedent's brother, Chief Lottes wrote that "in [his] opinion, [the decedent] was acting as a *bona fide* agent of the Jericho Fire Department, acting directly on its behalf, while assisting FDNY with rescue and emergency scene operations . . . ." Although these letters "assert certain propositions and provide some information," according to the PSOB Office determination, "they do not qualify as a certification, as required by the PATRIOT Act, that Mr. Winuk was a public safety officer employed by the Jericho Fire Department who died in the line of duty on September 11, 2001."[10]

With respect to the PSOB Act itself, the determination further concluded that the decedent, an "associate non-active member" of the Jericho Fire Department, was not authorized "'to take part in firematic [*sic*] activity.'"[11] The decedent, therefore, "was not, and did not have the authority to act as, a 'public safety officer' within the meaning of the PSOB Act at the time of his tragic death." Pursuant to 28 C.F.R. § 32.24(a), the decedent's parents appealed the PSOB Office's denial of their claim.

**Hearing Officer's Determination**

The appeal was assigned to an independent hearing officer in September 2004. He conducted a hearing on April 14, 2005, and rendered his decision on September 10, 2005, finding that the decedent's death was covered by the PSOB Act. In reaching a conclusion at odds with the PSOB Office's determination, the hearing officer dispatched with its stated impediment to payment – the decedent's status, at the time of his death, as an associate non-active member of the Jericho Fire Department unable to engage in firemanic activities. The hearing officer, rather, concluded that the emergency response at the World Trade Center was a rescue and emergency-medical effort, not a fire suppression effort, and that the decedent died providing emergency medical, not firefighting, services; the decedent's associate-member status only limited his authority to fight fires and not his authority to serve as an EMT; as an EMT, according to the hearing officer, the decedent was certified and "authorized to represent and to engage in medical assistance and rescue activities for the Jericho [Fire] Department . . . ."[12]

---

[10] Although Chief Lottes' letters (which, as indicated above, are not addressed to the federal government) are dated 2002, copies of them were not received by BJA until December 2003.

[11] *Quoting Letter from Marge Blais, Jericho Fire Department, to Eileen Garry, faxed April 19, 2004.* Ms. Blais' description of associate-member status refers to "firematic activity," although "firematic" does not appear to be a word. The Jericho Fire Department's by-laws, to which Ms. Blais' letter was addressed, use the word "firemanic," which is defined as, "of or relating to fire fighters or to fire fighting." Webster's Third New International Dictionary (unabridged) (1971).

[12] *HOD, p. 10.*

In sum, the hearing officer concluded that the decedent provided "EMT assistance to the New York Fire Department (FDNY) . . . as an officially recognized member of the Jericho Fire Department . . . unaffected by 'associate member' restrictions[,] which prevented him from engaging in firefighting activities;" moreover, his assistance "met the authorizing conditions required by New York [General Municipal Law § 209-i] to join in and assume the powers, privileges and immunities of FDNY firefighters engaged in that operation[,]"[13] and, accordingly, that the decedent was a public safety officer who died in the line of duty and whose death was covered by the PSOB Act.

Pursuant to 28 C.F.R. § 32.24(h), on December 16, 2005, I exercised my authority to review the hearing officer's determination.

**Discussion**

The terrorist assault on these United States on September 11, 2001, stunned the Nation and the world. Over twenty-seven hundred innocent lives were taken that day in the atrocity that unfolded at the World Trade Center in New York City. Through the recovery efforts and survivors' eyewitness accounts, many stories are known about the selflessness and heroism that day of numberless businessmen, rescue workers, firefighters, police personnel, tourists, and good Samaritans. Not all of these heroes received (or are entitled to receive) a federal benefit from BJA; not all of these heroes – even those who paid the ultimate price – were, within the meaning of the PSOB Act or Public Law 107-37, public safety officers whose response that day was in the line of duty. BJA's award of a federal benefit to some, but not to others, does not diminish the sacrifice made by any of them, or signal an ungrateful nation or lack of honor. It is a recognition, rather, that some are covered by a federal law, and others are not.

The decedent is one of those heroes; someone who sacrificed his life by running *to*, not *away from*, the World Trade Center; someone who showed no hesitation when others, even strangers, were in need. For his courage and selflessness under the most awful circumstances, he has my profound admiration and praise. Given the virtues that the decedent exemplified in life and in death, it is entirely unsurprising that the record contains so many tributes to and letters extolling his character, detailing and recalling his good works, and announcing posthumous honors, among which is nothing less extraordinary than a legislative act of the State of New

[13] *HOD, p. 3.* As I explain more fully below, the hearing officer's factual and legal conclusions were not supported by the record before him, and are not supported by the more developed record now before me. The failure of the facts to support the hearing officer's legal conclusion, in some instances, was patent on the face of his determination; for example, even though he relied upon New York General Municipal Law ("GML") § 209-i, which requires that an individual be an *active* volunteer member of a fire department or company, the hearing officer never found that the decedent was an *active* volunteer member of the Jericho Fire Department (as, indeed, he could not, based on the record).

York.[14]

The PSOB Act and Public Law 107-37, however, do not provide a federal benefit payable any time an individual dies a heroic death. What they provide (in relevant part), rather, is a death benefit[15] to the statutory survivors of each "public safety officer" serving "a public agency in an official capacity, with or without compensation, as a law enforcement officer, as a firefighter, as a chaplain, or as a member of a rescue squad or ambulance crew,"[16] payable (in the case of the PSOB Act) "[i]n any case in which [BJA] determines, under regulations issued pursuant to [the Act] that [such] public safety officer has died as the direct and proximate result of a personal injury sustained in the line of duty . . ."[17] or (in the case of Public Law 107-37) "upon certification . . . by a public agency that a public safety officer employed by such agency was killed . . . as a direct and proximate result of a personal injury sustained in the line of duty . . . in connection with the rescue or recovery efforts related to the terrorist attacks of September 11, 2001. . . ." The decedent is not covered, therefore, unless he was a public safety officer and he died directly and proximately from an injury sustained in the line of duty, within the (identical) meaning of the PSOB Act and Public Law 107-37.

Determining whether an individual was a public safety officer for purposes of these statutes, and whether a public safety officer died in the line of duty, often presents a difficult task, and this claim is no exception. The hearing officer wrote a lengthy opinion attempting to apply these concepts to the decedent's case, but in several significant respects, his determination missed the mark. Upon review of that determination, I decided that further consideration of this claim was warranted. The hearing officer, for example, based upon testimony from a friend of the decedent who had not been associated with the Jericho Fire Department in over fifteen years, assumed that associate membership in that Fire Department applied one way for individuals fighting fires, and another way for individuals providing emergency medical services. Nothing from the Jericho Fire Department itself, however, supported this. Rather than guess at this point, all that was needed was to follow up with the individual whom the Chairman of the Jericho Fire District expressly identified for such official purposes – Joseph Frank, General Counsel to the

---

[14] *E.g., April 12, 2005, letter from State Senator Carl Marcellino to Hearing Officer Daniel Skoler; March 25, 2005, letter from Representative Peter King (NY) to Attorney General Alberto Gonzales; October 21, 2004, letter from Thomas Von Essen to Hearing Officer Daniel Skoler; June 26, 2003, letter from Kevin L. Dillard to Lisa Gloffke; June 22, 2002, Citation from the Nassau County legislature; undated Citation from the Office of the Town Board of the Town of Oyster Bay.*

[15] $250,000, adjusted in accordance with 42 U.S.C. § 3796(h), (i). Unless otherwise noted, statutory citations are to the law applicable to a death occurring on September 11, 2001.

[16] 42 U.S.C. § 3796b(8)(A).

[17] 42 U.S.C. § 3796(a).

Board of Fire Commissioners of the Jericho Fire District,[18] whose official Opinion Letter (requested as part of my review of the hearing officer's determination) makes clear that associate membership in the Jericho Fire Department restricts a volunteer firefighter's activities on behalf of the Fire Department, regardless of the nature of the activity (*i.e.*, regardless of whether the activity is fire suppression or rescue/first aid activity).

