# FAX FROM SKOLER HOUSE

7036 BUXTON TERR.
W. BETHESDA, MD. 20817
(tel. 301/229-1130)

* * * * *

TO: FELICIA LOGAN-EPPS, PARALEGAL
PSOB OFFICE, OJP, USDOJ

FAX

FROM: Dan Skoler

FAX NO: 301-229-2469
TEL NO: 301-229-1130

DATE: 9-14-05
NO. PAGES: COVER + 9

Comments:
PLEASE MAKE THESE FINAL ADDITIONS TO THE RECORD IN CASE # 01-911-0421 (GLENN WINUK).

THANK YOU

DANIEL SKOLER
PSOB HEARING OFFICER

Subj: Ambulance Squad attached to FD
Date: Friday, August 26, 2005 5:15:46 PM
From: AMaloney@kreindler.com
To: DSkoler@aol.com

Mr. Skoler, attached is the decision you requested that makes clear that EMS functions are separate and distinct from firematic functions. You do not have to be an active firefighter with firefighter training to be able to recover benefits. I note the case does say you must be active as an EMT, and we submit that Glen was active and current as an EMT, and carried his Jericho FD identification that showed his affiliation thereto. You have the Jericho by-laws as they existed on 9/11/01 (I am not aware of any relevant changes to the by-laws since then), and there is nothing in there that bars an associate member from performing EMT functions - only "firematic" functions of a firefighter which require firefighter training, testing, currency and physical fitness elements. EMT functions, as this case shows, fall outside firematic functions of a firefighter.

I will still attempt to get the FDNY letter that draws this distinction and will report back to you sometime next week.

Regards,
Andrew J. Maloney
212-687-8181
<<IR5020_FAX-Exchange-08262005-154241.pdf>>

CONFIDENTIALITY NOTE -- THIS E-MAIL TRANSMISSION IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL OR EXEMPT FROM DISCLOSURE UNDERAPPLICABLE LAW. If the reader of this transmission is NOT the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify Kreindler & Kreindler immediately by telephone at 212-687-8181 and delete this

Source: Legal > States Legal - U.S. > New York > Agency & Administrative Materials > NY Agencies & Attorney General Opinions, Combined
Terms: "opinion no. 87-15" (Edit Search | Suggest Terms for My Search)

Select for FOCUS™ or Delivery

*1987 N.Y. Comp. LEXIS 170, *; 1987 N.Y. St. Comp. 27*

Office of the State Comptroller of New York

**Opinion No. 87-15**

1987 N.Y. Comp. LEXIS 170; 1987 N.Y. St. Comp. 27

March 10, 1987

**SYLLABUS:**
**[*1]**

EMERGENCY RESCUE AND FIRST AID SQUADS -- Disability Benefits (entitlement to of members who receive no firefighting training)

VOLUNTEER FIREMEN -- Disability Benefits (entitlement to of members who receive no firefighting training)

GENERAL MUNICIPAL LAW, § 209-b; VOLUNTEER FIREFIGHTERS' BENEFIT LAW, § 5(1)(a),(k): An active member of a volunteer fire department emergency first aid and rescue squad who has not received firefighting training is not precluded from receiving benefits under the VFBL for injuries incurred while performing a duty or activity enumerated in section 5 of the VFBL.

**REQUESTBY:**

William F. Donlon, Jr., Chairman
Hicksville Fire District Commissioners

**OPINION:**
We have been asked whether a member of a volunteer fire department assigned to the emergency rescue and first aid squad who receives no firefighting training and has no firefighting responsibilities would be entitled to the benefits available to volunteer firefighters under the Volunteer Firefighters' Benefit Law (VFBL) or other state statute.

Regarding the necessity for members of an emergency rescue and first aid squad to receive firefighting training, we note initially that General Municipal Law, § 209-b authorizes the **[*2]** formation of emergency rescue and first aid squads within fire departments to provide emergency and general ambulance service. We are aware of no State statute which prescribes specific training requirements as a prerequisite to membership in a volunteer fire department or company (*cf.* Civil Service Law, § 58-a and 19 NYCRR Part 426 relative to training standards for firefighters in the competitive class of the civil service). Therefore, we have expressed the opinion that the necessity for, and the extent of, any training for volunteer firefighters may be determined by village or fire district rules and regulations (see Village Law, § 10-1000[5]; Town Law, § 176[11]) or by fire company or department by-laws (see 1978 Opns St Comp No. 78-870, unreported). We have also concluded that such rules, regulations and by-laws may provide that persons can be accepted as volunteer firefighters for the sole purpose of becoming members of an emergency rescue and first aid squad and that, in the case of such members, may require first aid training in lieu of firefighting training (Opn No. 78-870, *supra*). Accordingly, it is our opinion that, except as may be required by rules and regulations **[*3]** of a fire district or village, as the case may be, or by fire department or company by-laws, a member of a fire department who is assigned to the emergency rescue and first aid squad need not receive firefighting training.

