IN RE: APPEAL HEARING: GLEN WINUK

PSOB Claim No. 01-911-0421

APPEAL HEARING

New York, New York

Thursday, April 14, 2005

**ORIGINAL**

Reported by:
NANCY SILBERGER
JOB NO.

April 14,, 2005

1:00 p.m.

Appeal Hearing of SEYMOUR WINUK, held at the offices of Kreindler & Kreindler, 100 Park Avenue, New York, New York 10017-5590, before NANCY SILBERGER, a Notary Public of the State of New York.

A P P E A R A N C E S:

KREINDLER & KREINDLER LLP
Attorneys for Appellants
100 Park Avenue
New York, New York 10017-5590
BY: ANDREW J. MALONEY, III, ESQ.

U.S. DEPARTMENT OF JUSTICE
Attorneys for PSOB
Washington, D.C
BY: DANIEL L. SKOLER, ABA State Court

ALSO PRESENT (AS WITNESSES):
JAY S. WINUK
THOMAS VON ESSEN
JOHN NAVARETTA

MR. SKOLER: Good afternoon. My name is Daniel Skoler and this hearing before the Department of Justice is called to order at the law offices of Kreindler and Kreindler LLP, in New York City on April 14, 2005.

Claimants, Seymour and Elaine Winuk, have asked for this hearing in order to request that the agency reconsider its determination that they are not eligible for survivor benefits under the Omnibus Crime Control and Safe Streets Act of 1968, as amended which, in relevant part, provides for the payment of death benefits to eligible survivors of public safety officers who have "died as the direct and proximate result of a personal injury sustained in the line of duty."

The Bureau of Justice Assistance, which I will sometimes refer to as "BJA", is the authorized administering agency for public safety officer benefits under the act (sometimes called

"The PSOB Act".) The Bureau has determined by decision issued in July of 2004 that Glenn J. Winuk of the Jericho, New York Fire Department was not functioning and did not have authority to function as a "public safety officer" at the time of his death in the course of apparent rescue assistance provided on the occasion of the terrorist "Twin Towers" attack and implosion of September 11, 2001, as required by The PSOB Act.

More specifically, the BJA found that Glenn Winuk (1) was not a member of the New York City Fire Department or acting pursuant to the direction of that department at the time of his death and (2) was not an authorized member of the Jericho Fire Department at the time of his death but rather an "Associate Non-Active Member" of that department without authority to undertake firefighting activity for the Jericho Fire Department.

I am not an employee of the Public Safety Officers' Benefits office, the Bureau of Justice Assistance (BJA) or any unit of the Department of Justice. I function as an independent hearing office under a contract with BJA. As such, I have been delegated the authority to conduct this hearing. I may sign and issue subpoenas, administer oaths, examine witnesses and receive evidence at any place within the United States. I will receive all relevant evidence the claimants choose to submit and neither the formal rules of evidence nor the Federal Administrative Procedure Act apply to this proceeding.

After the hearing, the record will be transcribed. I will review the transcript. Any evidence submitted at this hearing or present in the agency case record (including documentary evidence submitted to me on claimant's behalf prior to the hearing). I will make my final determination in this

matter not later than 30 days after I have received the final piece of information relevant to this proceeding. I will, at the time I close the record, advise claimant's attorney, Mr. Andrew Maloney, of the date I expect to make my determination.

All persons should be aware that the Director of the Bureau of Justice Assistance may review and reverse my determination. If my decision is to deny benefits to the claimants, Seymour and Elaine Winuk, they may ask the BJA director to review that decision. The director will make the final agency determination within 30 days after such a request. Other information pertaining to the appeals process is contained in the program's regulations, a copy of which, I understand, has already been provided to the claimants or their representatives.

Let me remind you that this is an informal session and ask that you

address me as Mr. Skoler. Are there any questions concerning the conduct of this hearing, or the appeals process in general? And you can raise those as we go along.

Attorney Maloney, please present your evidence and any legal argument you may wish to advance on behalf of your clients and their appeal in any order that you deem appropriate. I will, before you start, if I may just ask those who will be providing testimony to raise their hands, stand up and repeat after me and take the oath.

(Witnesses sworn).

Do you swear or affirm that the testimony you will give at this hearing is the truth, the whole truth, and nothing but the truth.

MR. MALONEY: Thank you, Mr. Skoler.

MR. SKOLER: And I apologize for being a little late in getting to the hearing.

MR. MALONEY: Thank you, Mr. Skoler. We -- I think all of us understand the issues that you articulated with respect to the denial of the benefits by the claimants, and we'll address those issues during the course of this hearing. Ironically, most of the facts in this case do not appear to be in dispute. The dispute, I think, arises over the characterization of some of the facts and, perhaps, understanding better some of the relationships between those facts and the statute itself.

What I'd like to do is have each of the witnesses that are here present some testimony to you. Some will be in the form of narration, some in response to questions that I present to them, and when I'm done with each witness, or done at the end, of course, any of us welcome questions from you at any time.

To my right is Seymour Winuk, the father of Glenn Winuk; Glenn's brother,

Jay, is to my immediate right, Jay Winuk. To my left is John Navaretta, formerly of the Jericho Fire Department, as well as the FDNY; and at this end of the table is former Commissioner Tom Von Essen, the commissioner of the FDNY during the September 11th terrorist attacks, and I'll probably just go in order right down the line here. I'd like to start with Mr. Winuk and, Mr. Winuk, please take your time.

(Examination begins on next page.)

TESTIMONY OF SEYMOUR WINUK
BY MR. MALONEY:
Q. I'd ask for you to describe for Mr. Skoler a little bit about Glenn, his background, his upbringing, how it is that he came to be interested in public safety and serving his community, and what this meant throughout the course of his life.
A. Well, from his youngest years -- first of all, I have three wonderful sons, but Glenn showed a little special interest in first aid, helping people, not too much above the others, but Glenn was a little special. He was always looking to help people do things, community service, whatever he could. I remember him asking me to build him a little first aid kit, and we lived in Jericho at the time, I had some tools and wood in the garage and I built him a box with a cover, a hinge and a handle on it, and he put Band-Aids and --
Q. How old was he at the time?
A. Oh, God. Maybe eight, seven years old --

JAY WINUK: That's about right.

A. As a matter of fact, I still have the red box at home where you maybe put a Red Cross on the box. And he was always interested in -- sometimes he wanted to become a doctor, and his brother, Jeff, was a member of the Jericho Fire Department at the time, and he wanted to follow in Jeff's footsteps. We also had a brother-in-law who was a New York City fireman, and so there was an area of conflict between becoming a fireman or a doctor. The law was the furthest thing from his mind. And I really don't know what else. It's very difficult for me to speak, and I also have a cold.

Q. When did he join the Jericho Fire Department?

A. Well, he was always at the firehouse as a kid. You know, we lived right around the corner from the firehouse, and as soon as he was able to cross the streets by himself, he would go around the corner and hang out at that firehouse. And he would climb on the trucks and, you know, honk the

horns and sirens and he -- any time he heard me -- sitting down at dinnertime, we heard those sirens go off, well, we had this box, I forget what they call it --

JAY WINUK: Plectron.

A. Any time his Plectron would go off, he would say, "Excuse me", and off to the firehouse he went. If his car wasn't readily available, he ran to the firehouse and tried to give any assistance that he could. And nothing stopped him from helping people. If he saw anybody that needed help, he was there. I can name many, many instances that I'm sure it will come out in these other gentlemen's testimony. He was a wonderful, wonderful boy, and everybody speaks highly of him.

I had occasion to go into Pearl Vision, I needed my eyeglasses repaired, and they heard the name Winuk, and they said "By any chance, are you Glenn Winuk's relative?" I said, "Yeah, I'm his father." He says, "What a wonderful, wonderful boy. He would be sitting here, we would be talking to him

examining him and if he saw an old lady having a hard time opening the door, he would get up from his seat in the middle of the conversation and just help this lady, you know, sit down." He -- I can't say enough about him.

Q. Mr. Winuk, at some point he moved out of the house and moved to Manhattan; is that right?

A. Yes.

Q. Do you remember roughly about when that was?

A. No. Jay would probably know better.

JAY WINUK: I think he lived in Manhattan for maybe 14 years.

Q. The time period of which he was living in Manhattan, did he come home, and when I say "home", I mean to your house; can you describe how he participated, if at all, with the Jericho Fire Department while he was still living in Manhattan?

A. All the time. He still had his Plectron. I still have it in the house, as a

matter of fact, the original Plectron. If he heard that Plectron go off, he would go off to the fire department, all the time.

Q. How often would he come out to Jericho?

A. I would say he came out almost every weekend.

Q. And you say he responded to calls while he was staying in your house, even though he was residing in Manhattan. Do you know if he kept up with his training and things like that?

A. Oh, yes, oh, yes. Absolutely. As a matter of fact, in going through his car we found that certificate of building collapses. We didn't even know it existed. I mean, that he attended classes on building collapses.

Q. Did you become aware at any time that he had taken any EMT type courses?

A. Oh, yes, yes.

Q. Tell us what you know about that?

A. Well, I don't know the specific dates, but any times there was an EMT course, Red Cross course class, he would go to. CPR,

anything he would go. He was very interested. It was only in his later years after graduating from high school that he decided to become an attorney. But being a firefighter and EMT, was always, always his first love, always. He just -- it was just in him to help anybody, and everybody that I ever come across that knew Glenn at any time always speaks very highly of him.

MR. MALONEY: My next witness, I'm going to ask -- I'm going to save Jay Winuk for the end.

I may ask John Navaretta to tell us, first of all, a little bit about yourself, John, and then how it is you came to know Glenn and I'll probably ask you him.

TESTIMONY OF MR. NAVARETTA

BY MR. MALONEY:

Q. Mr. Navaretta, first tell us, state your name for the court reporter, and then I would like you to tell us a little bit about your own background, vis-a-vis public service and what you are currently doing?

A. My name is John Navaretta. I am currently an attorney now, okay, but backtracking way back when, approximately 1972 is when I became a Jericho volunteer fireman at the age of 16. They actually had junior firemen back then, and then in 1978 -- actually, 1974 is when I became a full-fledged Jericho volunteer firemen and maintained my membership with them for approximately ten more years, and I rose to the rank of first assistant chief with the Jericho Fire Department.

In the interim, after I graduated college, on January 13, 1979 -- you never forget that day when you become a firemen in the City -- that's the day I got sworn in as a New York City fireman, and I approximately did that for another ten years before I was injured on-the-job and was forced to retire.