The hearing officer's opinion missed the mark in another way; for example, it relies upon a New York law that required that the decedent be an *active* volunteer member of the Jericho Fire Department, yet the hearing officer never determined if the decedent actually was an *active* volunteer member; instead, he recited (inappositely) that the decedent "maintained current competency, training and certification" in "EMT-type aid" and then asserted, *ipse dixit*, that in acting as an EMT the decedent did so on behalf of the Jericho Fire Department such that New York law authorized his response at the World Trade Center.[19] That is, the hearing officer appears to have believed that the decedent maintained current competency, training, and certification as an EMT and then to have assumed that such competency, training, and certification equated to being able to act on behalf of the Jericho Fire Department. Again, brief correspondence from the identified contact person, Jericho Fire District General Counsel Frank, further confirms what the record overall already indicated – that the decedent, at the time of his death, was *not* an active member of the Fire Department and *not* legally authorized to act on its behalf in any capacity; and the Memorandum of the State Department of Health (also requested as part of my review) makes clear that the decedent had not held any certification from the State in any emergency medical service since 1988.

In examining this record, it is essential to keep in mind the requirements of the PSOB Act (which are incorporated by reference in Public Law 107-37). The Act defines a "public safety officer" as "an individual serving a public agency in an official capacity, with or without compensation, . . . as a firefighter . . . or as a member of a rescue squad or ambulance crew . . . ."[20] The PSOB Act does not define what it means to "'serv[e] a public agency in an official capacity,'" but BJA, beginning over twenty-five years ago and continuing through today, consistently has understood "'serving a public agency in an official capacity' to mean [that] 'one must be an officer, employee, volunteer, or [in a] similar relationship of performing services as a part of a public agency. To have such a relationship with a public agency, an individual must be officially recognized or designated as functionally within or a part of the public agency.'"[21] The

---

[18] "Please coordinate with our District legal counsel . . . for matters relating to this process." *April 7, 2005, Letter from Chairman Biancanello to Hearing Officer Daniel L. Skoler.*

[19] *HOD, pp. 4, 5.*

[20] 42 U.S.C. § 3796b(8)(A).

[21] Administrator's Final Decision (July 8, 1980), reported in U.S. Department of Justice, *Legal Interpretations of the Public Safety Officers' Benefits Act*, at 9 (November 1981). The agency's Final Decision was appealed to court and affirmed in an unpublished decision, *Holstine* v. *Department of Justice*, No. 80-7477, slip op. (9th Cir. 1982), 688 F.2d 846 (table).

United States Court of Appeals for the Federal Circuit examined this articulation of BJA's and "[saw] nothing unreasonable in it."[22]

An understanding of the PSOB Act's "line of duty" requirement cannot be obtained from the statutory text alone because the Act, in the most general terms, provides that BJA may pay a benefit if it determines that the public safety officer "has died as the direct and proximate result of a personal injury *sustained in the line of duty* . . ."[23] BJA, as pronounced in its regulations, determines an injury to be sustained in the line of duty when it is suffered by a public safety officer (*i.e.*, an individual serving a public agency in an official capacity as, for example, a firefighter or member of a rescue squad or ambulance crew) in the course of performing an action that he "is obligated or authorized by rule, regulation, condition of employment or service, or law to perform . . . ."[24]

In rendering this Final Agency Determination, I considered the record before me concerning the decedent and his relationship with the Jericho Fire Department, and his authority and obligation to respond to the terrorist attacks on the World Trade Center. Substantial and significant new evidence relevant to the applicability of the PSOB Act to the decedent was received while I was conducting my review, and, in each instance, that evidence was provided to claimants' counsel for appropriate comment and response.[25] Thus, the record included documents and testimony provided to BJA or the hearing officer by or on behalf of the claimants, their counsel, or the decedent's brother,[26] and officials of the Jericho Fire Department and the State of New York, as well as the extensive arguments of claimants' counsel. With the foregoing background, I shall address the merits of the claimants' claim for federal benefits under the PSOB Act and Public Law 107-37.

---

[22] *Chacon* v. *United States*, 48 F.3d 508, 511 (Fed. Cir. 1995). Other courts also have recognized the PSOB Act legal interpretations collected in U.S. Department of Justice, *Legal Interpretations of the Public Safety Officers' Benefits Act* as authoritative. *E.g.*, *Morrow* v. *United States*, 647 F.2d 1099, 1101-1102 (Ct. Cl. 1981); *Durco* v. *United States*, 14 Cl. Ct. 424, 427 (1988); *Tafoya* v. *United States*, 8 Cl. Ct. 256, 262-265 (1985); *North* v. *United States*, 555 F. Supp. 382, 386 (Cl. Ct. 1982).

[23] 42 U.S.C. § 3796(a) (emphasis added). Neither does Public Law 107-37 contain a definition of "line of duty."

[24] 28 C.F.R. § 32.2(c)(2). *See Budd* v. *United States*, 225 Ct. Cl. 725, 727 (1980) (finding this regulation to be consistent with the intention of the PSOB Act).

[25] The new evidence consisted of the January 10, 2006, Jericho Fire District General Counsel Opinion Letter and the June 14, 2006, Memorandum of the State Department of Health. In May, June, and July 2006, responses to one or the other of these evidentiary documents was received from claimants' counsel.

[26] The decedent's brother has provided documents to BJA and testimony before the hearing officer, but is not a claimant.

**Public Law 107-37 Certification**

The relevant public agency never provided a certification, within the meaning of Public Law 107-37, that the decedent was a public safety officer employed by it who died in the line of duty. Accordingly, this claim is not one covered by Public Law 107-37.

The claimants submitted to BJA two letters of the Chief of the Jericho Fire Department, which were written to third parties, and one letter of the Chairman of the Jericho Fire District, which was written to the hearing officer. None of these letters, however, certifies that the decedent was a public safety officer employed by the Jericho Fire Department who died in the line of duty on September 11, 2001. Chief Lottes and Chairman Biancanello, in their separate letters, stated how each thought that others *should* consider or *should* recognize the decedent and his death, but neither states (let alone *certifies*) that the Jericho Fire Department *actually* considers or recognizes the decedent as a "public safety officer employed by [the Fire Department who was] killed . . . in the line of duty as described in [the PSOB Act] in connection with the rescue or recovery efforts related to the terrorist attacks," which is what Public Law 107-37 expressly requires.[27] In another letter, Chief Lottes went beyond how he thought others should consider the decedent and actually made a statement about how he considered the decedent – "as a *bona fide* agent of the Jericho Fire Department, acting directly on its behalf, while assisting FDNY with rescue and emergency scene operations . . . ."[28] This vague and ambiguous statement (*e.g.*, what kind of agent, how was he assisting FDNY), however, is not an official legal certification of the Jericho Fire Department to BJA that the Jericho Fire Department considers the decedent to have been a public safety officer who was killed in the line of duty.

A certification consistent with Public Law 107-37 does not need to be a formulaic incantation, but it must provide a clear and unequivocal official statement to BJA of how the public agency actually considers the individual and the individual's activity at the time he suffered his fatal injury, and it must be sufficiently precise to enable BJA to determine that the individual satisfied the standards of the PSOB Act. Public Law 107-37, after all, requires expedited payment of a federal benefit when a public safety officer dies in the line of duty from injuries sustained in connection with certain efforts related to responding to a terrorist attack; it does not expand the class of individuals for whose death federal benefits may be paid under the PSOB Act. That is, a claim processed pursuant to Public Law 107-37 still must satisfy the standards for eligibility contained in the PSOB Act; in determining who may be "qualified beneficiaries" under Public Law 107-37, BJA, instead of independently finding facts, may, under Public Law 107-37, rely upon the public agency's certification of the following facts: the

[27] *E.g., March 31, 2002 Letter from Chief Lottes to the Deputy Director of the Twin Towers Fund* ("[the decedent] should be recognized by all as having been lost 'in the line of duty' while acting as a rescuer representing the Jericho Fire Department"); *April 7, 2005, Letter from Chairman Biancanello to Hearing Officer Daniel L. Skoler* ("[the decedent] should be considered to have been a public safety officer killed in the line of duty, and his death resulted from traumatic injuries").

[28] *May 1, 2002, Letter from Chief Lottes to the decedent's brother.*

deceased individual was a public safety officer of the agency, and he sustained his fatal injury in the line of duty as he responded (in at least one of several possible ways) to the terrorist attacks. Thus, BJA must determine that the public agency's statement suffices as a certification to it that clearly demonstrates compliance with the PSOB Act's standards.

None of the foregoing letters from Chief Lottes or Chairman Biancanello contained a clear or precise statement of how the Jericho Fire Department officially considers the decedent or demonstrates that the decedent satisfied the standards of the PSOB Act; none of the letters was a certification within the meaning of Public Law 107-37.