With respect to the entitlement of a member of a fire department assigned to the emergency rescue and first aid squad to VFBL benefits, we note first that VFBL benefits are available only to *active* volunteer members of a fire company (VFBL, § 3[1]; 1983 Opns St Comp No. 83-115, p 144). In addition, to be eligible for the benefits authorized by the VFBL, the firefighter must be performing a duty or activity enumerated in section

5 of that statute.

In our opinion, section 5 covers both general and emergency ambulance service (see Memorandum of the Joint Legislative Committee on Fire Law, L 1957, ch 549, McKinney's Session Laws of 1957, p 2171). Section 5(1)(a) provides for benefits for injury or illness resulting from:

"a. Necessary travel to, working at, and necessary travel returning from a fire, alarm of fire *or other emergency to which his fire department, fire company, or any unit thereof,* either has responded or would be authorized to respond, **[*4]** including necessary travel during such work or incidental thereto." [Emphasis added.]

In addition, section 5(1)(k) provides for benefits for injury or illness resulting from:

"k. Necessary travel to, work in connection with, and necessary travel returning from *a call for general ambulance service by a member of an emergency rescue and first aid squad* which has been authorized to furnish such service pursuant to section two hundred nine-b of the general municipal law, including necessary travel during such work or incidental thereto." [Emphasis added.]

Therefore, based upon these provisions, it is our opinion that a volunteer firefighter who is an active member of a fire department emergency rescue and first aid squad and is injured or taken ill as the result of responding to a call for general ambulance service or to an emergency call would be entitled to VFBL benefits (1982 Opns St Comp No. 82-236, p 296; Opn No. 83-115, *supra*). We would suggest, however, to avoid the possibility of future disputes, that the fire district consult the insurance carrier which provides its VFBL coverage to ascertain its views in this matter since any determinations in this regard will, **[*5]** in the first instance, be made by the carrier.

Source: Legal > States Legal - U.S. > New York > Agency & Administrative Materials > **NY Agencies & Attorney General Opinions, Combined**
Terms: **"opinion no. 87-15"** (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Friday, August 26, 2005 - 10:06 AM EDT

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Subj: Glenn Winuk
Date: Friday, September 9, 2005 3:53:31 PM
From: AMaloney@kreindler.com
To: DSkoler@aol.com

Dear Mr. Skoler,

I was finally able to get a letter from Captain Lisa Gloffke, FDNY-EMS, who recently retired. I will forward the letter to you in another e-mail, momentarily. Her letter makes a clear distinction between a firematic activity and an EMS first aid activity. She goes a bit further and speaks to his "duty" to provide assistance given his training and association with Jericho. In addition, she spoke to me about the National EMS Memorial Service and further directed me to their web site (the site is contained in her letter). Unfortunately she was only able to find a few pages of the underlying paperwork that initiated nomination. I will also attached those pages to her letter in my next e-mail. Captain Gloffke further directed me to the criteria used in order to have Glenn appropriately honored.

Below is are two attachments: The first is taken from the National EMS Memorial Service web site that states its mission and lists the criteria needed to be honored. It also articulates that the Memorial, though not a government entity per se, enjoys the blessing from both houses of Congress as the "Official" EMS Memorial of the United States." The second attachment contains the actual resolutions from both Houses of Congress.

In reviewing the Bice case that you referred to in your Aug. 27, 2005 e-mail, I think that the National EMS Memorial Service honor that Glenn received is certainly persuasive, if not dispositive. While the Memorial is not a governmental agency, it certainly enjoys a formally recognized status by both Houses of Congress (they, not surprisingly, did not want to make it a government entity that required government funding). As you know, a federal investigative agency, or by extension, its substitute, should be afforded "substantial weight" according to the "regulatory requirement" of 28 C.F.R. sec. 32.5.

The Bice case is also instructive in mandating that "the PSOBA 'should not be applied grudgingly, but rather should be construed liberally to avoid frustration of its beneficial legislative purposes.' " Demutis v. U.S, 48 Fed. Cl. 81, 86 (2000). "A liberal construction is ordinarily one which makes the statutory rule or principle apply to more things or in more situations than would be the case under a strict construction.' " There is no single litmus test or rule that requires objective or "empirical" evidence (in Bice it was the absence of a blood test that would show traces of carbon monoxide to prove the causal relationship to the heart attack). In Mr. Winuk's case, the absence of a Jericho Fire Dept. by-law that either granted or prohibited a volunteer the ability to perform EMT functions, cannot be used against Mr. Winuk. He had been explicitly authorized to act as an EMS rescue worker for many years, and there is NO by-law that expressly repudiated that authorization. Additionally, he complied with NYS law to maintain his authorization (by virtue of his training and tests administered and passed) to act in such a capacity.

It is with heavy heart today that I am sending my final submission to you, because on this very day, President Bush is honoring 443 rescue workers and their families who made the ultimate sacrifice on Sept. 11, by presenting each of them with a Medal of Valor in Washington. Apparently, due to the present status of his case, Glenn Winuk is not among them.

On behalf of the Winuk family, it is my hope that you will assist in helping us right this wrong some day soon.