Q. While you were a paid firefighter for the FDNY, were you -- did you also continue your volunteer duties in Jericho?

A. Yes, yes. There was an overlap of about five years I did both. I guess it was

in my blood. I just couldn't get enough of it. I would go work the tours in the City, and I would come home and I believe most of the time I was a fire chief on the island during the time I was a City firemen, and then what happened was I got married sometime, I think it was '84 or '85, and that's when I had to move out of the Jericho fire district so that -- you no longer can be a member so I resigned.

Q. Now, at sometime -- withdrawn. When did you first meet Glenn Winuk?

A. I actually knew the Winuk family through their older son, Jeff, who we used to be firemen together before I met Glenn, and Glenn joined the Jericho Fire Department, I believe, it was around 1978, and I believe I was a captain in the truck company at the time and he was -- became a member into the engine company. And that was the first time I became acquainted with Glenn, even though I knew his older brother real well.

MR. SKOLER: How old would he have likely been at that time, in his teens?

THE WITNESS: Eighteen. I believe it was 18 when he joined. That's when you become an active full member.

Q. Did you have occasion to see Glenn fight fires and participate in rescue operations?

A. Absolutely. A little background. When Glenn first became a Jericho fireman, and I was a City firemen, there was always that aura of New York City firemen within the volunteer system that we were, not better, but better trained, more experienced, and we had more knowledge, and a lot of people within the volunteer system would look up to us for guidance along those lines. Glenn, we had an instant bond, it appeared, when I met him, and I became somewhat his mentor in the fire fighting programs, et cetera, and we just, as every year just passed by, we just became closer and closer to the point where I think we were probably closer than most family members or brothers. There wasn't a weekend that didn't go by that I wasn't with him. We spoke every day on the phone, just

about. When he was an attorney, he was actually instrumental in me becoming an attorney after I retired. He kept suggesting it and encouraged it, so I said, "What the hell, why not."

Q. Did the relationship like that continue after Glenn moved into Manhattan?

A. Absolutely. It actually got better, believe it or not, because we used to go out and have terrific steak dinners at least once a week or twice a week with another good friend of ours who lived in the City. And he introduced me to drinking Scotch. That was his big thing. It was just like the greatest relationship, you know.

Q. You said you left Jericho at some point, and I think you actually said you resigned; why did you have to resign?

A. I had to resign because I got married and basically couldn't afford to live in that Jericho district at the time. So we moved to Huntington, which was about two fire districts away, so you have to resign. But I maintained a relationship with the fire

department. I was consulted on many issues still being an ex-chief there, and I had tremendous bonds with a number of firemen there, and I wasn't that far away, and Glenn would come over to Huntington as much as he wanted, and he actually, I think, became a lieutenant at some point in time in the Jericho Fire Department while I was resigned and he would continuously -- we would talk about the fire department, you know, war stories and he would ask me an opinion about this, should I do this, how do I go about this, and it was just basically along those lines.

When we were both members together, we were in many incidents. I, obviously, would trust him with my life. I've done so on many occasions. He was a hell of a fireman, and not to pat my own back, but he would always say that it was a result of me and our other friend, Tom Casey, who's not here today, it was our training or out firematic injections into his life that made him such a great firefighter and person.

Well, whatever. I think, it was just always in him. You know, any time you needed something you could rely on him. He was there, okay.

Q. How did he respond to direction and control from superior officers; did he have any trouble taking orders, for example?

A. Absolutely not. He was -- no matter what you told him to do, or any superior officer, he would to exactly to the letter of the law, you know, that was Glenn. If you asked him to go pull that ceiling down, he would pull exactly what you wanted down. If you asked him to render first aid to someone he would be there with that patient until they were on their way to the hospital.

Q. Did you ever have cause to offer any -- when I say "you", I mean you and Glenn, and Jericho administer mutual aid to any districts outside of Jericho?

A. Occasionally, yes, we would. Anything that would come up -- how could I say this. Once you are a fireman, you're

always a fireman, even if you are retired. And if me and Glenn were driving by a town that was having -- there was a large fire or some sort of major car accident or whatever, we would stop and we would go report to the chief, or whoever we thought was in command, and tell them -- we identified ourselves. And they would pretty much say, yeah, we could use a hand over here or grab this person here and help us with that. And, I believe, there was one in Bayville at the time that was actually a house fire that we -- as I'm thinking -- when I lived in Bayville we jumped in, pulled some hose for them, or something like that.

Q. You are also an attorney; do you have a general understanding of the New York law and mutual aid?

A. A fair amount, yes.

Q. What is your understanding?

A. You as a volunteer or paid firemen can render mutual aid to any fire district or fire department that may need assistance by basically identifying yourself to someone in

command. To my knowledge, I'm not quite sure who that person in command has to be, okay. To my understanding, it could be just from going to another firemen at the scene from that district or right up the chain of command, whoever the chief of that department is at the time. Just identify yourself and if they need your assistance the would -- you now actually act under their direction and you become a temporary member of their department until the incident is over.

Q. How would you know who the officers are on the fire scene that's outside your district if you are reporting in to help and you wanted to find an officer to report?

A. Usually each officer is identified -- in Long Island they are identified by a color of the hats they wear, or the helmets. Usually a yellow helmet would be a lieutenant, and a red helmet would a captain, and the white helmet would be the chief. In New York City, the only ones that are different color helmets are the chiefs with white helmets. Lieutenants and captains are

designated by the shield on the front of their black helmet, that would say lieutenant or captain. So -- and it's usually the -- often the person that's barking out the orders or pointing a lot. You just know right away when you go to a conflagration, you know exactly who's in charge. So you would you report to him or his assistant or something, and that's basically how you get involved in helping out that department.

Q. After you had left the Jericho Fire Department, but you maintained your relationship with Glenn, did you have occasion to speak to Glenn about any instances where he provided mutual aid outside of Jericho?

A. Yes. Glenn being a -- worked in the City and lived in the City during the week, and he would come out every weekend. He happened to be at two major incidents. I'll bring up that we discussed. The first one was the first bombing of the World Trade Center. He responded to that site actually along with myself. I was actually doing a

deposition on the Upper West Side at that time, and I always carry my ID with me also and even though I was retired. He was only a block away, I assume, or whatever, two blocks away. He responded, and we discussed what he did. You know, he rendered some first aid to some of the people they were bringing out of the building, okay, out on the street.

Q. Did he express to you his understanding of how to offer mutual aid in a situation like that to the FDNY?

A. Oh, absolutely. Because I asked him, how did he get in there, because I had to have my badge out. I was going down the FDR Drive there at the time, and I must have showed my identification no less than five times to get right to the site. So he said he used his Jericho identification, and he told them he was an EMT, and they would let him in and he was -- I think on the first one he was actually just rendering -- assisting with oxygen and maybe a few bandages as they were taking them out of the first, second floors, the basement where they were carrying

them out.

Q. Was he -- was it your understanding he was doing that based on conversations under the direction or control of some officers of the FDNY or something else?

A. Oh, yeah, absolutely. Glenn was very highly trained and I know he would never -- there's a term we use, "freelance". If you are like driving by and something happens, you want to just jump in and help out. Glenn was not about that. Before Glenn would do anything he would report in to somebody, okay. It was kind of like that's what we always discussed, because if you start freelancing and get hurt or disappear, no one knows what you were doing. So I always told him -- we used to instill that in each other, just report in, tell somebody you are there, and then you can go to work under their direction. That's the best way to do any type of mutual aid.

Q. Are you familiar the term "incident command structure"?

A. Somewhat.

Q. As part of your training as a firefighter, both FDNY and volunteer for Jericho, am I correct they give actually classes on -- that's one of the things you have to understand, study, you even get tested, officially certified, in understanding the incident command structure? In other words, no freelancing, report to officers?

A. That's correct.

Q. And operate only under their direction and control?

A. That's absolutely correct. It's instilled in every firefighter from when he first joins, no matter what department it is.

Q. And I think you already said this; what's the purpose of that, what's the reason for this?

A. Well, just so that we know who is doing what jobs, okay, and nobody is getting lost, or you have a typical instances in a collapse, you need to know where all your units are, and I'm sure Mr. Von Essen can elaborate more on that. If no one reports

in, or if people just start running rampant, then nothing gets done. Because I don't know how else to describe an actual fire fighting attack. To the outsider, they may not understand what's really going on, but within, everybody has a job, everybody has to do that job or people don't go home at night, and that's basically what it comes down to. So Glenn understood that with one hundred percent certainty. He knew that the commanders would have a task for them -- you know, for him and that's basically what he would do, whatever they requested.

Q. At some point -- you actually were about to mention another incident; was there another incident?

A. Yeah, there was one other major incident was the explosion in the subway. I want to say it had to be about '98, maybe --

MR. MALONEY: John, if you don't remember the year, I don't want you to guess.

A. Yeah, it was somewhat of a major headliner in the City. There was an

explosion or a bomb, and Glenn happened to be right there, or on top. So when he heard the explosion, smoke coming out of the subway he just ran down and rendering first aid -- there was a police officer there, according to Glenn, we talked about this a lot, and there was police officer there who really wasn't an EMT, and Glenn was EMT trained. So he basically said, "oh, thank God. Take over for me." And Glenn administered first aid.

One of his concerns were they weren't sure if there was another bomb there, you know, what was really happening, and he really performed, like, brilliantly at that one, to the point where I think two police officers who he assisted there actually came up to Holland & Knight, where he was an attorney, and wanted to thank him. And I think wanted to send them -- that's typical Glenn. He wanted to send letter to somebody because these two officers got commendations because -- I'll never forget, the officer that really got the commendation, according to Glenn, he never saw. So he didn't

understand, like, where was this guy. The two guys he thought did all the work didn't get any recognition.

Q. There were two other instances that I think you told me about before that also may involve mutual aid. I'm not quite sure. One was wild fires out in Suffolk County and the Avianca plane crash?

A. That's correct. I believe Glenn was living in Manhattan at the time, and he was the type of guy that as soon as he heard there was something major going on, he would jump in a car -- he always used a car service because sometimes he didn't have his car in the city. And he would respond to the Jericho firehouse, and then he would jump on a truck and he wound up out at the Hamptons there, a major brush fire there, or the pine barrens.

Q. There is a couple of items we have on the table. I'm not going to mark them as exhibits for obvious reasons, but I am going to show them to Mr. Skoler, and I want to show you one in particular that has some bars

on that. What significance, if any, do they have to you?