Even if one of the letters, or all of them combined, from Chief Lottes and/or Chairman Biancanello, were to be interpreted as containing the substance of what is required of a certification under Public Law 107-37, other (contrary) evidence and considerations in this claim make it untenable to accept such an interpretation as an unequivocal certification of compliance with the standards contained in the PSOB Act or otherwise dispositive of the claim. For example, the official Report of Public Safety Officer's Death *submitted to BJA by the Jericho Fire District* and dated March 31, 2004,[29/] which has not been rescinded or amended, expressly certifies that the decedent's "employment status when injury occurred" was "*Associate Non-Active* Member of Jericho Fire Department,"[30/] nor does it classify his status as "full-time," "part-time," or "volunteer;" moreover, the Report certifies that, at the time of his death, the decedent was not "working a regular shift or an assigned overtime shift." Such statements in the Report signed by David Marmann, Chairman of the Jericho Fire District, and submitted officially to BJA, are at odds with a finding that the decedent met the standards set forth by the PSOB Act.

Additionally, Jericho Fire District General Counsel Frank's statement, contained in his January 10, 2006, Opinion Letter, that the decedent did *not* respond to the World Trade Center on the Jericho Fire Department's behalf is absolutely opposed to a finding that the decedent met the standards set forth by the PSOB Act. Thus, even if any or all of the letters from Chief Lottes and Chairman Biancanello were interpreted as containing the substance of what is required of certifications under Public Law 107-37, when the other, official statements in the record from officials of the Jericho Fire District are considered, I am left with, at best, equivocation as to the application of Public Law 107-37 to the decedent.[31/] Under such circumstances, Public Law 107-

---

[29/] The Report of Public Safety Officer's Death – a form provided by BJA, for use by public agencies, to aid in its administration of the PSOB Program – includes a notice, immediately above the signature line, that statements contained in the Report must be accurate, and that false statements may be punished under 18 U.S.C. § 1001. Neither of Chief Lottes' letters was addressed to the federal government, acknowledged the criminal penalties available for false statements made to the federal government, provided to the federal government by Chief Lottes, nor contains an indication that its statements were intended expressly to certify any matter under Public Law 107-37.

[30/] Emphasis added.

[31/] Moreover, Chief Lottes' May 1, 2002, letter was not consistent with a letter from Daniel A. Nigro, Chief of the Fire Department of New York ("FDNY"). Chief Lottes relied upon GML § 209-i (and thereby its requirement that FDNY have accepted the decedent's assistance) in suggesting that the decedent was providing mutual aid at the

37 cannot properly be invoked here to authorize payment of a federal death benefit reserved for the "qualified beneficiaries" of a public safety officer whose public agency certifies that his death satisfied the standards of the PSOB Act.

I, for the foregoing reasons,[32] find that the Jericho Fire Department did not make a certification that satisfies the requirements of Public Law 107-37.[33]

**PSOB Act**

The Decedent was not a public safety officer.

The decedent was not a public safety officer within the meaning of the PSOB Act. As an *associate member* of the Jericho Fire Department, the decedent was not legally authorized to be involved in fire-related responses and emergency-medical-related responses on behalf of that Fire Department; he was an *inactive* member of that Fire Department; and he did *not* have any New York State emergency medical services certification. Accordingly, the decedent did not "*serve* [the Jericho Fire Department] *in an official capacity* as a firefighter . . . or as a member of a rescue squad or ambulance crew," and, therefore, was not a "public safety officer" within the meaning of the PSOB Act.

The hearing officer concluded, in error, that the decedent was a public safety officer because he appears to have believed that the decedent served the Jericho Fire Department in an official capacity "as a member thereof," and was "authorized and qualified to engage in rescue

---

World Trade Center. Chief Nigro, however, states flatly in his April 2, 2002, letter to the decedent's brother that the decedent was *not* acting under the direction of FDNY on September 11, 2001.

[32] In considering these letters from Chairman Biancanello, Chief Lottes, and Jericho Fire District General Counsel Frank, and the Report from Chairman Marmann, I did not give all of them the same weight. The letters from Chief Lottes were not addressed to the federal government or sent to BJA by the Jericho Fire Department. Accordingly, I do not accord his letters "substantial weight" pursuant to the PSOB regulations relating to evidence and findings of fact "presented by State, local, and Federal administrative and investigative agencies." *See* 28 C.F.R. § 32.5. I do, however, accord substantial weight to the evidence and findings of fact contained in the Report from Chairman Marmann, and the letters from Jericho Fire District General Counsel Frank and Chairman Biancanello. *See Cartwright* v. *United States*, 16 Cl. Ct. 238, 240 (1989) ("The Claims Court continues to hold . . . that the weight to be accorded testimony received is within the province of the PSOBA fact-finder.").

[33] The hearing officer did not disagree with the PSOB Office's conclusion that the two letters from Chief Lottes were not certifications under Public Law 107-37, *HOD, p. 4*, but believed that the letter from Chairman Biancanello *was* such a certification, although untimely. *HOD, p. 6, n. 12.* In making his assessment of this issue, the hearing officer appears to have given little, if any consideration (though he should have) to the Report of Public Safety Officer's Death executed by Chairman Marmann. *See* 28 C.F.R. § 32.5. For the reasons stated above, I disagree with the hearing officer's assessment of Chairman Biancanello's letter and find that there was no Public Law 107-37 certification in this claim.

squad activities for that agency."[34] In support of this conclusion, the hearing officer stated his belief that the decedent "maintained current competency, training and certification to engage in [EMT services] for [the] Jericho FD and other public safety agencies" and that the decedent was a "continuing qualified EMT."[35] In further support of this conclusion, the hearing officer cited the testimony of John Navaretta, "former First Assistant Chief of the Jericho Fire Department and friend and mentor" of the decedent, that "affirm[ed]" that the decedent's "ability to undertake EMT duties would not be affected by [restrictions the Jericho Fire Department places on associate members] so long as he kept up his credentials."[36]

The hearing officer did not have the benefit of the Memorandum of the State Department of Health, regarding the status of the decedent's emergency medical service certifications. The hearing officer, therefore, did not know that the decedent had *not*, in fact, maintained his

---

[34] *HOD, p. 5*. The hearing officer wrote that there "seem[ed to be] no evidentiary basis in this case for denying that [the decedent] met the following definition of 'public safety officer' under the PSOB Act: 'An individual serving a public agency in an official capacity, with or without compensation, as a . . . member of a rescue squad.'" *Id.* Although the hearing officer indicated that he was quoting, in the foregoing sentence, 42 U.S.C. § 3796b(7), he should have cited to section 3796b(8)(A). When Congress enacted, and the President, on June 24, 2002, signed into law, Public Law 107-196, section 3796b was amended, retroactive to September 11, 2001, to move the definition of "public safety officer" to subsection (8). *See* 116 Stat. 719, 719-20.

[35] *HOD, pp. 2, 4*. The hearing officer did not cite to a source for these statements, but witness John Navaretta testified similarly to this. *See Hearing Transcript ("Hrg. Tr."), p. 35* ("[I]t's my understanding [the decedent] maintained his qualifications as an EMT"); *Hrg. Tr., p. 48* ("[H]e maintained his EMT status. He went back for his refresher classes").

[36] *HOD, p. 4* (citing to *Hrg. Tr., p. 54*). Mr. Navaretta's testimony was consistent with the hearing officer's speculation as to the Jericho Fire Department's by-laws' permitting associate members to engage in emergency medical services because the by-laws did not contain "any explicit provision . . . barring EMT activity by associate members (as opposed to firematic [*sic*] activity)." *HOD, p. 4*. Such an omission (if it be an omission), however, is of no moment because the by-laws nowhere contain *any* explicit mention of emergency medical services or emergency medical technicians; the failure expressly to restrict EMT activity in a particular place in the by-laws is unremarkable when they fail expressly to mention EMTs or EMT activity at all. Of course, perhaps it is not an omission because, as I discuss below in another footnote, the by-laws' restriction on firemanic activity actually may sweep within its scope emergency medical activity.

Alternatively, it might be the case that the by-laws do not address emergency medical activities at all. The by-laws, which according to the document itself became effective in 1963, and which according to evidence in the record were last amended in 1975, express the sole purpose of the Jericho Fire Department as "the extinguishing and prevention of fires and the salvage and protection of life and property." Thus, it is entirely possible that the by-laws did not contemplate emergency medical activities.