Respectfully submitted,
Andrew J. Maloney
(212) 687-8181

> > <<National EMS Memorial Web Site>> > > <<House & Senate Resolutions on EMS>>

CONFIDENTIALITY NOTE -- THIS E-MAIL TRANSMISSION IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY

Captain Lisa Gloffke (Ret. FDNY)

September 9, 2005

**Via Facsimile (212) 972-9432**
Andrew J. Maloney, Esq.
Kreindler & Kreindler LLP
100 Park Avenue
New York, NY 10017

**Re: FDNY EMS Functions**

Dear Mr. Maloney:

I understand you are seeking a description of the job duties of an FDNY- EMS worker as distinguished from those of a firefighter. In short, the two job functions are very distinct and different.

As you know, EMS had previously been a part of the New York Health and Hospital Administration. In 1996, we were brought in under the FDNY umbrella and housed at many of the firehouses. This enabled us to be located in a variety of neighborhoods and closer to the scene of an emergency. This cut down on our response time.

It is not uncommon for EMS workers to work closely with firefighters in responding to an emergency, but our functions are very different. EMS provides airway management, life stabilization, life support and transportation for victims. Our training requires practice in a multitude of life stabilization and life support techniques ranging from simple first aid, CPR, basic hemorrhage control and spinal immobilization by a certified first responder through advanced life support techniques performed by a paramedic.

We do not fight fires and do not normally enter a structure fire. The fire-fighters have separate training and physical fitness requirements that are necessary to perform firematic duties such as these. We do not use hydraulic Hurst tools or saws to extricate victims from cars or collapsed structures, firefighters do that. Firematic activities involve work in potentially life threatening circumstances and are therefore heavily regulated by State Law as to when a person is qualified and current to perform such functions. EMS functions, while not normally life threatening to the responder, are also regulated to the extent that a person must be trained, evaluated, licensed and remain current to perform life saving medical assistance to an injured person and transport them to a hospital.

While EMS is often called to the scene of an emergency with firefighters, EMS is also often called to an emergency that does not require or involve firefighters. If a rescue worker is not trained to perform firematic functions or is no longer qualified or active in performing said functions, that rescue worker if trained, certified, qualified and current to perform EMS functions as a First Responder, can still perform his or her duties an EMS rescue worker. Many work as volunteers in firehouses as EMTs.

Our relationship with firefighters can best be described in public safety as "where their job ends, ours begins."

I am familiar with Glen Winuk's case and believe as a New York State trained, qualified, certified and current First Responder, Mr. Winuk was obligated to provide mutual aid during the emergency rescue operations at the World Trade Center on the morning of September 11, 2001.

I am further aware that he was appropriately nominated and granted recognition by the National EMS Memorial Service, a government endorsed organization that is the official EMS Memorial for the United States. That organization has certain criteria (see www.nemsms.org/criteria.htm) that were met by the facts presented by in Mr. Winuk's case.

Very truly yours,

By [signature]
Captain Lisa Gloffke, Paramedic
(FDNY EMS Retired)

171545
v1

*"The Ultimate Sacrifice"*

## About the National EMS Memorial Service

The purpose of the National EMS Memorial Service is to honor those emergency medical services personnel who have died in the line of duty and to recognize the ultimate sacrifice they have made for their fellow man.

The first National EMS Memorial Service was held in 1992. It is now held annually during National EMS Week.

During the service a family member or agency representative is presented with a U.S. flag that has flown over the U.S. Capitol denoting the honoree's service to their country, a white rose representing their undying love, and a medallion signifying their eternal memory.

This year's Service will be conducted on May 28, 2005 at 7:00 p.m. (EDT) in Roanoke, Va. Please take a moment at that time to join us in remembering our fallen colleagues.

In May of 1998 both the Senate and House of Representatives unanimously passed concurrent resolutions, H.Con.Res 171 and S.Con.Res 55, recognizing the National EMS Memorial Service, held in Roanoke, VA, as the "official" EMS Memorial of the United States.

The National EMS Memorial Service is supported solely by corporate, institutional and private contributions. If you would like to learn more about how you can support the Service, click here.

---

National EMS Memorial Service

*"The Ultimate Sacrifice"*

## NATIONAL EMS MEMORIAL SERVICE CRITERIA

The National EMS Memorial Service is held each year to honor those who have lost their lives while saving others in EMS related incidents. Nominees must meet certain criteria in order to be honored for the memorial service:

- Nominees must not have been honored previously in the National EMS Memorial Service.
- Nominee must have been affiliated with an established EMS agency and performing EMS duties at the time of death. EMS duties include, but are not limited to, transporting patients, treating patients, performing extrication procedures, rescue operations, and may include attending meetings, public appearances, or other related functions.
- Those nominees who have followed established safety regulations, local protocols, and standard operating procedures will be eligible to be honored at the service.
- A copy of the nominee's obituary or death certificate and several photos are required and must be submitted with the nomination. Nominations must be postmarked by December 31 to be considered for the following year's service. Each nomination will be reviewed individually and any exceptions or deviations from said criteria will be reviewed accordingly.

In the event the nomination is not accepted, the individual(s) submitting the nomination may appeal the decision in writing and the National EMS Memorial Service Board will review the nomination and make a final decision.