A. Okay. These bars up top? Or these are the medals that he received for outstanding performance at the -- well, the first was the Suffolk wild fires. He spent days there fighting the fire, okay --

Q. And Suffolk County is outside the Jericho Fire Department?

A. That's correct. It's actually a whole county away.

Q. So that would be another example of offering mutual aid.

A. Offering mutual aid. That's correct. And Avianca is a similar situation. He responded out from the city on the Avianca plane cash in Cove Neck, if you recall that one, and he stayed there about, you know, at least 24 hours and rendered first aid and helped evacuate the victims on that plane crash.

Q. By the way, if he violated the standard operating procedures for providing mutual aid and freelancing, or something like

that, do you think he would have gotten into those situations?

A. Oh, absolutely not. With any department, as Mr. Von Essen probably can elaborate to, these are significant. They just don't hand these medals out, whether within the Jericho Fire Department or the New York City Fire Department. All of these medals indicate that he did something outstanding at these incidents, okay, and the only way to do that would be to operate under the proper chain of command and perform the way he was taught.

Q. And that would evidence to you that he understood and followed the principals of rendering or offering mutual aid to outside districts?

A. Oh, absolutely. Absolutely.

Q. There is another badge here --

MR. SKOLER: You might photocopy that. It would be nice to enter that as an exhibit.

MR. MALONEY: We'll save photocopying for the end. I don't know

how well that will come out, but I will try.

Q. I want to show you another badge on the table and ask you if you know what that is and then you will show it to Mr. Skoler.

A. Okay, this is an EMT badge issued from the Jericho Fire Department where each Jericho fireman has an option of whether or not they want to be trained as an EMT, and then would actually be called on rescue calls. That's the terminology they use, which is calls involving civilians that are in need of medical attention, et cetera.

MR. SKOLER: Would you repeat that again?

THE WITNESS: Okay. As a firefighter in the Jericho Fire Department you have an option to also become an EMT.

Q. That's not mandatory, it's optional?

A. It's optional, correct.

Q. So not every volunteer firefighter at Jericho is also an EMT, correct?

A. , correct. So Glenn, obviously, you know, exercised the option to became EMT trained, which now allowed him to respond to medical emergencies on the rescue truck from the Jericho Fire Department. And there were many instances within the department and outside the department that he performed this service, or based on his qualifications as an EMT.

I have been in his company where we've done it on several occasions outside the Jericho Fire Department, okay. So -- and it's my understanding he maintained his qualifications as an EMT. Because I believe every so many years you have to get requalified, and he always kept that current, to my knowledge.

Q. What significance, if any, is there between having two different badges -- there actually is a third badge; maybe you will explain that, too. Why do we have three separate badges issued to Glenn Winuk from the Jericho Fire Department?

A. What would happen is when you first

join the department, you get issued the 237, that's his badge number; okay, that's how you are identified.

Q. That's when you become a firefighter?

A. That's correct.

MR. SKOLER: That's something you keep for a long time?

THE WITNESS: Right. This is your badge forever. You are given that number and this badge, and this is what you would wear on your uniform or your hat when you get dressed up to go to functions, et cetera. On your fire helmet, your firefighting gear. You are also identified by 237. It's the number on the front shield. In the course of your membership and training, if you want to advance yourself into different areas as a firefighter, you can have the option of becoming what they call an engineer, which in Jericho, that is the actual chauffeurs, the guys that drive the trucks, pump the water, you know, do

all that. In New York City they are defined as chauffeurs; in Long Island a lot of them are defined as engineers. They are the drivers of trucks. And it's quite a lengthy course. You have to learn all about water hydraulics and pumps, and it's quite involved, and Glenn finished that so he was qualified for that, so they give him a badge and, obviously, once you get qualified as an EMT they give you this badge. So you have the option -- the reason why they you give this badge, should you wish to display either one of these on your uniform, whether it be just to show that, a status symbol of some sort, or recognition that you have reached these qualifications. So that's the three badges.

So in looking at all this, Glenn was -- couldn't get anymore training. You know, that was it. That was what the Jericho Fire Department was offering. That's the best that you can

get.

Q. Mr. Navaretta, are you familiar with the term "firematic activity"?

A. Yes.

Q. What does that mean to you?

A. Firematic activity would be any activity or incident that's actually involving firefighting duties, okay. Certain times it would be the engine, a ladder.

Q. What do you have to do to be qualified to participate in a firematic activity under New York law, as far as you know, either New York law or the Jericho bylaws, whichever is easier for you?

A. You would have to be -- pass physicals given by the fire department.

Q. On what frequency?

A. I believe it's either every year, or every two years. I'm not sure. They change occasionally. You have to maintain your qualifications by New York State, set I believe, under the OSHA, they have all these qualifications that you have to go and meet so many classes of actual firefighting

Q. Are you familiar with how Jericho operated the two, in terms of a call coming in to dispatch, and I want you to focus primarily on recent years, let's say 1997 through 2001.

A. Okay. It would go through local dispatch, and depending on the nature of the incident, if it was a fire, a building fire, a brush fire, a car fire, anything like that, the fire department would get called out. I believe on structure fires, they called out rescue department and the fire department, okay, but if it was a heart attack victim or somebody had fallen in a house, stroke or something like that, then the dispatcher would just dispatches the EMT company, which I believe was Rescue 4 in Jericho.

Q. And Glenn was a part of the rescue --

A. Yes, right. Right.

Q. -- EMT division of the fire department?

A. Exactly right. If would have -- either had two pagers, or one pager that

accepted both signals so that if they would just call out the rescue company, his pager would go off and he could respond to the rescue call only, or if it was a firematic, his pager would still go off and he would respond on an engine or ladder truck.

MR. SKOLER: Where was the dispatch located?

THE WITNESS: In the Jericho Fire Department. They had their own central station dispatcher.

MR. SKOLER: So they would dispatch for non-fire incidents like heart attacks as well?

THE WITNESS: Exactly, yes. If you dialed 911, it would eventually go to the Jericho Fire Department dispatcher, and then he designate what he's going to call out.

Q. Just to backtrack a little bit, was there a point in time where Glenn became a fire commissioner in Jericho?

A. Yes. He was very highly regarded. I think you are getting that flavor a little

bit. Each fire district in Long Island has five fire commissioners that sit as a board and they run the fire district. One of those members retired prematurely and there was a vacancy for about six or eight months that had to be filled, and the board had the option of having an election or appointing someone to fill that position until the next time for the election. And they unanimously asked Glenn to become the fire commissioner, and this is when he lived in the City, and he said -- reluctantly he said, okay, because he just didn't know if he was going to be able to have the time. That was typical Glenn. Most men would have thought it was such an honor, and Glenn was like I would love to do it, but can I really devote the time to it, and they said don't worry, we'll change the meeting time, whatever works for you. We want you on the board. And he did it, I think, for six or seven months before the next election.

Q. In fact, some of the meetings were during the week?

A. Absolutely. In fact, all of them were during the week.

Q. He had to come out to Jericho during the week?

A. And that's what he did. He would come out, and after the meetings -- and occasionally we would get together after the meetings.

Q. That was going be my next question. You continued your close relationship with Glenn during this time frame really up until the time he was killed?

A. Yes.

Q. You had -- you are a lawyer. When did you become a lawyer?

A. About '89.

Q. And Glenn was a lawyer. So you would have occasion to -- well, withdrawn.

You kept your finger on the pulse of what was going on in the Jericho fire house?

A. Absolutely, absolutely. We would talk, literally, we were probably like wash women. I tell you, it was really bad. We

would talk at least once a day. Whether it was legal things that we were talking about, or would just say, how you doing, something to do with the fire department. Mostly it always evolved into the fire department. Literally once a day, or every other day. If two days went by and we didn't talk, something was up; that type of thing.

Q. What I'm getting at next is going to be the area of the Jericho Fire Department bylaws, which you have some familiarity with, I take it?

A. Yes.

Q. There are descriptions in there regarding membership status. You had said earlier in your testimony that you had to give up your membership when you got married and moved away?

A. That's correct.

Q. Why is that, and then my next question is going to be, how is it that Glenn had something different?

A. Well, in 1984, is when I got married, the understanding of state law was

that when you left the fire district you had to resign, okay. In the course of time, whether the state law was changed, I'm not aware of, or because manpower in Long Island was becoming a -- reaching the critical stage, they relaxed that rule to say you didn't have to live in the fire district to became -- to maintain your status as a Jericho fireman.

So when Glenn moved into the City they allowed him to -- there had to be a special request made, and then the commissioners would act on that and, obviously, hands down, a guy like Glenn, sure just you have to maintain your quotas, and that's why Glenn would be out every weekend and still be active in the fire department. So that kind of explains why.

Q. Are you familiar with a term that's in the bylaws that define or describes associate membership status?

A. Yes.

Q. What's your understanding of that?

A. An associate member is for someone

who -- I believe it used to be 20 years. Now it's changed to 15 years. Once you have 15 years of service in the fire department you have an option to become an associate member of that fire department, with gives you basically all the benefits of being a member of the fire department, except you do not respond to fire calls any longer, and you have no quotas that you have to make to maintain your membership. That's basically an associate member.

Q. Why is it you didn't become an associate member?

A. I only had 12 years before I got married. So I needed three more years to be an associate member, which I would have if I had the time in. So I always thought I'd be back in the fire district eventually.

Q. So you resigned your membership and Glenn maintained his membership, albeit in a different status?

A. That's correct.

Q. And he -- as far as you know, on September 11, 2001, do you know what -- if he

was a member of the Jericho Fire Department?
A. He was an associate member of the Jericho Fire Department.
Q. Now, is it your understanding that he was active or non-active regarding firematic activities?
A. Regarding firematic, I would say he was non-active at that time.
Q. How about with EMT activities?
A. With EMT activities, I would say he was active because he maintained his EMT status. He went back for his refresher classes. I personally was with him on few instances where he rendered first aid, whether it was on my boat rendering to someone else, or stopping at a car accident, or something like that. So I would say he still maintained his EMT status.
Q. Have you had an opportunity to look at some of the correspondence from the Jericho Fire Department regarding Glenn's death with respect to his membership status?
A. Yes.
Q. What's your understanding of the

Jericho fire commissioner's position, as you sit here now, regarding whether or not Glenn was a member of the Jericho Fire Department at the time of his death?

A. In reviewing their letter, I see that they now -- they recognize that he was a member of the Jericho Fire Department as an associate member and, you know, basically was representing Jericho at that incident. Based on his training obtained from Jericho, he would be acting as a Jericho firemen would have acted, as any other Jericho fireman would have acted.

Q. What's the feeling amongst other Jericho Fire Department members regarding Glenn's actions? Are they proud of him as one of their members?

A. Yes. There was some dedications in the course of -- after 9/11, we dedicated a park to him, a little memorial site, and everyone was very proud of what he did, you know, as a Jericho firemen.