In any event, there is no need to speculate about the by-laws because Jericho Fire District General Counsel Frank has provided a definitive official statement that associate membership restricts a member from engaging in emergency medical activities on behalf of the Jericho Fire Department.

credentials as a certified first responder, EMT, or advanced EMT,[37] having allowed his certification to lapse in 1988, some thirteen years before his death. The reason that the record is devoid of any direct proof of New York State's certification of the decedent, at the time of his death, as an EMT, advanced EMT, or first responder, is that there is no such evidence to be had: The decedent was not so certified.

Similarly, the hearing officer did not have the benefit of the official Opinion Letter from Jericho Fire District General Counsel Frank that was received on January 10, 2006, regarding the affect of associate membership on the status of volunteers of the Jericho Fire Department.[38] The Opinion Letter leaves no doubt that the decedent was *not* legally authorized by the Jericho Fire Department to engage in emergency medical services on its behalf. The conclusion of the hearing officer to the contrary, therefore, is incorrect and unsupported.[39]

---

[37] New York Public Health Law §§ 3000 and 3001 recognize under New York law three possible categories of certification: first responders, emergency medical technicians, and advanced emergency medical technicians.

[38] Claimants' counsel submitted to BJA one page, printed from the Jericho Fire Department website, it appears, in May 2006. This page, which contains the heading "Become a Firefighter or Medical Technician," states that "[m]embers wishing to be EMS-ONLY volunteers need not become firefighters." That a member of the Jericho Fire Department may provide services exclusively as an EMS, or as a firefighter is not inconsistent with the Jericho Fire Department's classification of associate members as inactive. Claimants' counsel appears to make the same mistake that the hearing officer made – focusing on the activity of the member (*e.g.*, fighting fires or providing first aid), as opposed to the member's membership status (*e.g.*, associate). Jericho Fire District General Counsel Frank's Opinion Letter makes clear that an associate member is inactive, regardless of what his activities may be.

[39] Because nothing from the Jericho Fire Department suggested that the decedent's status as active or inactive changed depending on whether his activity was fighting fires as opposed to providing first aid or engaging in rescue activity, Jericho Fire District General Counsel Frank's Opinion Letter provided unsurprising information. Even without the Opinion Letter, however, the hearing officer's attempt to distinguish between the decedent's "firematic" [*sic*] activity and emergency medical activity does not appear to be supported by relevant law. Although the claimants submitted testimony or statements from Thomas Von Essen, Lisa Gloffke, and John Navaretta, all of whom appear to indicate an understanding of "firematic" [*sic*] activity that seems to exclude emergency medical activity, the claimants did not provide any law to support this; nor does there appear to be any in New York. There is relevant legal authority to the contrary, however: The New York State Comptroller has issued an opinion directly at odds with such exclusion. N.Y. St. Cptr., No. 87-76 ("the ambulance services of an emergency rescue and first aid squad of the village fire department would be provided to village residents directly as part of the fire department's firemanic functions.") (1987).

Additionally, the New York State Attorney General has opined that when volunteer firemen render emergency medical assistance as part of a fire department's rescue squad, they are performing their duties as firefighters. N.Y. St. Atty. Gen., No. 197 (informal) (1975). If "firemanic" were understood to mean "of or relating to fire fighters or fire fighting;" *supra fn. 11*; and the fire department included among its responsibilities the operation of a rescue squad; and the rescue squad were manned by firefighters; then the emergency medical assistance provided by the firefighters assigned to the rescue squad properly, as a logical and linguistic matter, would be described as firemanic activity. It would be entirely reasonable, therefore, for the Jericho Fire Department, which has firefighters performing emergency medical services, to interpret its by-laws' restriction on associate members' performing firemanic activity to include a restriction on emergency medical activity, as General Counsel Frank's Opinion Letter says it does.

The evidence in the record is clear that the decedent was an associate member. There is dispute as to what this membership status meant with regard to the decedent's role in the Jericho Fire Department. The Report of Public Safety Officer's Death, signed March 31, 2004, by Chairman Marmann, identifies the decedent's "employment status when injury occurred" as "*Associate Non-Active* Member of Jericho Fire Department,"[40/] and declined to describe the decedent as a firefighter or ambulance and rescue squad member, opting instead to describe him as "other." Jericho Fire District General Counsel Frank, in his Opinion Letter, states that associate members, generally, are inactive, and that the decedent himself was considered to be an inactive member of the Jericho Fire Department.[41/] In addition, General Counsel Frank stated that associate members are *not* subject to being called to respond and are restricted from responding to fire-related and medical-related emergencies.[42/] I find these statements of Chairman Marmann and Jericho Fire District General Counsel Frank to be persuasive and worthy of being credited.[43/]

The hearing officer, in his determination, "noted" that the Report of Public Safety Officer's Death, which Chairman Marmann executed, characterized the decedent's status as "Associate Non-Active Member" even though the Jericho Fire Department's "Constitution and

---

[40/] Emphasis added.

[41/] To the question, "is an associate member of the Jericho Fire Department, an active or inactive member for purposes of Section 3 of New York's Volunteer Firefighters' Benefit Law;" General Counsel Frank responded, "inactive." To the question, "did the Jericho Fire Department consider [the decedent at the time of his death] to be an active or inactive member of the Jericho Fire Department within the meaning of Section 3 of New York's Volunteer Firefighters' Benefit Law;" General Counsel Frank responded, "inactive." Contrary to the contentions of claimants' counsel, expressed in his May 16, 2006, letter to PSOB Office Director Hope Janke the hearing officer's determination, the testimony and evidence presented to him, and the arguments of counsel should have no bearing on General Counsel Frank's answers to the factual questions concerning the Jericho Fire Department's rules and procedures and the decedent's relationship to the Fire Department. It also is inaccurate to refer, as claimants' counsel does, to the answers provided by General Counsel Frank in his January 10, 2006, letter as General Counsel Frank's "personal and subjective understanding" of the Jericho Fire Department's by-laws. General Counsel Frank identified himself in his letter as the "general counsel to the Board of Fire Commissioners of the Jericho Fire District" and copied the Board on his letter. I find General Counsel Frank's responses to be the official statement of the Board of Fire Commissioners of the Jericho Fire District, which has not distanced itself in any way from its General Counsel's Opinion Letter.

[42/] Informal opinions of the Attorney General of New York, indicate that a mark of an *active* volunteer member, as defined by the Volunteer Firefighters' Benefit Law, is whether the member "is subject to call for duty and does not have an option of whether he will or will not place himself on duty." *1958 N.Y. Atty. Gen. Op. (Informal) 168*; *accord*, *1977 N.Y. Atty. Gen. Op. (Informal) 149* (a volunteer fireman who was a minor and subject to compulsory school attendance laws would be an *active* member if he "was subject to call for duty" when not in school "and does not have an option of placing himself on duty while not in compulsory school attendance."); *1960 N.Y. Atty. Gen. Op. (Informal) 188*.

[43/] I also find these statements to be consonant with other evidence in the record. For example, Chairman Biancanello wrote in his April 7, 2005, letter that the decedent's "status *changed from active member to associate member*" and that at the time of the decedent's death, "[he] was an associate member of the Jericho Fire Department, *and prior to that had been an active member* . . ." Emphasis added.

By-Laws" "refer only to 'Associate Membership' and do not use or define 'non-active' terminology and status."[44/] Although it is technically correct that the by-laws do not use the term "non-active," there is no reason why "non-active" should not be understood in its ordinary sense, as the opposite of "active" and synonymous with "inactive." The by-laws frequently use the terms "active" and "inactive," making clear that there is a distinction in the by-laws between *active* members and *inactive* (or non-active) members of the Jericho Fire Department. Although the by-laws do not expressly specify whether associate members are active or inactive members, at least one characteristic of associate membership appears to be at odds with active membership – active membership is a prerequisite for eligibility to vote and associate members are forbidden from voting. Thus, Chairman Marmann's statement is not inconsistent with the by-laws, and it was error for the hearing officer not to give consideration (or to have given little consideration) in his decision to the Report of Public Safety Officer's Death that the public agency submitted.[45/]

At odds with the statements of Chairman Marmann and Jericho Fire District General Counsel Frank is the testimony of John Navaretta.[46/] Mr. Navaretta testified that he "would say

---

[44/] *HOD, p. 5, n. 9.* Although the hearing officer purports merely to "note" this point, he actually uses this point to dismiss out-of-hand Chairman Marmann's Report. The hearing officer's determination appears never to have considered or addressed the substance of the Report, including its statement that the decedent was not, at the time of his death, working a regular or assigned overtime shift. Such apparent wholesale disregard of the official report filed by the Jericho Fire Department with BJA is unjustified. If the hearing officer wished to "note" the terms that are not included in the by-laws, then, if only for consistency, he also should have noted that the by-laws do not use or define the terms "emergency medical technician," or "medical assistance and rescue activities;" somewhat oddly, however, given that he apparently dismissed terms not included in the by-laws, the hearing officer did not hesitate to use the terms "emergency medical technician" and "medical assistance and rescue activities" to describe the decedent's actions that he attributed to be on behalf of the Jericho Fire Department. *E.g., id., p. 10.*

[45/] The hearing officer's dismissive treatment of the Report of Chairman Marmann is particularly unfortunate, because the hearing officer should have accorded substantial weight to the findings of fact and evidence contained in that Report. *See* 28 C.F.R. § 32.5.