Q. A good reflection on the department?

A. Absolutely. Unfortunately it ended the way it did. But I think any department would be proud to have a member like Glenn, you know, and represent that department in any other district.

Q. Thank you, Mr. Navaretta.

MR. MALONEY: I'm going to turn the floor over to Mr. Von Essen. It would be easier if we had you switch seats.

MR. SKOLER: I'd like to ask a few questions.

MR. MALONEY: Oh, sure. I apologize.

EXAMINATION OF MR. NAVARETTA

BY MR. SKOLER:

Q. Mr. Maloney really developed what I was interested in very well. I just want to address some things.

Would you have intervened in a major emergency, personally, like 9/11 or something of even a tenth of that without ever trying to find somebody and identify yourself if you were intervening to provide mutual aid?

A. No.
Q. Could you ever imagine that you would do that?
A. No, no. Just based on my training I would want to report to somebody, and either be brought up to speed on what they needed, or just for the sake of reporting in so that now that I go to work for them, they know I'm in there working, and that's pretty important.
MR. MALONEY: If I can interject.
Q. Is there information that's shared to people -- under the incident command structure, is there information, dangers, for example, shared amongst people working under that structure?
A. Absolutely.
Q. So you would want to get that information from the officers. You would be crazy to go into a building, for example, that there might be dangers without knowing all there is you could know by reporting to officers?
A. Absolutely. You don't want to be

in a place say, where they are putting a hose line where you don't belong or doing something else, because you weren't aware the command was making a different attack on something. You just don't want to be in that situation. You need to be part of the team. That's basically what it's all about.

MR. SKOLER: As you can guess, my second question is: As close as you were to Glenn Winuk, both personally, as kind of a surrogate brother, but also as a professional for many years, do you think it would be possible for him to ever go into something like the south tower without attempting to make contact first with somebody who appeared to be in charge; obviously, something that big you never find the key man?

THE WITNESS: That's -- if I may elaborate on that. Based on where they found him finally, and based on my knowledge of his training and just the type of person he was, he would never have just ran to the site without

checking in with somebody in charge to say, I'm an EMT, I'm a Jericho fireman, can I help out; and on that day I actually tried calling him several times right when it happened, because I knew Glenn would probably wind up rendering aid down there. He worked right next door. So he -- I spoke to someone from Holland & Knight who told me they saw him in the street talking to some EMTs, FDNY EMTs, and then proceeded down Dey Street with them.

And then, based on the location of where they found him, I don't believe he could have gotten into that location at that time without checking in with somebody and identifying himself. And he would never have done it any other way.

MR. SKOLER: From your testimony about the matter of associate member, I take it it would be possible for a member of the department to take associate membership status, assuming he

or she qualified, and continue to do firematic activity if they maintained the connection to training recurrency because the record does indicate in some spots that he did come back to render assistance.

THE WITNESS: Right. Once he was an associate member he can no longer perform firematic duties.

MR. SKOLER: Regardless of keeping his credentials up?

THE WITNESS: That's correct. Okay, he can, though, render first aid, as long as he kept his EMT credentials.

MR. SKOLER: So there is that difference?

THE WITNESS: Yes.

MR. SKOLER: And that would be his ability to do emergency medical technician work would not necessarily be affected by the firematic activity ban that comes with an associate membership; is that correct?

THE WITNESS: That's correct, yes.

MR. MALONEY: Do you have more questions for Mr. Navaretta.

MR. SKOLER: Maybe just one. I appreciate your waiting.

I think we have covered all the ground.

MR. NAVARETTA: Thank you.

MR. MALONEY: Mr. Von Essen, if you could switch seats.

EXAMINATION OF MR. VON ESSEN

BY MR. MALONEY:

Q. Mr. Von Essen, thank you for joining us. If you could just start by telling us a little bit about who you are and your background and lead us up to September 11, 2001, and I'll follow up with some questions.

A. Okay. First, I just want to say that I try to avoid this kind of stuff, because I find it very emotional and painful to relive it, you know, but I thought that this person, you know, was worth an effort to try to make something, make it right, at least in my view, to be made right, even if

there is things that technically prevent things originally from being made right, and hopefully later on they can be. So having said that, to listen to John talk about a man who will take a car service to his volunteer unit to help others, it just kind of says it all for me right there. I wouldn't have to hear anything else, you know. That would be enough for me. But I'm not a lawyer and, you know, not -- luckily wasn't obstructed all the time by lawyers that, in my opinion, you can't get anything done if you fill the room with lawyers.

Having said that, I was a firefighter since 1970, and I worked in the South Bronx about 16 years, which was very active at the time. So I developed a real sense of concern of about safety and firematics and everything.

Then I became involved in the union and wound up being union president three years, different position for a total of ten. And then was asked by Mayor Giulliani to be fire commissioner. So I did that for six

years. And was asked by Mayor Bloomberg to consider staying before his election, and was going to stay until after September 11. In November, at some point, I decided that it was just too emotional for me to continue. The hardest part of it was looking at people like Mr. Winuk, and the fathers, the mothers, the wives, the kids. It was just so emotional and so painful that -- I knew what the department was like and how difficult, not just those three months had been, four months, but how it would continue to be reliving a reenactment of it every day for at least another year, but who knows how long after that. I mean we are now almost four years and we still relive it.

The other day Mayor Giulliani went in partnership with a law firm from Texas and a lady asked me, she said she was going to jog down to the Trade Center. She wanted to see it. So I kind of avoided it. I went down with her and it just brings it all back, just going through that experience, and I thought it was good for me to do once in a

while, anyway. I tried to avoid on it.

Okay. So having said that, I arrived there that morning. Everybody is, believe me, running out. There is nobody running into that building, except police officers, firefighters, EMTs, paramedics, people who want to help and people who knew what they were doing. Nobody is running in. Everybody is running, north, north or south, but nobody is running into those buildings. I was in the lobby for quite a while. After the second tower was hit, we then knew we naturally had an incident greater than we ever could have imagined, and we knew we were in the middle of something that wasn't our bailiwick. It was war, and not a fire or an accident.

The second tower was hit, Mayor Guilliani was looking for me. I finally leave to meet him across the street where they had set up a command center, and before this, the police had done an excellent job of -- outside the periphery, of keeping everybody away from the building, unless they

were people that they thought could be helpful, people who were qualified, as John suggested before. There was nobody trying to get in. If you were trying to get in, they wanted to know why and wouldn't let you in if you were.

In the south tower we had established another command center, and that's where they originally found Glenn. We had to break up all of our command teams because we had now two fifth alarms, instead of one fifth alarm, which is an enormous account of manpower, or need for manpower. So we split up all our experience and everything and things just rolled downward from there. I met Mayor Giulliani and we started to move north to try to find a place to set up a command center and everybody was moving away from that building, you know, nobody, nobody was going towards that building unless they had a great desire to help others, and had the ability to make a difference.

As time went by, you know, I don't

need to tell you all the graphic details of the hopes of rescue and recovery, and the months afterwards, and several months afterwards we began to get requests from people to be considered, you know, as rescue workers, and people -- volunteers from everywhere, to go back to the incident, the day of the incident, and the next couple weeks there was no question about that we were desperate -- in desperate need of help from anyone who would give it to us. In my experience in the 30 years I spent in the department, I had never seen an official sharing of, or mutual aid, from anywhere in the department, any other city, Yonkers, Jersey, Long Island. I had never seen it, personally. It may have happened, but I had never seen it. But I had witnessed many unofficial acts of individual acts of mutual aid. Firefighters, police officers, EMTs, paramedics that would assist a car accident, truck accidents. The times I spent as a firefighter and as a union official and as commissioner, I would go to incidents often

where I would see people that came to help that were welcomed, and their assistance, especially hopefully, qualified and trained, how it was welcomed and accepted. Firefighters and police officers, were always quick to step aside, not so much with each other. They always wanted to punch each other out, but if someone else came along that -- if it was a doctor or EMT or paramedic or person with a particular skill of some sort, they were always intelligent enough to accept that help and to guide them in the areas of their expertise, whether it was as John was referring to. There is other things going on that you should be aware of, if you are in this position, that you might not know about that. So that's where your incident command and you are making sure that people know you are there and everything else is so critical.

Q. Knowing what you know now, Commissioner, about Glenn Winuk's background and qualifications and years of experience, had he come up to you at the scene during the

incident and conveyed to you his qualifications and his offer to help, what would you have done?

A. Well, I would have asked him immediately to help, to report to a chief, if he could find one. If he couldn't, to a captain; if he couldn't, to a lieutenant. If he couldn't, to firefighter. Just let somebody know that you are here, you are available and willing to take the risk that everybody else was taking and to help, because we really needed it, Mr. Skoler. It's not just -- we are a big department that never looked for help before. We always gave it to Jersey for boats, and Yonkers for firefighters and Long Island wild land and brush fires and stuff, but never coming the other way as a department. Like I said, I've seen many times, back to the '93 bombing, where I was made aware of many people helping. And incidents in subways and other incidents on highways and stuff. So I'm well aware of that, but I'd never seen official acts of us requesting it until September

11th, where we did request volunteers and other paid departments to help us out.

Mayor Giulliani tells of the story about going down the street and seeing a Chicago police officer directing traffic and always wondering where everybody was being sent because he was sure he had no clue, or where this police officer was sending people. Just getting them to move. So they came from everywhere.

MR. SKOLER: As a further footnote, not speaking of yourself, but talking for your commanders, your lieutenants and other officers, is it virtually certain in your mind that they would react the same way if somebody presented their credentials that Glenn did.

THE WITNESS: No question about it. They were overwhelmed, and the amount of people that were coming down out of that building that were injured, people overcome, just exhausted, you know, people, men, woman, overweight, having palpitations, hit by a piece of debris

on the stairwells that hadn't held -- a lot of damage. People that were above the fire floors were almost all lost, but many of the people close to those fire floors were injured by debris. The destruction on their floors wasn't as serious, but it was enough to -- where they would get hit with something, or glass even. People with cuts and burns and just people needed to be carried and men that needed oxygen from helping other people, other men or woman. So there were -- there was -- you couldn't have enough, you couldn't have enough EMTs, paramedics, especially there was more medical work to be done that day and assisting of civilians than there was actual fire duty.

We never made any effort to put that fire out. We never made any effort to -- we took hoses up. Which I still don't understand why with all at that extra weight I would have told the guy just leave them downstairs. There was

no effort to put the fire out. The effort was a rescue event and medical assistance effort.