[46/] Mr. Navaretta is not an official of a State, local, or Federal administrative or investigative agency, and, therefore, any evidence or findings of fact that he may have presented is not entitled, by regulation, to substantial weight. *See* 28 C.F.R. § 32.5. The Twin Towers Fund and the National EMS Memorial, likewise, have not been shown by the claimants to be State, local, or Federal agencies. That the Fund and the EMS Memorial may have honored the decedent as "an active rescue worker killed in the line of duty," as claimants' counsel asserts in his April 7, 2005, letter to Hearing Officer Daniel L. Skoler, therefore, is not evidence or findings of fact entitled to any special evidentiary weight under the PSOB regulations. The claimants also have failed to offer any evidence relating to the criteria that either the Fund or the EMS Memorial use in deciding eligibility for those they honor. A review of the EMS Memorial's website, however, reveals that its criteria are substantially and significantly less stringent than those imposed by the PSOB Act. *Compare, e.g.*, EMS Memorial ("Nominee must have been affiliated with an established EMS agency and performing EMS duties at the time of death"), available at http:nemsms.org/criteria.htm (last visited August 28, 2006) *with* 42 U.S.C. § 3796b(8)(A) ("Public safety officer" is "an individual serving a public agency in an official capacity . . . as a member of a rescue squad or ambulance crew") *and* 28 C.F.R. § 32.2(c)(2) ("Line of duty means" "action . . . obligated or authorized by rule, regulation, condition of employment or service, or law to perform"). Given the lack of evidence regarding the Twin Towers Fund's criteria for eligibility, and the wide divide between the National EMS Memorial's criteria and the PSOB Act's criteria, I give little weight,

[that the decedent] was non-active" "regarding firematic [(*sic*) activities]," but "would say [that the decedent] was active because he maintained his EMT status."[47] I do not find Mr. Navaretta's testimony to be persuasive. First, Mr. Navaretta's testimony (testifying "I would say he was active," instead of "he was active") suggests some lack of certainty in his understanding of associate membership. Second, and more importantly, however, Mr. Navaretta, a close friend of the decedent, had not been associated with the Jericho Fire Department for over fifteen years.[48] Under such circumstances, the official statements from the Chairman of the Jericho Fire District and the General Counsel of the Board of Fire Commissioners must outweigh the personal opinion of a friend of the decedent so far removed from the Fire Department.

In addition, on this record, I find that the decedent was not a certified first responder, EMT, or advanced EMT: The June 14, 2006, Memorandum of the State Department of Health is dispositive of this issue.[49] Not since 1988 had the decedent been certified by the State of New York in any emergency medical services.[50]

The claimants' counsel has argued that the decedent at the time of his death was a "current," "active," "qualified," and "certified" New York State EMT.[51] In support of his assertion, claimants' counsel submitted to the hearing officer a letter from Joseph Mlynarczyk, an American Heart Association instructor, that purports to document that the decedent participated in a "CPR first responder course" that "qualified him as a current New York State Certified First

---

in my determining whether the decedent was, within the meaning of the PSOB Act, a public safety officer killed in the line of duty, to the fact that these entities have honored him.

[47] *Hrg. Tr., p. 48.*

[48] Mr. Navaretta's testimony also is belied by the decedent's brother, who, in a June 3, 2002, letter submitted in support of the claimants' claim, wrote that the decedent was "no longer on active duty at Jericho." *Letter from Jay Winuk to Nicholas Scoppetta, Commissioner, New York Fire Department.*

[49] The findings of fact and evidence contained in this memorandum are entitled to substantial weight as they are presented by a State administrative agency. *See* 28 C.F.R. § 32.5.

[50] Mr. Clayton of the New York State Department of Health, Bureau of Emergency Medical Services was asked to verify when the decedent "last received certification from the Bureau of Emergency Medical Services at any level (CFR, EMT, or AEMT); and when any such certification(s) expired." In the Memorandum of the State Department of Health, Mr. Clayton responded, in relevant part, as follows: "Please allow this memorandum to serve as verification that [the decedent] was certified as an EMT-Basic from 03/31/1981 through 03/31/1984 and then again from 03/31/1985 through 03/31/1988." Thus, even if I found persuasive Mr. Navaretta's testimony, discussed above, that the decedent would have been able to undertake EMT activities on behalf of the Jericho Fire Department "so long as he kept up his credentials," the claimants have not shown that the decedent, in fact, kept up his emergency medical service credentials.

[51] *E.g.*, April 7, 2005, letter from Andrew J. Maloney to Hearing Officer Daniel Skoler. Mr. Maloney wrote in this letter, among other things, that the decedent "continued to stay current and active as an EMT . . . he was a qualified, active and current EMT." *Hrg. Tr., p. 116* (Mr. Maloney: "[The decedent] was a New York firefighter and EMT and all qualifications and certifications came from New York State, or by virtue of New York State.").

Responder (CFR) from November 3, 1999 through November 30, 2001 (after his death)." Mr. Mlynarczyk's letter, however, says nothing about qualifying the decedent as a New York State certified first responder, but merely verifies that the decedent took an American Heart Association CPR course, and "was issued an American Heart Association Card." Counsel also supplied a copy of that American Heart Association Card, which declares only that the decedent successfully completed a course within the American Heart Association's curriculum for the Heartsaver Plus Program and includes a "Recommended Renewal Date" of November 30, 2001. Nothing that counsel provided, however, demonstrates that the decedent was a first responder or EMT under New York law.[52/]

In support of his initial assertions, claimants' counsel expressly cited certain New York statutes and regulations that govern certification of EMTs and first responders.[53/] Under the very laws that counsel cited, certification (and re-certification) as an EMT or first responder requires more than completion of a CPR course;[54/] in addition, there is nothing in New York's Emergency Medical Services law that suggests that an American Heart Association Card may be obtained in lieu of a New York State EMT or first responder certification card. What claimants' counsel has submitted to demonstrate that the decedent was certified and qualified as an EMT or first responder, plainly is inadequate to demonstrate satisfaction of New York State certification (and re-certification) requirements.[55/]

When presented with the June 14, 2006, Memorandum of the State Department of Health, claimants' counsel conceded in his July 7, 2006, response that the decedent was not "registered" with the New York State Department of Health. Such "registration," however, counsel said was not required, although he provided no support for this assertion.[56/] Instead, claimants' counsel

---

[52/] One letter submitted on behalf of the claimants appears to have attempted to address the issue of the decedent's EMT certification status more delicately, although quite curiously. State Senator Carl Marcellino wrote in his April 12, 2005, letter to the hearing officer that the decedent "maintained elements of his EMT certification." Even so, this more qualified description of the decedent's status as an EMT is incorrect.

[53/] Counsel, in his April 7, 2005, letter to the hearing officer wrote that the decedent "[c]ontinued to stay current and active as an EMT (see N.Y.S. Emergency Medical Services, Art. 39 [*sic*], § 3001-3002; and Chapter VI of Title 10 (Health) of the Official Compilation of Codes, Rules and Regulations, Part 800 Emergency Medical Services, §§ 800.08; 800.17; 800.20 enclosed)."

[54/] *See* N.Y. Comp. Codes R. & Regs. tit. 10, §§ 800.6, 800.8 (requiring, among other things, that applicants for certification or re-certification pass examinations).

[55/] *See* 28 C.F.R. § 32.21 (Requiring claimant to submit evidence of eligibility and providing that a PSOB Act award may be denied because of a claimant's failure to submit such evidence). *See also Tafoya*, 8 Cl. Ct. at 264.