Q. Have you had an opportunity to review the affidavit of Joseph Sander of the FDNY EMS workers. Based on that affidavit, what do you take away from that affidavit regarding where Glenn's body was found, where it was located, and the evidence that was seen on Glenn's person when he was recovered?

A. Of course, we'll never know exactly, but I would think that when he made a contact with another FDNY EMT or paramedic in the street, that he said if he got some extra equipment, I'm an EMT from Jericho and I want to help. I wouldn't be surprised if that EMT helped him past all the security if there was a person that stopped him and he wasn't satisfied with his identification, whatever, I would think that's how he got in. That's what I would have done if I was him. All he had to do was tell an EMT or a paramedic his qualifications and he was there to help, and they would be glad to accept his

assistance.

Q. I want to language on that do the emergency assistance lieu that refers to personnel in charge of operations also, but anything as big as this I take it that any officers or apparent supervisor is indicated would be a person who within your understanding could authorize a volunteer like Glenn Winuk to go to work from Jericho?

A. Well, I would think that even if he couldn't, even if he didn't think he had the legal ability, he was not thinking, first of all, that this building was going to come down and he and Glenn or were we going to be killed. He was thinking that we have a problem and we want to solve it as quickly as possible, and here is qualified help that will help us accomplish that. Let's just go and do it, you know. The guys aren't thinking at that point, you know, what's the state law on mutual aid, what's the -- it's not lawyers, the lawyers all. It's the next day when the lawyers get involved, but that day, it solved the problem.

MR. SKOLER: There is a statement in one of the letters from the New York City Police Department indicating that while fire fighters, EMT Winuk was a great hero, that he was not acting for the New York City Police Department or under our supervision.

THE WITNESS: I saw that letter. It was from Chief Nigro.

And I can understand. I can't put words in Chief Nigro's mouth. He was chief of operations during September 11th. We made him chief of the department because we lost our chief of the department that day. Dan was never in the building. He was outside of the building the whole time, and I would think that knowing how the department works, that he was getting several letters and requests for recognition of different people and then he went to the lawyers, and the lawyers said he wasn't a member of the department; he was not acting officially as he didn't come in

with a truck from Jericho, and said you better protect the City and put that down. To me, it just looks like he's covering his rear end and it doesn't make sense. I can't believe that it could be accurate because he's -- he's a firefighter, and he knows that this person, as soon as he identifies himself as an EMT, that someone which could be considered as acting under the direction of would ask him to help, and I just -- you know, it just looks to me like another lawyer got involved.

Q. What is the date of that hearing?

A. This is April 2002.

Q. And if I'm not mistaken, according go to the affidavit of Joseph Sanders, I think it was only a few weeks after Glenn's body was recovered; is it possible Chief Nigro didn't have the facts went at the time that went to the all the lawyers?

A. Absolutely. What was happening as we recovered remains, the family's, of course, we tried to notify immediately, and

then everything else became pretty drawn out. So there could have been a notification that a person was found, and it could have been more documentation, more information about the stethoscope and the gloves and everything else that could easily have come afterwards.

MR. SKOLER: And I'm intrigued with your characterization of the work of 9/11 as primarily an EMT, rather than a firefighting operation. I haven't event thought of that. If you can comment further.

THE WITNESS. Well, it really was. There was a much greater need -- and all of our firefighters have first responder training, so they are able to do a minimum of medical assistance. An EMT has more, a paramedic has more, a nurse, a doctor. You know, it just goes up in a tiered response. But it really was an assistance more than it was -- I mean, there were firefighters that were raising steel and getting people who were trapped, but that was minimum as

compared to people -- firefighters carrying people down and getting oxygen for others who needed it and everything else.

Q. Commissioner, is an EMT service event a firematic activity in New York City?

A. It's a totally separate bureau in the fire department. The EMS division was with Health and Hospitals. They were a disaster. They didn't know what to do with them, they figured maybe the firefighters, the fire department can fix it, and we did. We made great improvements, and then by giving all of our guys medical training, many who wanted no part of it, we were able to get a fire engine to a scene in three, four and five minutes before an ambulance, which had been six, seven and eight minutes. So you didn't get an EMT, you got a first responder. And then the ambulance came, you got an EMT and then maybe another ambulance came, a paramedic. So it was that tiered response. But it's totally separate functions. The firefighters had minimum medical training, as

first responders. The EMTs and paramedics, on the EMS side, had no fire training. So the firefighters did both, but the EMTs and paramedics just did medical work.

MR. SKOLER: Of course, Glenn had both?

THE WITNESS: Yes, Glenn -- as John referred to before, many of the firefighters out on Long Island had more training and more skills than the firefighters in New York City. What New York City had was more experience actually doing it because -- you moved to Jericho for reasons, to get away from some of the things we are exposed to everyday in the City. Nobody was moving to the South Bronx in 1970.

Q. What was the standard operating procedure for the FDNY during the recovery of bodies at Ground Zero in the weeks and months during their recovery operation if they found a civilian versus a rescue workers?

A. It was just a -- well, it was something that was controversial at the time,

too, because people felt we were taking too long to -- we could have done it even faster using heavy machinery all the time. But we tried to have as much respect for remains of people as we could, so it took longer. We were digging by hand and very slowly picking it with heavy machinery. The steel was too heavy to move no matter how many guys you had so you would pick and lift. And when they found a member of any -- people who had responded, whether police officers, paramedics, firefighters, they tried to do it with a little bit more ceremony.

Q. By ceremony, if I'm not mistaken, for rescue workers they brought out an American flag and wrapped the body up and carried them out --

A. Carried them out, and everybody to stopped working.

Q. Sort of an honor guard, an unofficial honor guard; is that right?

A. Yes.

Q. They didn't do that for civilians, but more for rescue workers, essentially?

MR. SKOLER: This is kind of a collateral situation, but would -- in timing, would any of you responded -- when Glenn set off for the Twin Tower area, had the implosion taken place in the north tower; he was found in the south tower?

THE WITNESS: The south tower was the first collapse.

MR. SKOLER: Oh, that was the first collapse?

THE WITNESS: Yeah. It was the second building hit, but it was the first building to collapse. That's why it's confusing. You would think it would fall second, but it fell first, which really scared us. Now we knew the first tower was going to fall. And up to that point nobody believed, or the finest experts we had, believed that it might fall. But nobody believed all of it would happen in 102 minutes. Nobody believed that.

Q. In fact, tower two, the south tower

-- first of all, do you have an understanding where Glenn was found?

A. Just in the lobby of the south tower.

Q. And the south tower is the second tower to be hit; is that correct?

A. Yes.

Q. And I think that was approximately 9:00?

A. Yes.

Q. And it fell less than an hour later; is that right?

A. Yes.

Q. Whereas the first tower, I think, took an hour and a half?

A. About an hour and a half.

Q. Since the south tower was hit second, there was time for the police and FDNY to set up a perimeter; in other words, I think you described nobody was going in unless they were qualified as rescue personnel; would it have been possible for anybody to get in there and start to render first aid to anybody without being permitted

to do so by people in charge there? Was it a secure area?

A. I would say it was a secure area, but I could not say it would not be possible to get in. There is so many ways into those buildings, which is -- was a problem for -- a lot of additional problems. I couldn't say that nobody could get in. But I don't think that would be accurate. But I do believe it was secured. They had put lines around it, they were not letting people in and anybody who was going in that direction was going there to help them.

MR. SKOLER: When you began your remarks, Commissioner, you indicated that this was a matter of both compassion and deep concern and hard memories for you. It came across in your testimony, but it certainly also came across in your letters, which I think were submitted for the record, about the status of Glenn and the appropriateness of his being considered as a firefighter/EMT who had been killed

in the line of duty, and I appreciate that.

THE WITNESS: I truly believe it's -- you know, I get caught up sometimes, and people say doing the right thing, and you often wonder, like, what's the right thing; is it for the oil company to do that; for the lawyer to do that; for the firefighter to do that. Sometimes there is a thing that is the right thing, and I believe this to fit into that.

MR. SKOLER: Again, I want to tell all of you, this may be more appropriate for you, but to understand the Jericho Fire Department, does it have any full-time staff, as well as volunteer firemen?

MR. MALONEY: I know the answer, but I don't want to testify. Maybe Mr. Navaretta can comment.

MR. NAVARETTA: No, it's an all volunteer department. The only people that get paid are called the firehouse

men, and the dispatcher.

MR. MALONEY: I happen to be a volunteer out in Connecticut and it is split, just as you're referring to.

MR. SKOLER: That has full-time?

MR. MALONEY: We have full number of career --

THE WITNESS: Which I think is going to happen, which is going to be the way of the future around the country. A combination of departments.

MR. MALONEY: I don't have any further questions for Mr. Von Essen, and he has a pretty tight schedule, and so before we start with Jay Winuk, Mr. Skoler, I don't know if you have anything further for the Commissioner --

MR. SKOLER: Let me just check.

MR. MALONEY: Sure. I didn't mean to rush you.

MR. SKOLER: I want to make sure we've covered it all.

I guess I would raise this. I'm not sure we will need it in terms of the

direction we are going here, but my question to you, why was there not a certification much earlier by the Jericho Fire Department that, quite simply, Glenn Winuk was a firefighter representing the department who was killed, not should be considered to have been killed, but simply was killed in the line of duty, and I know that certainly the New York City department knew exactly what had to be done here. You had a long list of people you had to certify.

MR. MALONEY: I'd like to address that.

As a matter of first instance, with all the respect to you Mr. Skoler, I think that the Jericho Fire Department thought that's exactly what they were doing when they wrote us this letter. I think that they believed that that letter was all that needed to be done to certify that he was a member of the Jericho Fire Department killed in the

line of duty. If you read that letter from Chief Lewis to the Twin Towers Foundation, also sent to the Justice Department, it is pretty clear, and even though the magic word "certification" is not used, stated. You had said before this time it is clear from that letter and powerful. That's exactly Jericho thought it was doing at the time.

I'm going to have Jay Winuk comment a little bit about the aftermath and touch on some of this. But I think the Justice Department, at a certain point, felt also satisfied. In other words, agreeing with what I'm saying, and wanted a few loose ends tied up and asked for some more documentation. And when one of the documents came back from Jericho that he was not active, it sent off a red flag and resulted in them continuing to investigate, as they should, to find out what that meant. And, unfortunately, I think they stopped short of fully developing the record as

we are doing today.

But I'm going to have Mr. Jay Winuk, actually, address some of those issues in a minute. I just didn't want to keep Commissioner Von Essen here too long because I know he's got --

MR. SKOLER: The certification was really much simpler than requiring a letter. I have -- there was in the file, the kind of certification Commissioner Scopetta used, and he simply said here's the list and the names and --

JAY WINUK: Seven of those names are the three retired firemen, by the way.