[56/] This argument appears to be directly contrary to counsel's argument in his April 7, 2005, letter to the hearing officer. In his April letter, counsel asserted that the decedent was, at the time of his death, "current" and "qualified" and "active" as an EMT and expressly cited to the New York Emergency Medical Services regulations as authority for these assertions. Now, without any explanation or support, counsel argues that the regulations, which he previously cited to BJA, do not apply.

asserts that the decedent "was current and certified[] by a nationally recognized first aid-CPR organization and qualified to perform limited triage duties."[57]

On this record, it appears that what counsel means by the decedent's being "current and certified" is that he took a CPR course offered by an American Heart Association instructor on November 3, 1999, and that it was recommended by the American Heart Association that the decedent renew his CPR training two years thereafter.[58] The evidence in the record regarding the CPR course that the decedent took also does not support another statement that counsel made in his July 7, 2006, letter – the decedent "received training from the American Heart Association and was current on September 11, 2001, for CPR and *basic first aid similar to the [certified first responder] criteria*."[59] The New York State Emergency Medical Services regulations specify that any certified first responder training curriculum must include content on, at a minimum –

1. basic adult and pediatric patient assessment, including history taking, physical assessment, and determination of vital signs;

2. basic cardiopulmonary resuscitation (CPR);

3. basic airway management and oxygen therapy;

4. basic hemorrhage control;

5. manual stabilization of the spine;

6. spinal immobilization, including application of a rigid extrication collar; and

7. emergency childbirth.[60]

---

[57] It is not clear what counsel may mean by "current and certified [] by" the American Heart Association. Claimants' counsel has produced no guidelines from the American Heart Association, or other relevant documentation, that would inform me of what may be required to be "current and certified" by the American Heart Association, or in what regard the decedent may have been "current and certified" by that entity.

[58] *See HOD, Exhibits 5 and 6.*

[59] Emphasis added.

[60] N.Y. Comp. Codes R. & Regs. tit. 10, § 800.20.

The evidence in the record reveals that the only similarity between the American Heart Association CPR course that the decedent took, and the minimum curriculum requirements for certified first responders is training in CPR. In any event, even if the decedent had received actual training (and the record does not demonstrate even that he received similar training) in all the areas required for certified first responders, the claimants have not established that training alone entitles an individual to certification by the State.[61]

The evidence in the record does not demonstrate that the decedent was current, active, or certified as a first responder or an EMT.[62] The evidence shows that the decedent last had been certified as an EMT or first responder by the State of New York in 1988, but had not been so certified in the thirteen-some years since, and that the decedent had completed an American Heart Association CPR course in November 1999. The claimants have not demonstrated that such CPR training, which was received by the decedent and (it appears) approximately sixteen other individuals at the same time,[63] is legally significant for their claim.

I, therefore, find that the decedent did not possess New York State certification as an EMT, advanced EMT, or first responder, at the time of his death. Although there is evidence that the decedent took an American Heart Association CPR course almost two years prior to his death, the claimants have not shown that such training is legally sufficient to make the decedent a member of a rescue squad, as the hearing officer had found, or an ambulance crew. Accordingly,

---

[61] *See e.g.*, N.Y. Comp. Codes R. & Regs. tit. 10, §§ 800.6, 800.8, 800.18.

[62] The record contains what appears to be a photocopy of three badges that the decedent apparently received throughout his career with the Jericho Fire Department, although he did not have any of them on his person when he responded to the World Trade Center: Jericho Fire Department Badge 237; Jericho Fire Department EMT Badge; and Jericho Fire Department, Guardian Engine Company 2, Engineer Badge. *HOD, Exhibit 17*. Claimants' counsel, in his May 16, 2006, letter to PSOB Office Director Hope Janke, suggests that the decedent's possession of the EMT Badge from the Jericho Fire Department demonstrates that he "was current when he was killed on September 11 while providing medical assistance, not firefighting." I do not agree. The claimants have not shown that mere continued possession of a Jericho Fire Department EMT Badge issued at some unspecified point in the decedent's career translates into the decedent's being "current," on the date of his death, in his EMT training. Contrary to what claimants' counsel asserts, the evidence in the record suggests that the badges issued by the Jericho Fire Department are not necessarily indicative of the member's training status or his authority to act on behalf of the Fire Department. For example, there does not appear to be any dispute that the decedent did not maintain his training as a firefighter (and, according to the by-laws, he expressly was forbidden to participate in firemanic activity, which at a minimum included fighting fires and riding apparatus), yet he still apparently possessed his Jericho Fire Department Badge 237 and his Engineer Badge. On this record, therefore, I find it unremarkable that the decedent, who still was a member of the Jericho Fire Department (as an "associate"), continued to possess the badges that had been issued to him at various times during his career, and the photocopy does not alter my conclusions that, at them time of his death, the decedent was not certified as a first responder, EMT, or advance EMT, and was not legally authorized to engage in emergency medical services on behalf of the Jericho Fire Department..

[63] *HOD, Exhibit 5.*

I conclude that the decedent was not a member of the Jericho Fire Department rescue squad or ambulance crew for purposes of being a "public safety officer" within the meaning of the PSOB Act

In addition, I find that the decedent was an associate member of the Jericho Fire Department. It is undisputed that the Fire Department's by-laws' ban on associate members' engaging in firemanic activity prohibited the decedent from responding to fires on behalf of the Jericho Fire Department, and it is at least possible, although disputed by the claimants, that the by-laws' ban on firemanic activity prohibited the decedent from responding to emergency medical situations on behalf of the Jericho Fire Department. Whether the ban on firemanic activity that is contained in the by-laws *itself* prohibits an emergency medical response, *see fn. 39*, is beside the point, however, because Jericho Fire District General Counsel Frank has made clear that "the same restriction on [associate members taking part in] fire related responses applies to emergency medical related responses." General Counsel Frank's official Opinion Letter is consonant with the other official documents in the record from the Jericho Fire Department, none of which remotely suggests that the decedent's associate membership limited his fire suppression activity, but not his rescue/first aid activity. I, therefore, find that the decedent was not an active member of the Jericho Fire Department, he was not authorized to respond to fire and medical emergencies on its behalf, and he was not subject to being called to so respond. Accordingly, I conclude that the decedent did not serve the Jericho Fire Department in an official capacity at the time of his death.

Based on the foregoing findings and conclusions, and when substantial weight is given to the findings of fact and evidence contained in the Report of Chairman Marmann, the Opinion Letter from Jericho Fire District General Counsel Frank, and the Memorandum of the State Department of Health; the claimants failed to establish that the decedent was a public safety officer at the time of his death within the meaning of the PSOB Act.

The decedent did not die in the line of duty

Even if the decedent were a public safety officer at the time of his death (which he was not), he did not die in the line of duty within the meaning of the PSOB Act. There is no evidence that his response to the terrorist attacks on the World Trade Center, although undeniably heroic, was an action that he was "*obligated or authorized* by rule, regulation, condition of employment or service, or law to perform."[64]

---

[64] 28 C.F.R. § 32.2 (c)(2) (emphasis added). The compulsion of a moral obligation is inadequate to place an individual in the line of duty for purposes of the PSOB Act. Claimants' counsel submitted to the hearing officer a September 9, 2005, letter from Retired Captain Lisa Gloffke, formerly with the FDNY EMS, in which she asserted that she "believe[d]" the decedent was "obligated to provide mutual aid" at the World Trade Center. Captain Gloffke does not explain whether this "obligation" was a legal or moral (or some other kind of) obligation, and

The PSOB Act requires not only that the individual have been a public safety officer, but also that the officer have sustained his fatal injury in the line of duty.[65] Pursuant to BJA's interpretive regulation, 28 C.F.R. § 32.2(c)(2), the "line of duty" question in the decedent's case is whether he, an associate member of the Jericho Fire Department, was authorized or obligated to respond to an emergency outside of the area regularly served by the Jericho Fire Department. This question is answered by the Jericho Fire Department, and the laws of New York, in the negative.