MR. SKOLER: -- and simply certifying they were killed in the line of duty, period.

MR. MALONEY: I think that the requirement, perhaps Commissioner Scopetta had better lawyers, and this is all you need to do; and Jericho either didn't either get that advice or didn't

understand that it was a little bit simpler. And I think they felt they met the requirement that was being asked of them and, in fact, it did result in the case in the Twin Towers Fund line of duty death recognition, and the EMS recognition.

So I think Jericho's position has been consistent and that is, he was one of us, he was a member, he was killed in the line of duty. And as we started out earlier today, almost none of the facts are in dispute here, and I don't think Jericho ever disputed the facts. I think, unfortunately, this thing spiraled down the wrong direction once the words "non-active" were used, or not able to respond to a firematic activity, and we got off on a different road.

I was called in afterwards and, obviously, as you can see, we have developed the record much further. We have gotten additional information to help explain how it is, legally, to

comply with the PSOB statute, ti legally comply with it, and I think we have done it. I want too save some more comments for the end and not ignore your question.

MR. SKOLER: I should respond as saying, as I indicated to Mr. Winuk, that the issue of using the procedure in the Patriot Act was really not relevant to what we are looking at the basic question here of the death and what it was, and whether it was in line of duty, but I was curious, I guess, in those early days everybody hasn't been accurately briefed on -- and almost avoid problems.

MR. MALONEY: That's absolutely true.

MR. VON ESSEN: It was not automatic that Commissioner Scopetta did that either. That was those families had made -- they were not in the original --

MR. SKOLER: That was a small

number.

MR. VON ESSEN: When I was Commissioner, are those people were assumed to be retired firefighters and after I left I was involved in -- we were getting requests, and we said, well, gee, they may be retired firefighters, but they were really acting in the role of public safety officers and they should be considered, and there is still, you know, arguments about them trying to get more recognition in different ways with the Fire Department.

MR. SKOLER: I would like to have that addressed, that topic of the retired firefighters.

MR. MALONEY: I have the statute here. We are kind of going out of order because I wanted to get Mr. Von Essen on his way. I know he expressed he had some scheduling issues.

Q. The number 343, is that a significant number in the FDNY?

A. Well, it was kind of another thing that nobody knew about. It was really 341 firefighters and their two paramedics that died, but I felt we should include them as members of the fire department and heroes of that tragedy. So we made the number 343. And some of the family's of retired firefighters are now trying to get the number changed to 347 or 348. So, you know, it's just been one of those things. So many rules have been bent and done away with, in good intentions, and I hope you can do it, too, if you have a role that you get caught with.

MR. SKOLER: I think we can apply the law, as well.

MR. MALONEY: The two things, and I don't want to address too much because I want to save a little bit for the end, and I wants Jay Winuk to comment on since the subject of the three retired FDNY firefighters. As I think you are aware, there was a statute that was passed under New York law -- I have a copy here for you -- we'll make it an

exhibit, and you will see, I have highlighted on, I think, it's the third page there, the sentences that makes it very clear that firefighters, retired firefighters, James Corrigan, William Wren, and Phillip Hayes, who were retired on September 11, 2001, that they be deemed, as a matter of law, to be reactivated as of that morning so that they could get all the full benefits as active members of the fire department. It doesn't change the 343 number, but it does change their legal status in case there was never any doubt, such as we are dealing with here.

As you may further know, there is currently pending a proposal in the New York Legislature to do the exact same thing for Glenn Winuk. I think I sent you a copy of the text of the bill, and there is also a letter I recently received from Senator Carl Marcellino that discusses and describes the nature of that bill and the reasons for it, and

in support of --

MR. SKOLER: Before we close the hearing, I'd like to formally enter these documents and the bylaws and your prior submission of a few days ago as exhibits, as hearing exhibits.

MR. MALONEY: Absolutely.

MR. SKOLER: And I appreciate it.

MR. MALONEY: Do we have anything more for Commissioner Von Essen?

MR. SKOLER: No. I'm quite grateful that he took the time.

MR. VON ESSEN: Oh, thank you. But if you want me to stay, I will stay.

MR. SKOLER: I don't think we need you to.

(Brief recess.)

MR. MALONEY: My fourth and final witness, Mr. Skoler, is going to be Jay Winuk, the brother of decedent, Glenn Winuk, and I'm going to allow Jay Winuk to say a few things and have some follow-up questions for him to focus after he's finished with some of the

comments he's probably going to make on some of the testimony he just heard. I want to direct him to comment further on some of the things that we just touched upon, and that is the aftermath of 9/11, in terms of the process, the PSOB application process, and some of the questions you raised regarding Jericho's role in this matter.

So, Jay, if you could tell us what it is that you want to say, or comment on the testimony we heard prior, and then we'll lead into some of the things that happened after 9/11.

TESTIMONY OF JAY WINUK

BY MR. MALONEY:

MR. WINUK: Sure, and then after I make my comments and we discuss, I also have some materials that may be of value to you to see different certificates, in addition to the materials of my brothers training and career as an EMT and firefighter.

MR. MALONEY: Any of which we can

copy before you leave quickly and make exhibits.

THE WITNESS: Additional photographs in addition to those we have already scanned and e-mailed to you during the course of our correspondence but, you know, from my perspective as the person who has been first addressing this matter going back years now with the Department of Justice, and then from the time that you picked it up and so ably directed us as to what the issue at hand was, it really seems that the issue is not so much about Glenn's qualifications or about what he was doing that day. The issue really seems to be mostly about who was he representing that day, and I think in many ways we have established that the Jericho Fire Department was who he was representing, and Jericho has demonstrated in a number of ways that, indeed, he was representing them. But before I go into some of the detail

about that, it's also very clear that people with important perspective on this kind of issue have also weighed in Glenn's favor on this. And that goes to members of the Federal government, such as Congressmen King, who has looked closely at this issue and is wholly in support of Glenn's recognition in this regard by the Department of Justice, and as you know he's written to the attorney general specifically about Glenn. The New York State legislature, you have heard from Commissioner Von Essen, perhaps the most senior -- certainly the most senior fire official that day and perhaps the most prominent fire official this country has ever had, and the Jericho Fire Department itself, as well as the local government in which Jericho sits in the community of Nassau County, and the Town of Oyster Bay and some of the certificates before you demonstrate, their support for Glenn and recognition of his actions that day, but particular

to Jericho. They really have, getting back to your point before, why has it taken Jericho so long to properly certify him; it really hasn't been. In numerous ways, Jericho has demonstrated it's position on this and publicly so, and I'd like to take you through some other examples, some of which you may be familiar with, but most maybe not.

The chief of the department twice wrote that Glenn should be qualified as representing the department and lost in the line of duty.

The department actively sanctioned Glenn being honored as a member by sending an official department patch to represent the department to the National EMS Service, whose purpose it was, whose intent it was to demonstrate that Glenn was lost in the line of duty as a public safety officer.

The department followed line of duty procedures for Glenn's two memorial services and two funerals and, of

course, there were multiples of that because once his remains were found, we went back and did what we felt was the right thing, in terms of his final resting place.

The department assigned members to serve as pall bearers to carry Glenn's coffin to its resting place. The department's former chief and chaplain publicly addressed those attending those services and those ceremonies. The department sent a contingent of officers and members to publicly represent at the memorial service that Glenn's employer, Holland & Knight, held in New York City, and also a former chief and chaplain from the department spoke to the six hundred or so people in attendance.

They sent a contingent with a fire truck and in dress uniform to the Jericho High School Hall of Fame ceremony, which honored Glenn for his dedication and sacrifice on behalf of the community. The department even held

a raffle at the firehouse so that it could raise money to donate to the Glenn Winuk Disaster Relief Fund that Holland & Knight had set up.

The department, as you heard earlier from John, actively participated at a formal park dedication for Glenn in Jericho, and every year on September 11th, they very publicly, annually, make a pilgrimage from the fire house to the park to lay a wreath and flag at the plaque bearing Glenn's name and his qualifications as a Jericho fireman and former commissioner. They are now considering placing a flagpole there, as well. They don't do that for any member who dies. They do that for members who have been lost in the line of duty, and so it's a rare and very special decision to make.

As you have seen in photos that I believe I had sent to you, but we have other copies here, the department set up two ladder trucks at attention at

Glenn's memorial service with the American flag draped over it. Again, clearly a sign of the "in the line of duty" status and treatment. There are literally dozens of examples, from the chief on down, has demonstrated its position that Glenn was representing Jericho and died in the line of duty on September 11th.

Even further, in terms of the commissioners, there is a gentleman named Mike Milner, who is a current commissioner. He was commissioner at the time of Glenn's death, and was a former fire chief of Jericho. He was the first person to tell me in October, as he sat in my house October '01, to mourn my brother, he was the first person to bring up this notion in the line of duty status, which I knew nothing about at the time. And so you had this 20-year New York City fire department veteran, a commissioner of the department and former chief of the

Jericho Fire Department, raising the issue to me that Glenn should be considered lost in the line of duty. He's the same commissioner who stood at both memorial services and read, in dress uniform, the Pledge of Allegiance -- led the Pledge of Allegiance reading at the services. He's the same commissioner who presented my parents with a framed American Flag at Glenn's memorial service as a tribute to a fallen member.

All the issues as to Glenn's PSOB qualifications were deemed satisfied by the DOJ when Ilene Gary, who is the Associate Deputy Director at the DOJ, called me on January 30, 2004 to advise me that the DOJ had completed review of your claim and all the supporting documents, and that Glenn was officially approved for PSOB recognition. That had all been satisfied. There was no question in her mind. She indicated that she was representing DOJ counsel on

this, had the authority to call me so that I could advise my parents and then proceeded to ask me for contact information for my parents so they could issue them a formal letter and start sending them checks.

And yet here we are. My family has fought this fight for my brother's honor for more than three years. On top of all of the challenges and heartache his death has brought upon us, the injustice of this matter has added unimaginable and simply unfair pain. It's one thing to lose a loved one who gallantly sacrificed his life for those of others. As the family of a fireman and an EMT, you realize that somewhere along the way that is a possible outcome of such valor. But to then have your loved one stripped of that valor, that courage, that acknowledgement of service by those whose responsibility it is to step forward and recognize it is a pain of the worst kind.

My little brother, Glenn Winuk, was dedicated to public safety his whole life, from joining the safety patrol in elementary school through his membership in the Cub Scouts to joining the fire department as soon as he was of age.