The hearing officer erroneously concluded that the decedent sustained his fatal injury in the line of duty, relying exclusively on GML § 209-i as authorizing the decedent's response at the World Trade Center. "[C]ircumstantial and historical evidence," the hearing officer wrote, provided the basis for his finding that the decedent's –

> training, previous record of participation in mutual aid operations for other departments, and ability on September 11 to bring himself within New York Fire Department security perimeters and staging areas for rendition of rescue services at the South Tower constitute prima facie evidence that he presented himself and his credentials to FDNY command personnel directing emergency operations in the South Tower and offered assistance in those efforts.[66]

Moreover, the hearing officer found that the decedent's –

> actual rendition of EMT services at the South Tower, as evidenced by materials and implements found with his person, coupled with the knowledge of FDNY onsite command personnel directing rescue operations of the acute need for qualified EMT assistance to respond to unmet victim need constitutes compelling

---

provides no support or authority for her belief. That aside, Captain Gloffke's personal opinion is entirely unhelpful because it is expressly predicated upon her erroneous understanding that the decedent was a "certified and current First Responder," which he was not.

Moreover, the claimants have offered no specific basis upon which I might find that the decedent was legally obligated to respond to the World Trade Center. Claimants' counsel suggested to the hearing officer that the decedent might have been obligated to respond "under the good [S]amaritan laws," *Hrg. Tr., p. 110*; this is not so because New York's "good Samaritan" law creates no obligations, but, rather, serves as a shield against liability for, among others, first responders and EMTs, but only if they are certified by the State. N.Y.S. Emergency Medical Services, Art. 30, § 3013. The decedent's brother even conceded, in his June 3, 2002, letter to Nicholas Scoppetta, Fire Commissioner of the New York City Fire Department, that "[i]t was not [the decedent's] official responsibility to put his life on the line for others that terrible day."

[65] 42 U.S.C. § 3796(a).

[66] *HOD, p. 10.*

evidence that such command personnel gave permission to [the decedent] to lend EMT assistance within the meaning and scope of [GML § 209-i[67]].

The hearing officer's discussion of GML § 209-i, and its application to the facts of the decedent's case, focused on whether the decedent properly offered his services and on whether "command personnel" properly accepted that offer. Noticeably absent from the hearing officer's discussion, however, is any recognition that GML § 209-i applies only to *active* volunteer members of a fire company.[68]

GML § 209-i authorizes a "volunteer fireman," in response to a fire or other emergency "outside of the area regularly served by the fire company or fire department of which he is a member," but still within New York, to offer his services to "the officer in command" of the fire department or fire company handling the emergency; and, if those services are accepted, "the volunteer fireman shall then be entitled to all powers, rights, privileges and immunities granted by law to volunteer firemen . . . to the same extent as if he were a volunteer member of the fire company or fire department which he is assisting . . . ." For purposes of GML § 209-i, a "volunteer fireman" is "an *active* volunteer member of a fire company."[69]

Based on the record established in this case, as discussed *supra*, the claimants have not established that the decedent was an *active* volunteer member of the Jericho Fire Department, or any other fire department; therefore, the decedent was not authorized or obligated under GML § 209-i to act as a volunteer fireman at the World Trade Center.[70] This alone would be a sufficient basis upon which to find that the decedent did not satisfy the provisions of GML § 209-i, and, therefore, was not acting in the line of duty, within the meaning of the PSOB Act, when he

---

[67] *HOD, p. 11.*

[68] The hearing officer's decision even suggests that he did not believe that the decedent was an active member of the Jericho Fire Department. *HOD, p. 1* ("[The decedent], . . . a long time active member of the Jericho Fire Department[,] but who at the time of his death was in associate member status").

[69] *Volunteer Firefighters' Benefit Law*, §3(1) (emphasis added). GML § 209-i(3) adopts the definition of "volunteer fireman" contained in the Volunteer Firefighters' Benefit Law.

[70] Chief Lottes, however, in his May 1, 2002, letter (discussed above in the "Initial Determination" and "Public Law 107-37 Certification" sections), asserted that "it is apparent to [him] that [GML § 209-i] is certainly applicable" to the decedent's case. He stated this after reciting portions of that law, but his recitation, like that of the hearing officer's, did not demonstrate that he recognized the law's requirement that the volunteer fireman be an *active* volunteer member. Moreover, other official statements in the record, including those of other officials of Jericho (*e.g.*, those made by Chairmen Marmann and Biancanello, and the Jericho Fire District's General Counsel Frank, that the decedent was not active), would be inconsistent with Chief Lottes' legal conclusion. I, therefore, disagree with Chief Lottes' assertions as to GML § 209-i because the facts do not support it.

responded to the World Trade Center.[71]

There is a second reason, however, to find that the decedent did not satisfy the provisions of GML § 209-i when he responded to the World Trade Center. GML § 209-i requires that there be an offer of assistance from the out-of-jurisdiction volunteer fireman to "the officer in command" of the fire department or fire company handling the emergency and an acceptance of that assistance.[72] The hearing officer, relying upon "circumstantial and historical evidence" and giving a nod to the PSOB regulations' "reasonable doubt" provision,[73] concluded that the decedent offered his EMT services at the World Trade Center, and that offer was accepted by "command personnel" on the scene.

The Chief of the FDNY, however, wrote a letter that is directly at odds with the findings of the hearing officer. Chief Daniel Nigro wrote to the decedent's brother on April 2, 2002, and stated:

> We have just learned . . . that your brother, [the decedent], was recently found at the World Trade Center with all indications that he had gone there on September 11th to lend assistance as an EMT.
>
> Although he was not a member of this Department and was not acting pursuant to this Department's direction that day, the Department nevertheless is honored to write this letter in recognition of his heroic efforts.

Although the hearing officer called this letter "not a negligible" piece of contradictory evidence, the hearing officer opined it to be rebutted by the following testimony of a former Fire Commissioner of FDNY:

---

[71] Claimant's counsel, in his May 16, 2006, letter to PSOB Office Director Hope Janke, quibbles with Jericho Fire District General Counsel Frank's statement that the decedent was an "inactive" member of the Jericho Fire Department at the time of his death. Counsel argues that the decedent's status changed from active to associate, not to inactive. I have found, however, that associate members are inactive members in the Jericho Fire Department. But even if counsel's contention were correct, that would not bring the decedent within the coverage of GML § 209-i, because the law applies only to *active* members, not *associate* members.

[72] The hearing officer referred to the decedent's offering his help to "*a* command officer" or to "command personnel." These formulations create a category of people broader than the statutory text, which refers expressly and exclusively to "*the* officer in command." The hearing officer cited no authority, and none has been presented by the claimants, to justify expanding the language of GML § 209-i more broadly than its very terms permit.

[73] 28 C.F.R. § 32.4 provides that BJA "shall resolve any reasonable doubt arising from the circumstances of the officer's death or permanent and total disability in favor of payment of the death or disability benefit."

> I can't put words in Chief Nigro's mouth. He was chief of operations during September 11[th]. We made him chief of the department because we lost our chief of the department that day. Dan was never in the building. He was outside [of] the building the whole time, and I would think that knowing how the department works, that he was getting several letters and requests for recognition of different people and then he went to the lawyers, and the lawyers said he wasn't [a] member of the department; he was not acting officially as he didn't come in with a truck from Jericho, and said you'd better protect the [C]ity and put that down . . . I can't believe that it's accurate because he's -- he's a firefighter and he knows that this person, as soon as he identifies himself as an EMT, that someone which could be considered as acting under the direction of would ask him to help.[74/]

This speculative statement, made at a time (after leaving office) when it can no longer bind the government, by a former official who has not shown himself to have any particularized knowledge about the decedent's actions on September 11th, as a matter of law is insufficient to rebut the letter of the Chief of FDNY speaking in his official capacity. Mr. Von Essen's statement is further weakened by his counter-intuitive statement (given what GML § 209-i actually provides) of his personal opinion that any consideration of the decedent's inactive status is "irrelevant."[75/] Whatever may be said about the specifics of Mr. Von Essen's personal opinion of Chief Nigro's letter, his speculation alone is not sufficient, absent some extraordinary circumstances that are not present here, to rebut an official statement of a government officer.