As a kid he would write to bandage manufacturers, such as Parke-Davis and J&J, so they could send him free samples of Band-Aid, tape and gauze for his homemade first aid kit that my dad referred to earlier, and up until the day he died, Glenn regularly put himself in harm's way to assist others less capable or in danger. Simply put, public safety was his life.

For my brave brother's honor, Mr. Skoler, I ask you to please carefully consider the extensive body of factual information in support of our claim, as well as the true intent and spirit of the PSOB Act and recommend the approval of Glenn Winuk for this great and deserved honor.

MR. SKOLER: Thank you. I do have one question for you Mr. Winuk.

Was there -- after you were given the word of allowance of the claim, was there any early warning, or prior warning, of the decision to disallow the claim before you received the letter indicating what we call the determination.

THE WITNESS: Yeah. After Ilene Gary called me with what she considered to be great news, because she had been down this road with me all along. I guess, because it wasn't as automatic as it was for the 343 city fireman. And so there was great documentation required and reviewed, and so when she called that day to say, "I've got great news for you, it's approved." I said, "can I call my parents?", and she said, yeah great. I'll need some information as to Glenn's life insurance policy and other, I guess, logistical stuff. She said a letter would be forthcoming to your

parents. I said, "Okay, great, I'll let them know."

Then sometime went on. I think she asked for more information. We sent it. And then we got a call or an e-mail saying there is one more form we need the Jericho Fire Department to send in. And, ultimately, once they sent that form in, I guess, it raised a red flag in the way the language about associate membership was conveyed.

And so then some more time went by and I, you know, I started to realize maybe we have an issue here and started to chase it a little bit a hesitant to give me an answer because she was maybe getting, internally, some feedback that well, maybe this isn't actually going to be as easy as we thought. And then at some point I believe she sent me an e-mail, you know, saying we have problem here, and then the formal letter came saying it was denied, which you have a copy of.

I have other documents that I can share with you. I'll be happy to answer any of your questions about this.

Q. What documents do you have with you that may be most relevant to showing us -- shedding more light on the status question and the EMT question?

A. This is -- was a missing person page that was created by somebody on the computer at home the night -- once we resolved Glenn was missing. It was done, I believe, within the first 24 hours. I don't know that you have a copy of it or not, but if you don't, we'll get you a copy of it.

MR. SKOLER: I think I do.

THE WITNESS: The immediate assumption, the immediate assumption by everybody at home that night, and anybody who looked into this within the first 24 hours was that Glenn had run to Ladder Company 10, which was across the Street and kind of catty corner around from Ground Zero and the Holland & Knight offices. I think that was your

feeling, too --

MR. MALONEY: Mr. Skoler, there is a fire station called the 10 and 10 House, which is literally right across the street from the World Trade Center.

THE WITNESS: Which, by the way, come summer 2006, will likely be the first permanent national memorial to September 11th, and it will list the names of all 343 City firemen, and it will be dedicated in my brother's honor by Holland & Knight, and the City of New York and the Fire Department have been working together on this. The City has control over the way it looks. It will be almost 60 feet long and ten feet high, and it will be dedicated that day by the City and Holland & Knight in Glenn's honor. The City is recognizing my brother's actions that day, not only in the way that Mr. Von Essen has expressed, but in numerous ways.

So in any event, I share this with you because this wasn't about a lawyer

missing. This was about a volunteer firefighter who probably had access, and who probably joined the efforts of the New York fire company nearest his office and to Ground Zero.

The same thing with a news announcements that was sent out. Maybe, you heard from other family's, but you are not sure what to do in the first 24 hours. You know, we knew, my dad and I, John and anybody that knew Glenn, that he ran down there; is he missing; we can't reach him on the cell phone; he's not calling out, obviously. Anybody who knows Glenn knows he's going to sleep there if he has to. But he's not going to sleep at all, he's going to work through the night. But he's missing. We need control. We are reaching out. We want him included in the news reports that say, here's a picture of this guy, he's missing, maybe he's working, or maybe he's not, but in any event, he's identified as a volunteer firefighter.

This is his certificate which, I believe, is in the DOJ record, which is his completion of a building collapse rescue training course. I found his manual for that course. It's here. My dad referred earlier to the fact that we found some papers in Glenn's car. This was, and we went through the course. Besides his fire department window shield that which allowed him to park at emergencies, this was the certificate that was in his trunk. A Xerox of it. The original is in better shape.

He was trained for this. There is a Hazmat certificate for other technical training. This is the photo of the fire trucks at attention representing Jericho's consideration of him as having represented him as lost in the line of duty outside the memorial service in October.

This is another letter from the chief that you probably didn't even see, that is requesting that -- I'll read it

for the record, but we'll get you a copy of it. "September 11th, Glenn Winuk, as he had died at the World Trade Center served as he had done in February '93 following the bombing there. It was repeatedly apparent that his continuing commitment to public safety and emergency service remained strong. His example of personal risk, heroism, self-sacrifices is without equal. On behalf of the officers and members of the Jericho Fire Department, I am hereby requesting that you include Glenn's name in the planned Grove of Heroes Memorial", which is on Long Island. Another example of the fire department stepping up and saying he was one of us. This is the brochure from the EMS National Memorial Service where Glenn was honored in Roanoke, Virginia and identifies him as a member of the Jericho Fire Department lost in the line of duty. This is the same certificate Nassau County recognizing his heroism in

representing that community. His original EMT certification course; another education course from New York State in fire. His certification for -- in '95, going to the wildfires outside of his district in Suffolk County.

I believe that Mr. Maloney sent you this from the County Executive recognizing Glenn's valor, fighting the Avianca catastrophe. His certification as commissioner of the department, and documents supporting that.

And then additional certificates that go on and on in terms of his training in all forms and manner of EMT and firefighter.

I'm not a firefighting expert. I went as far as the auxiliary fire department, whereas my two brothers took it all the way, as well they should have, because it's my contention that firefighters, even our attorney here, are a different sort. They're a different breed. They run towards

danger the way soldiers run towards danger. I do other things well, that's not me. But it is everything that Glenn was about. And so he did it with absolute enthusiasm and absolute training and though I'm not the expert, it is, in all likelihood, that he was at least, but maybe more qualified, than half of the guys down there who died alongside him, those other 343, and I think Commissioner Von Essen's statements to the level of training Glenn had speak to that.

I think you have been given most of these other documents, and there are additional photographs.

I'd like to read something to you, a letter I got in February of '03 from a captain at the Jericho Fire Department, who was given the task of trying to find photos of my brother in fire department action or in uniform: "Your brother was one of my earliest mentors in the JFD almost from the day I joined in 1986.

To say he influenced my career here and helped shape the man I am is a gross understatement. I owe him a debt of gratitude I can never fully repay."

I think John would concur that's the way an awful lot of guys in that fire department felt. It wasn't just about him getting glory or getting his kicks out of fighting fires, or running to emergencies. I mean, he was a mentor and tutor to the younger guys. So, if he didn't have to make money and go become a lawyer...

I have a few more quotes from another letter to read to you. It's from a person who was the captain of Garden Engine Number 2, which was Glenn's company, the fire department. It's actually a letter of reference probably when he was going to become a lawyer. "Very few very distinguished themselves above the mainstream. Glenn Winuk is the pinnacle of that chosen and select few. His attendance and

participation in fire and rescue calls, drills, trainings, and all other functions has always been well above average. He has always gone out of his way to help, and has made many personal sacrifices which have enabled him to obtain extra knowledge to be utilized in benefitting his community. The hundreds of hours spent furthering his medical education typically illustrate Glenn's dedication and unselfish attitude."

MR. MALONEY: That was from a captain in his fire company, and the date of that letter is July 23, 1983, long before we get to 9/11, and specifically references his medical training. Any other document?

THE WITNESS: I could go on for hours, but I want to get to anything that you think is more --

MR. SKOLER: I thank you for your eloquence and for being a primary information provider in this appeal. I know you have carried the weight of it,

the claim, up to -- right up to this very point, and that's quite commendable. You have been most helpful and I really have no further questions. Oh, I do have one which may be partially relevant: The other Winuk brother, is he still a fireman?

THE WITNESS: No, he's not. He moved to South Carolina and lives there with his wife. So he gave it up when he moved out of state.

MR. MALONEY: Just in closing, Mr. Skoler, I'd like to say, first, I mean, Jay Winuk was extremely articulate and eloquent, and he said many things that I would have said, and I know his brother, if he is looking down, is very proud.

I have done some research and looked at some of the history and some of the cases that have considered PSOB claims and, as I said in my cover letter to you, from a few days ago, this statute is literally construed. I think that was the intent of Congress. We

have one Congressman weighing in on it. But clearly from some of the cases that I have read, even some of the more borderline cases not nearly as compelling as this one, both the BJA and/or court of claims have reversed the initial denials of such a claim on what I consider to be fairly thin evidentiary records and granting the award on cases of the death of public safety officers. And the reason is simple; the extent of the statute is to be an added benefit to attract and maintain and acknowledge the public service, the courageous valor of heroes.

It's not really even about the money, and the money is not that much. It's about understanding what these people do with their lives, and in some cases, make the ultimate sacrifice. So it's no surprise that if you look at cases out there that courts and the BJA interpret the statute very liberally. I cannot think of a more compelling case

than this one that I have come across in my research. As I said earlier when we started, I think probably the most, if not all, of the facts are not contested in any manner. We've tried do lend more corroboration to give you more evidence to show you that the intent of Jericho was always certification, to show you that we have complied with the letter of the law. We have certainly, I think, complied with the spirit of the law a long time ago, but in terms of some legal hurdles regarding status, active or versus non-active, I think it's clear he was active as an EMT qualified, and I think maybe even obligated under New York State EMT -- under the good samaritan laws to respond to somebody in need. And it's exactly what he was doing. He was trained, qualified to do and active, his status was current, and at the same time he was a member of the Jericho Fire Department. There is no question about that. So -- and he was

not responding to firematic activity.

In any event, he was an EMT and for him that's what he was doing; that's what he was found with, a stethoscope, EMT bag, gloves on his hands to protect himself from blood borne pathogens.

The comments by Mr. Von Essen echoed really what was needed was triage and EMT work to help with injured victims. And that's what Glenn was doing.

I cannot think of a more compelling case, factually. I certainly think legally, it more than passes muster. We think that this is a case that cries out for a reversal of the prior determination and to have some measure of justice and closure for the Winuk family on this.