When proper weight is given to the letter from Chief Nigro, and absent evidence in the record that someone who may be considered "the officer in command" actually accepted the decedent's services, there is no basis upon which to find that the officer in command actually

---

[74/] *HOD, p. 9* (citing testimony of Thomas Von Essen, *Hrg. Tr., pp. 67-8*). From his testimony, Mr. Von Essen appears to have been, for a time, in a lobby (with no indication of which one) of the World Trade Center on the morning of September 11th, but then departed to meet Mayor Guiliani across the street after the South Tower was hit. *Hrg. Tr., p. 58*. Mr. Von Essen did not encounter the decedent on September 11th, *Hrg. Tr., Exhibit 15*, and it does not appear that he knew anything about the decedent's actions before he relinquished his post as Commissioner in December 2001. It appears, instead, that his information about the decedent came from a review of documents in the record and the testimony of witnesses at the appeal hearing. In finding Mr. Von Essen's testimony "convincing," *HOD, p. 9*, the hearing officer never noted Mr. Von Essen's lack of direct knowledge of the decedent's situation, or the lack of evidence concerning the lobby in which Mr. Von Essen was present; nevertheless, the hearing officer, in finding Chief Nigro's letter "not [] sufficiently persuasive," criticized the letter as an "unexplained and unsupported *assertion by command personnel not present in the South Tower* . . . ." *HOD, p. 11* (emphasis added). Such selective criticism is unwarranted.

[75/] *Mr. Von Essen letter to Daniel Skoler, dated October 21, 2004* ("Whether [the decedent] was an active or non-active member of his fire department on that tragic morning is irrelevant to me. . . There was no time, nor the inclination, to differentiate whether firefighters and rescuers were on duty or off, 'active' or 'inactive.'").

accepted the decedent's services as required by GML § 209-i.[76] Thus, for this additional and independent ground, I conclude that the decedent's response at the World Trade Center was not authorized by GML § 209-i.

Based on the foregoing findings and conclusions, the claimants have failed to prove that the decedent's death on September 11, 2001, was in the line of duty within the meaning of the PSOB Act.

**Other arguments of claimants'**

A New York law that became effective August 2, 2005, declares that the decedent "who, at the time of his death, was an associate member of the Jericho volunteer fire department, shall be deemed to have been an active member of the Jericho volunteer fire department at the time of his death."[77] Claimants' counsel argues that this law should end my inquiry in this claim. This is not so.

What the New York Legislature passed and the Governor signed into law is not "evidence [or] findings of fact presented by State, local, [or] Federal administrative [or] investigative agencies."[78] As such, I do not accord it any special evidentiary weight, except perhaps insofar as it indicates a finding that the decedent, "*at the time of his death*, was an associate member," but this fact is already well supported by the record. The New York statute also suggests, consistent with what I have already found, that the decedent was not active at the time of his death (otherwise, why enact it?); the State Senator who proposed this legislation even recognized, in his press release announcing Governor Pataki's signing of this legislation, that the decedent was not active on September 11th.[79] In any event, I find that the New York law purports to create a fiction – that the decedent "*shall be deemed to have been* an active member" at the time of his death – which may affect benefits available to the claimants under New York law, but does not alter my obligation under the PSOB Act to determine, as of the time of the decedent's death, whether he was a public safety officer as a matter of *federal* law and whether he died from an injury sustained in the line of duty under *federal* law.

---

[76] 28 C.F.R. § 32.4 is inapplicable to this situation, among other reasons, because there is no doubt, reasonable or otherwise, that the decedent's services were not accepted by the officer in command once proper weight is given to Chief Nigro's letter.

[77] Ch. 368, Laws of New York, 2005, eff. Aug. 2, 2005.

[78] *See* 28 C.F.R. § 32.5.

[79] The press release *quotes* Senator Marcellino, "[a]t the time of his death, [the decedent] was an associate member of the Jericho Volunteer Fire Department *and not an active member*." Emphasis added. Available at http://www.senatormarcellino.com/press_archive_story.asp?id=11793 (last visited August 24, 2006).

Even if I were to consider this New York law as evidence that the decedent actually was an active member of the Jericho Fire Department at the time of his death, it is only one piece of evidence before me on this issue. The evidence that the decedent was not an active member of the Jericho Fire Department, discussed *supra*, some of which is entitled to substantial weight under the PSOB regulations, I still find more persuasive. Even if I were to weigh this law with the other evidence of the decedent's status with the Jericho Fire Department at the time of his death, therefore, I find that the evidence in the record as a whole still points me to the conclusion that the decedent was not an active member of the Jericho Fire Department at the time of his death. Accordingly, this *post-hoc* law does not change my conclusion that the decedent was not a public safety officer within the meaning of the PSOB Act and did not die in the line of duty under that Act.

Claimants' counsel also suggests that it was because of similar New York legislation that declared three retired New York City firemen to have been *active* that the three were determined by BJA to be covered by the PSOB Act.[80/] This suggestion is not correct: these benefits were paid pursuant to Public Law 107-37, discussed above, not the PSOB Act,[81/] and the legislative action of New York had nothing to do with the award of death benefits to their eligible survivors.

In the case of each of the three firemen that claimants' counsel identifies, BJA awarded the benefit in a decision dated July 26, 2002 – *before* the New York legislature declared that these firemen should be deemed to have been active.[82/] And in the case of each of the three firemen, payment was made pursuant to the May 24, 2002, certification under Public Law 107-37 from Nicholas Scoppetta, Fire Commissioner of the New York City Fire Department, to the Director of BJA that each of the firemen was a public safety officer who was killed in the line of duty on September 11, 2001.[83/] The cases of these three firemen, therefore, serve as no guide as

---

[80/] *January 12, 2006, letter from Andrew J. Maloney to Director Hope Janke* ("Governor Pataki signed legislation restoring [three retired New York City firemen] to 'active' status after they were killed[,] and they were granted PSOB Act recognition and awards."). *Cf., Hrg. Tr., p. 85* (counsel identified these three retired firemen as James Corrigan, William Wren, and Phillip Hayes).

[81/] *See LaBare* v. *United States*, No. 05-907C, __ Fed. Cl. __ (Aug. 2, 2006) (recognizing that a benefit paid under Public Law 107-37 is not a PSOB Act benefit).

[82/] *See HOD, Exhibit 14* (2002 N.Y. Laws ch. 468, approved August 20, 2002; 2003 N.Y. Laws ch. 162, approved July 22, 2003).

[83/] Commissioner Scoppetta wrote as follows: "Pursuant to P.L. 107-37, signed by the President on September 18, 2001, to provide for the expedited payment of certain benefits for a public safety officer who died as a direct and proximate result of a traumatic injury sustained in the line of duty as described in section 1201(a) of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796(A) [(*sic*) )] in connection with the terrorist attacks of September 11, 2001, I am hereby certifying that the following public safety officers listed on the attachment, were killed in the line of duty, and their deaths resulted from traumatic injuries." The attachment that Commissioner Scoppetta included with his certification listed, among others, James Corrigan, Phillip Hayes, and William Wren.

to how I should consider the New York law relating to the decedent.[84]

## Conclusion

The decedent unselfishly and courageously ran toward danger and died assisting strangers in the lobby of the South Tower of the World Trade Center on September 11, 2001. I recognize the decedent's heroism that day and readily acknowledge and salute his bravery: Glenn J. Winuk gave unstintingly of himself, under the most dreadful circumstances, and gave unto death itself. Given the extent of his firemanic experience and his CPR training, he surely was among the most able of those good Samaritans who lent their hands, at the risk – and cost – of their lives, to the rescue effort at the World Trade Center. The law does not entrust me, however, with authority to distribute federal benefits in recognition of the ultimate sacrifice paid by good Samaritans, no matter how deserving, as Glenn Winuk undoubtedly was. Rather, the law charges me only with distributing specified federal death benefits to eligible survivors of public safety officers who die, directly and proximately, from injuries sustained in the line of duty. For the reasons discussed above, the claimants have not proven that the decedent is covered. Accordingly, I have no choice but to deny their claim.

9/1/06
Date

Domingo S. Herraiz, Director, BJA

[84] Commissioner Scoppetta's unequivocal and clear statement certifying to the Director of BJA, consistent with Public Law 107-37, that James Corrigan, Phillip Hayes, and William Wren were public safety officers who were killed in the line of duty stands in stark contrast to the letters that claimants' counsel asserts are Public Law 107-37 certifications on behalf of the decedent. It is interesting to compare the April 7, 2005, letter from Chairman Biancanello to Hearing Officer Daniel L. Skoler with Commissioner Scoppetta's certification quoted in the preceding footnote. Chairman Biancanello's letter opens with four-and-one-half lines of text that, with one exception, is identical to the language quoted from Commissioner Scoppetta's certification (even identical in its erroneous citation to a non-existent section of Title 42 of the United States Code – § 3796(A)). Then, unlike Commissioner Scoppetta's unequivocal and clear certification (*i.e.*, "I am hereby certifying . . ."), Chairman Biancanello's statement becomes hortatory (*i.e.*, "[the decedent] should be considered to have been").