I'm happy to answer any questions, factual or technical. You know, we talk sometimes as lawyers and I think some of the communications you and I have had have been, is a legal question. While

it's been my experience that while you have the law, almost every legal question turns on facts, and it's how you interpret the facts and characterize those facts that may make a difference, and in this case I think it's pretty compelling and clear that as a matter of fact, based on those facts, Glenn Winuk should qualify to be considered a public safety officer who died in the line of duty on September 11, 2001.

I'm happy to answer any additional questions. What I would propose with the exhibits we have, before actually closing the record, we discuss what we want to mark as exhibits for you and in terms of photocopies we'll get that done immediately so you can take whatever you want with you. To the extent we don't get it all done, or if your schedule dictates you leave sooner, we will certainly mail them to you.

MR. SKOLER: Off the record.

(Discussion held off the record.)

MR. SKOLER: I did have one question for you. This is assumed, I thinking you are argue would you address specifically your conviction in the extents to which you feel the New York State emergency assistance what you has become replied with in this case and how and why?

MR. MALONEY: Yes. I think the law is designed for almost the exact circumstances New York City faced on the morning of September 11th, and in the aftermath. I think that law and other similar laws are designed to provide legal coverage, if needed, but simply put, to let certain entities know that as a matter of law we'll permit people from outside districts to come in and aid you if you need it and they are supposed to pass certain -- they are supposed to operate under SOPs, if you will. You heard about those earlier today. That is to say, if you are operating outside your district, that

you report to somebody with authority to identify yourself and your qualifications present credentials if you have them and offer assistance. That's only the first part of the step. The second prong is that that assistance be accepted. I think in this case it's clear that it was given. A lot of factual records we develop, and I think that's what the statute is designed to do. In some instances, and I have to refresh my recollection on this particular statute. It's actually required, and obligation to perform your duty if you are faced with or present for a crisis or an emergency, an all hands on deck situation. The country has never seen anything like 9/11 before, outside of Pearl Harbor. So this was clearly an exceptional circumstance calling for exceptional measures to be taken, calling in all the help that the City could get at that moment, Glenn provided it. He didn't

hesitate. If he hesitated, maybe he would be alive today. He knew people were in need and in danger. He knew from his training, from his obligations or moral compass, he knew what had to be done and he did it.

MR. SKOLER: My reading of the law, is that it really isn't a matter of the obligations; it's just a firefighter, an EMT, in a neighboring jurisdiction can join in and we can assume they are, in essence, deputized.

MR. MALONEY: Yes, I think the law was created really for legal purposes because if you do lend assistance in the other district, you're essentially deputized and adopted by that district and you have to follow that orders. There are liability issues that come into play and I have looked at some of cases, for example, if the volunteer does something wrong and that municipality you were to get sued, they have to be the ones to defend the

action, or maybe even pay a judgment. If there is an injury, it's potentially a Worker's Comp issue. They would have to probably subsume that or work it out with the other district.

The law is really confined to New York State. That usually doesn't become an issue. It does speak to volunteers that come from other states, but the law, in words and discussing, is for intra-New York State. Clearly, Jericho is inside New York. He was a New York firefighter and EMT and all qualifications and certifications came from New York State, or by virtue of New York State. 9/11 happened in New York City. There is no issue about being outside the boundaries of that law. He was clearly acting within the boundaries of the law, and I think the law really is there more for the municipality than it is for the people on the ground, so to speak, and Commissioner Von Essen indicated, he doesn't really know much

about the law, I'm not a lawyer. I do know that when we need help, or somebody needs help, we give it to them, and the way you do it is to follow the chain of command report in, get your assignment and act accordingly.

So on the grounds, factually, that's what Glenn was doing, and I think we have corroborated that in a number of different ways today and some prior documentation, but I think the law itself is frankly solely for the protection -- legal protection really for various municipalities in New York State of New York.

MR. SKOLER: I think we are ready to say that this hearing is closed unless any further comments subject to conferring about exhibits to be included with the record, it probably would be less appropriate for me than for others to join in. The obvious respect that I would have for a person of Glenn Winuk's character, because I am judging matters

of a legal status, but I do appreciate the brevity of the hearing, also the relevance and strength of it, and the testimony I have heard from every witness at this hearing.

And so I should tell you, again, it's my practice I think I will, when I receive the transcript, sometimes we have delays in that, that is a time when I'll write a letter to Mr. Maloney. In say 30 days there will be a -- my final determination will be submitted to the Public Safety Benefit Headquarters Program.

I don't need to tell you at that time they can disagree either way. If I were to uphold the denial of the claim, it would require your asking for reconsideration, ultimately, with a right of appeal to the court of claims and not just the Federal circuit.

If they disagreed with a favorable determination that is within the authority of the statute and my

determinations are not final and one would need to consider further appeal.

So I think we will be able to dispose of this, Mr. Jay Winuk, in a few months more, at most, but I do think it has moved since the time of my assignment. It was not earlier than 11 months after the final determination between January to September. So we'll keep it moving.

MR. MALONEY: We want to thank you for coming up from Maryland.

JAY WINUK: Thank you.

MR. MALONEY: And your kind words and comments.

MR. SKOLER: It's my job. I think we stand adjourned.

(Time noted: 3:27 p.m.)

(Plaintiff's Exhibit 1, Letter dated April 7, 2005 from Kreindler & Kreindler to Daniel L. Skoler, marked for identification, as of this date.)

(Plaintiff's Exhibit 2, Letter dated April 7, 2005 from R. Biancanello

of Jericho Fire District, marked for identification, as of this date.)

(Plaintiff's Exhibit 3, Photos of Glenn Winuk, marked for identification, as of this date.)

(Plaintiff's Exhibit 4, Affidavid of Joseph Sanders, marked for identification, as of this date.)

(Plaintiff's Exhibit 5, Letter of completion of CPR Course at Holland & Knight LLP, marked for identification, as of this date.)

(Plaintiff's Exhibit 6, Certificate from American Heart Association, marked for identification, as of this date.)

(Plaintiff's Exhibit 7, State Emergency Medical Services Code, Part 800, marked for identification, as of this date.)

(Plaintiff's Exhibit 8, Section 209-1, Emergency Service by volunteer fireman marked for identification, as of this date.)

(Plaintiff's Exhibit 9, National

EMS Memorial Service January 26, 2003 letter to FDNY EMS Battalion #57, marked for identification, as of this date.)

(Plaintiff's Exhibit 10, Senate Act introduced by Sen. Marcellino, dated March 30, 2005, marked for identification, as of this date.)

(Plaintiff's Exhibit 11, March 25, 2005 letter from Congressman Peter T. King to The Hon. Alberto Gonzales regarding eligibility of Glenn Winuk for Public Safety Officer's Benefit, marked for identification, as of this date.)

(Plaintiff's Exhibit 12, Letter to Glenn Winuk from Thomas Gulotta for Glenn Winuk's service at the Avianca crash, marked for identification, as of this date.)

(Plaintiff's Exhibit 13, Article IX, Definition of Assoiate Membership in the Jericho Fire Department, marked for identification, as of this date.)

(Plaintiff's Exhibit 14, Westlaw research on "Firefighters--World Trade

Center--Accidental Death Benefits", marked for identification, as of this date.)

(Plaintiff's Exhibit 15, October 24, 2005 letter from former Fire Commissioner Thomas Von Essen to Mr. Daniel L.Skoler, marked for identification, as of this date.)

(Plaintiff's Exhibit 16, April 12, 2005 Letter from Sen. Carl L. Marcellino to Mr. Daniel L. Skoler, marked for identification, as of this date.)

(Plaintiff's Exhibit1 17, Photocopy of badges of Glenn Winuk, marked for identification, as of this date.)

(Plaintiff's Exhibit 18, Photocopies of Citations received by Glenn Winuk, marked for identification, as of this date.)

C E R T I F I C A T E

STATE OF NEW YORK )

: ss.

COUNTY OF NEW YORK )

I, NANCY SILBERGER, a Notary Public within and for the State of New York, do hereby certify:

That I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of April, 2005.

N. Silberger

NANCY SILBERGER

--------------- I N D E X --------------------



| WITNESS | EXAMINATION BY | PAGE |
| --- | --- | --- |
| Seymour Winuk | Mr. Maloney | 11-16 |
| John Navaretta | Mr. Maloney | 16-50 |
| | Mr. Skoler | 50-55 |
| Thomas Von Essen | Mr. Maloney | 55-87 |
| Jay Winuk | Mr. Maloney | 87-108 |



---------------- EXHIBITS --------------------



| PLAINTIFF'S | FOR ID. | |
| --- | --- | --- |
| Exhibit 1, Letter dated April 7, 2005 from Kreindler & Kreindler to Daniel L. Skoler | 119 | 20 |
| Exhibit 2, Letter dated April 7, 2005 from R. Biancanello of Jericho Fire District | 119 | 24 |
| Exhibit 3, Photos of Glenn Winuk | 120 | 4 |
| Exhibit 4, Affidavid of Joseph Sanders | 120 | 7 |
| Exhibit 5, Letter of completion of CPR Course at Holland & Knight LLP | 120 | 10 |
| Exhibit 6, Certificate from | 120 | 14 |

| | | |
|---|---|---|
| Exhibit 7, State Emergency Medical Services Code, Part 800 | 120 | 17 |
| Exhibit 8, Section 209-1, Emergency Service by volunteer fireman | 120 | 21 |
| Exhibit 9, National EMS Memorial Service January 26, 2003 letter to FDNY EMS Battalion #57 | 120 | 25 |
| Exhibit 10, Senate Act introduced by Sen. Marcellino, dated March 30, 2005 | 121 | 5 |
| Exhibit 11, March 25, 2005 letter from Congressman Peter T. King to The Hon. Alberto Gonzales regarding eligibility of Glenn Winuk for Public Safety Officer's Benefit | 121 | 9 |
| Exhibit 12, Letter to Glenn Winuk from Thomas Gulotta for Glenn Winuk's service at the Avianca crash | 121 | 15 |
| Exhibit 13, Article IX, Definition of Assoiate Membership in the Jericho Fire Department | 121 | 20 |
| Exhibit 14, Westlaw research on "Firefighters--World Trade Center--Accidental Death Benefits" | 121 | 24 |
| Exhibit 15, October 24, 2005 letter from former Fire Commissioner Thomas Von Essen to Mr. Daniel L.Skoler | 122 | 5 |

| | | |
|---|---|---|
| Exhibit 16, April 12, 2005 Letter from Sen. Carl L. Marcellino to Mr. Daniel L. Skoler | 122 | 10 |
| Exhibit1 17, Photocopy of badges of Glenn Winuk | 122 | 14 |
| Exhibit 18, Photocopies of Citations received by Glenn Winuk | 122 | 17 |