NO. 06-770C(MBH)

IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS

SEYMOUR WINUK, individually as the father of GLENN WINUK, Deceased

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# PLAINTIFF'S OPPOSITION TO BJA'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND PLAINTIFF'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD, ADDITIONAL EVIDENCE AND THE LAW

Dated: New York, New York
March 26, 2007

Respectfully submitted,

KREINDLER & KREINDLER LLP
ANDREW J. MALONEY III
*Attorneys for Plaintiff*
100 Park Avenue
New York, NY 10017
(212) 687-8181

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Demutiis v. United States*, 48 Fed.Cl. 81 (2000) .......... 10

*Demutiis v. United States*, 291 F.3d 1373(2002) .......... 10, 13, 14, 25

*Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade*, 412 U.S. 800 (1973) .......... 11, 16

*Baltimore & Philadelphia Steamboat, Co. v. Norton*, 284 U.S. 408 (1932) .......... 10

*Bice v. United States*, 61 Fed.Cl. 420 (2004) .......... 18

*Davis v. United States*, 50 Fed.Cl. 192 (2001) .......... 18

*Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C.Cir.1970), *quoted in State Farm,* 463 U.S. 29 (1983) .......... 11

*Groff v. United States,* 72 Fed.Cl. 68 (2006) .......... 9, 10, 14 ,17, 18, 23, 26

*Hillensbeck v. U.S.*, 69 Fed.Cl. 369 (2006) .......... 17
*Messick v. United States,* 70 Fed.Cl. 319 (2006) .......... 14, 16, 22

*Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978) .......... 10

*Northwest Environmental Defense Center v. Bonneville Power Admin.* 477 F.3d 668 (2007) .......... 11, 16

*Tcherepnin v. Knight*, 389 U.S. 332 (1967) .......... 10

*W. States Petroleum Association v. EPA*, 87 F.3d 280 (9th Cir. 1996) .......... 12

### FEDERAL STATUTES

42 U.S.C. § 3796(A) .......... 13

28 C.F.R. § 32.24(h) .......... 7

28 C.F.R. § 32.5 .......... 18

42 U.S.C. § 3796 et seq .......... 1

### MUNICIPAL LAW

State of New York. NY General Municipal Law § 209-i .......... 23, 24

# TABLE OF CONTENTS

PLAINTIFF'S OPPOSITION TO BJA'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND PLAINTIFF'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD, ADDITIONAL EVIDENCE AND THE LAW . . . . . 1

SUMMARY . . . . . 1

STATEMENT OF FACTS . . . . . 2

BJA REVIEW . . . . . 4

WINUK LEGISLATION . . . . . 7

BJA REVERSES ITS OWN HEARING OFFICER TO DENY CLAIM . . . . . 7

BJA AWARDS 911 CLAIMS TO "RESCUE WORKERS" WITH AMBIGUOUS STATUS . . . . . 8

JFD REBUTTAL . . . . . 9

ARGUMENT . . . . . 10

I. STANDARD OF REVIEW . . . . . 10

II. THE JERICHO FIRE DEPARTMENT CERTIFIED THAT WINUK WAS A PUBLIC SAFETY OFFICER KILLED IN THE LINE OF DUTY . . . . . 12

III. WINUK WAS A PUBLIC SAFETY OFFICER . . . . . 16

IV. WEIGHING EVIDENCE . . . . . 17

V. WINUK DIED WHILE PROVIDING MUTUAL AID TO THE FDNY . . . . . 23

VI. THE WINUK LAW . . . . . 26

CONCLUSION . . . . . 28

# PLAINTIFF'S OPPOSITION TO BJA'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND PLAINTIFF'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD, ADDITIONAL EVIDENCE AND THE LAW

Plaintiff respectfully opposes the Government's Motion for Judgment on the Administrative Record and cross moves for Judgment in his favor based on the Administrative Record, additional evidence, and Federal and New York law, granting an award to Mr. Winuk under the Public Safety Officer's Benefit Act, ("PSOBA" or "Act"), 42 U.S.C. § 3796 et seq., and Public Law 107-37 supplementing the Act for 911 rescue workers.

## SUMMARY

The defendant, acting through the Bureau of Justice Assistance ("BJA"), a division of the Justice Department, acted arbitrarily and capriciously in overturning its hearing officer's award that granted plaintiff PSOBA benefits. In reviewing several other claims of rescue workers killed in the September 11, 2001 terrorist attacks ("911"), the BJA applied its own review of the Act's criteria inconsistently, arbitrarily, and in the case of plaintiff's decedent, Glenn Winuk, capriciously. The BJA disregarded applicable law and overwhelming evidence in support of the underlying claim.

Glenn Winuk was a volunteer firefighter and EMS rescue worker and was a member of the Jericho Fire Department, New York ("JFD") on September 11, 2001. He provided authorized mutual aid to the FDNY at the World Trade Center in New York, and was killed when the buildings collapsed while he was performing first aid to victims injured at the scene.

The BJA decided that because Glenn Winuk had changed his JFD status from "active" to

"associate," he should be considered only a "good samaritan," rather than a public safety officer. This decision is wrong as a matter of fact and law, and is addressed in detail below. In an effort to put the issue to rest however, and without conceding he was not entitled to federal benefits, the New York State Legislature and Governor George Pataki unanimously passed a law specific to Mr. Winuk, declaring his JFD status as "active" at the time he was killed. Nonetheless, the BJA believed it could ignore this New York law, while it simultaneously choose other areas of New York law in a strained effort to justify their capricious decision. In doing so, the BJA exceeded its authority and mandate.

## STATEMENT OF FACTS

On September 11, 2001, Mr. Winuk died tragically in the collapse of the World Trade Center. AR 51.

Prior to his death, and since 1979, Mr. Winuk had served, in one form or another, as a volunteer member of the Jericho Fire Department ("JFD"). Mr. Winuk was, at one time, trained as a firefighter and certified by New York State as an EMT. In 1998, after 19 years of service, Mr. Winuk elected to change his status from active member to "associate" member of the JFD because of his increasing workload as a lawyer in Manhattan. AR 150. Mr. Winuk was still an associate member of the JFD when he was killed on September 11, 2001. Id.

On September 11, 2001, Mr. Winuk, who was a partner at the law firm Holland & Knight LLP, evacuated personnel from his own office building and was last seen running toward the World Trade Center "donning EMS equipment." AR 56. The Trade Center was two blocks from his office. Id.

In March 2002, rescue workers recovered Mr. Winuk's body in what would have

been the lobby of the World Trade Center south tower in the vicinity of the bodies of other rescue workers. AR 241. Mr. Winuk's body was found with a photo ID card in the wallet of his pants pocket identifying him as a member of the JFD and he was wearing surgical gloves, either wearing or holding a stethoscope, and laid beside an EMT bag. AR 242. (See photo of EMT Kit AR 315).

On March 31, 2002, John Lottes, Chief of the JFD, sent a letter to the Twin Towers Fund that was established to assist the families of rescue workers killed in the line of duty at the World Trade Center and stated that:

> **"Glenn Winuk should be recognized by all as having been lost 'in the line of duty' while acting as a rescuer representing the Jericho Fire Department**. Anything short of this recognition would be a disservice to his courage, training and selflessness. . . . . The firefighters, EMS workers and other recovery workers at Ground Zero certainly recognized his "rescuer" status and heroism by giving him full fireman honors as they carried his remains from the site." AR 55.

This letter was later forwarded to the BJA.

On May 1, 2002 Chief Lottes of the JFD, wrote a letter to decedent's brother, Jay Winuk, describing New York State Municipal Law § 209-(i), "mutual aid law," that authorized a New York State rescue worker to identify himself, provide his credentials and offer his assistance to a commander of a fire company in another district, and if accepted, act under the direction of that commander and his officers. Chief Lottes also confirmed that FDNY, on September 11, 2001, requested the assistance of firefighters and EMS workers in the surrounding counties, including the JFD, to help in the wake of the 911 attacks. Chief Lottes confirmed that JFD apparatus and manpower went to Ground Zero and remained there through September 13, 2001. AR 53. In

this letter, Chief Lottes once again stated that:

> **"Glenn was acting as a bona fide agent of the Jericho Fire Department, acting directly on its behalf, while assisting FDNY with rescue and emergency scene operations in the South Tower of the World Trade Center."** Id.

In December 2003, Mr. Winuk's father and mother, Seymour Winuk and Elaine Winuk, filed a claim with the Department of Justice, Office of Justice Programs, Bureau of Justice Assistance ("BJA") for death benefits pursuant to the Public Safety Officers' Benefits Act ("PSOBA"). On December 18, 2003 decedent's brother, Jay Winuk, sent a letter to the BJA enclosing all the material he had collected about his brother at that point in time, proving his line of duty death. He further included information concerning Glenn Winuk being recognized and honored by the National EMS Service, the Twin Towers Fund, the International Association of Fire Chiefs and Congressman Peter King as a line of duty death.

**BJA REVIEW**

In July 2004, the PSOBA office determined that the Winuks' claim failed to satisfy the requirements of the PSOBA. The PSOBA office concluded that because Mr. Winuk was an associate member of the JFD, he did not hold the same privileges or obligations as full active members. AR 3-5. The PSOBA office also found that no proper certification had been received from a public agency because Chief Lottes' letters had not been sent directly to the BJA and did not use the proper language to trigger the Public Law 107-37 for expedited payment. AR 3-5.

The Winuks appealed this decision. The BJA appointed an independent hearing officer, Daniel Skoler, who, after holding a hearing, stated that it was "debatable" whether a

public agency certification had been provided with the application in 2003 that would have triggered the expedited payment in Public Law 107-37 for 911 rescue workers. AR 9. Another letter from the Chairman of the JFD Board of Fire Commissioners was sent to the hearing officer, dated April 7, 2005, that stated: **"I am hereby certifying that Glenn Winuk should be considered to have been a public safety officer killed in the line of duty ....** " AR 234. The hearing officer determined that this letter constituted a proper certification, but that because the appeal was already underway, it was too late to receive the expedited treatment in Public Law 107-37. AR 11, fn 12.

The hearing officer then determined that although Mr. Winuk's associate status in the Jericho Fire Department prevented Mr. Winuk from engaging in "firematic" activities, he nevertheless could and did provide emergency medical services on behalf of the Jericho Fire Department. AR 10-13. The hearing officer stated that the Jericho Fire Department's by-laws "refer only to 'Associate Membership' and do not use or define "nonactive" terminology or status." AR 10. The hearing officer found that Mr. Winuk's provision of emergency medical services was authorized by the JFD and had been accepted by the New York Fire Department ("FDNY") on September 11,2001. AR 12-13.

The hearing officer relied upon seven pieces of evidence, including the testimony of Tom Von Essen, the FDNY Fire Commissioner on September 11, for his finding that mutual aid had been offered by Mr. Winuk and had been accepted by the FDNY. AR 12-13. Mr. Von Essen testified before the hearing officer that "I'd never seen official acts of us requesting [mutual aid] until September 11th, where we did request volunteers and other paid departments to help us out." AR 164-165. In addition, the police and FDNY, were not allowing ordinary civilians into

the buildings at the point in time Mr. Winuk arrived. Mr. Winuk however, had credentials and a paramedic bag and would have been invited to enter and assist. AR 168. The record further reflected that Mr. John Navaretta, a former JFD firefighter and assistant chief, stated that Mr. Winuk had previously provided mutual aid to other fire departments. AR 129-130. Mr. Navaretta stated, "[b]efore Glenn would do anything he would report in to somebody." AR 130. Mr. Navaretta also stated that Mr. Winuk provided mutual aid at the 1993 World Trade Center bombing, AR 128, the New York City subway bombing, AR 133, the Avianca plane crash in the early '90s, AR 134-135, and various wildfires in Suffolk County, New York. AR 134. The hearing officer concluded that prima facie evidence established that the FDNY authorized Mr. Winuk's participation on the morning of September 11, 2001. AR 12-13. The hearing officer concluded that Mr. Winuk was a public safety officer who died in the line of duty on September 11, 2001, and recommended he receive the recognition and benefits due under the Act. Id.

Mr. Winuk's line of duty death was further recognized by the National Fallen Firefighters Foundation in Emitsburg, Maryland[1] Apx at 1-4; the New York State Fallen Firefighters Memorial Committee Apx at 5-10; at the Ground Zero Firefighters' Memorial Wall dedication on June 10, 2006 before President Bush, Governor Pataki, Mayor Bloomberg, former Mayor Giuliani, Representatives King and Nadler and current FDNY Commissioner Scopetta and former Commissioner Von Essen at the first permanent memorial at Ground Zero on the 56 foot bronze wall sculpture affixed to the "Ten/Ten Firehouse" FDNY, honoring Winuk and the 343

[1] Plaintiff has attached an appendix hereto and will cite to the sequential page numbers as "Apx at ___."

FDNY firefighters killed in the line of duty on September 11, 2001[2] Apx at 11-18; the FDNY Honor Legion, Apx at 19-21 and FEMA/Homeland Security. Apx at 22. These organizations honor fellow public safety officers killed in the line of duty, not civilian good samaritans.

## WINUK LEGISLATION

In August 2005, while this matter was pending before the hearing officer, New York State Governor George Pataki signed bi-partisan legislation stating:

> Glenn Winuk, who served as a firefighter and emergency medical technician with the Jericho volunteer fire department for a period of 19 years, and who died on September 11, 2001 while participating in the rescue efforts in the south tower of the World Trade Center, and who, at the time of his death, was an associate member of the Jericho volunteer fire department, shall be deemed to have been an active member of the Jericho volunteer fire department at the time of his death with full active employment status ....

AR 262 (hereinafter referred to as the "Winuk Law").

Mr. Winuk's efforts were also recognized by the National EMS Memorial Service (May 2003) AR 261; the International Association of Fire Chiefs Volunteer and Combination Officers Section (May 2002), AR 61, Nassau County (May 2002) AR 298; New York City Mayor's Office (November 2001) AR 58; New York State Senator Marcellino (2005) AR 295; Congressional representatives' recognition (2005,2006) (Sen. Hilary Clinton; Rep. Peter King) AR 263-264, 353-354.

## BJA REVERSES ITS OWN HEARING OFFICER TO DENY CLAIM

Pursuant to 28 C.F.R. § 32.24(h)(2001), the director of the BJA reviewed the hearing officer's decision in favor of the Winuk claim for one *additional* year. On September 1,

---

[2] Some speakers appeared by videotaped messages displayed on large television screens at the ceremony.

2006, the BJA issued its final decision holding that Mr. Winuk was not a public safety officer within the meaning of either the Public Law 107-37 or the PSOBA. AR 42. The BJA also determined that, even if Mr. Winuk had been a public safety officer, he did not die in the line of duty. Id. The BJA concluded that the 2005 New York law was not entitled to "any special evidentiary weight." AR 40. However, the BJA relied upon other New York laws, e.g., volunteer firefighter workers' comp laws, to support its decision. It further concluded that awards that it gave to three FDNY firefighters (who were later acknowledged to have been retired) killed on 9/11 "serv[ed] as no guide" in the Winuk claim. AR 41.

**BJA AWARDS 911 CLAIMS TO "RESCUE WORKERS" WITH AMBIGUOUS STATUS**

On October 2, 2002, the New York/New Jersey Port Authority ("PA") sent a letter to the BJA stating that 13 of its employees were serving in their official rescue capacity and were killed in the line of duty. Apx at 23-24. Another letter dated October 18, 2002, was sent by the PA Chief of the Department to the BJA that stated "I am hereby certifying that the following public safety officers listed in the attached were killed in the line of duty . . .." and once again listed the same 13 Port Authority employees. Apx at 25-26. Phone calls were made between the PA Chief and Eileen M. Garry, Associate Deputy Director of the BJA to discuss the eligibility of these 13 PA employees. By letter date January 22, 2003, BJA Associate Deputy Director Eileen Garry notified the PA that "the following 13 deceased Port Authority civilian staff members . . . are **not eligible** to receive benefits under the [PSOB] Act." Apx at 27-28.

One of the PA employee's representatives for the Eugene Raggio family, filed a claim and challenged the subsequent BJA denial in an appeal. Apx at 29. The Raggios successfully

won the appeal before the hearing examiner on May 12, 2005 Apx at 30-41 and the BJA affirmed it the following year by March 2006. Apx at 42-43. During the BJA review of the Raggio claim, on January 13, 2006, the PA sent a third letter to the BJA to certify that all 13 of the same PA employees were public safety officers who died in the line of duty. Apx at 44-45. Between April 2006 and June 2006, the other PA employees' beneficiaries claims were filed. By June 30, 2006, all 12 of those remaining PA claims were granted by the BJA in summary fashion. Apx at 46-69. Mr. Raggio's claim was the only PA claim that the BJA acknowledged that it performed an analysis for (through the hearing examiner), that included a claim denial and appeal to a hearing officer that resulted in the granting of his claim. Ironically, the PA certification letter indicates that most of these PA employees were operations or building maintenance managers, architect designers and a locksmith, and did not appear to meet the definition of firefighter, rescue squad or ambulance crew.[3] Apx at 45.

**JFD REBUTTAL**

On February 22, 2007, the Jericho Fire Department ("JFD") sent BJA Director Herrariz a letter in rebuttal to several of the BJA's conclusions, stated that it had previously certified Mr. Winuk and urged that Mr. Winuk be recognized as a rescue worker killed in the line of duty and afforded recognition and benefits under the PSOBA. Apx at 70-75.

---

[3] Upon information and belief, the BJA also granted awards to rescue workers of private ambulance crews who were not public agencies. No information has been provided to plaintiff on these cases when plaintiff requested information on 911 rescue workers whose status was ambiguous, but they are discussed in *Groff v. United States*, 72 Fed.Cl. 68, 81 (2006) and were blessed under Pub. Law 107-37 which was expanded to include privately employed rescue workers who were swept up in the response to the 911 attacks.

## ARGUMENT

## I. STANDARD OF REVIEW

There are three elements for the judicial review of the denial by the BJA of death benefits as provided by PSOBA: "(1) whether there has been substantial compliance with statutory [sic] and implementing regulations; (2) whether there has been any arbitrary or capricious action on the part of the Government officials involved; and (3) whether there was substantial evidence supporting the decision." *Groff v. United States*, 72 Fed.Cl. 68, 70 (2006) citing *Chacon v. United States*, 48 F.3d 508, 511 (Fed.Cir. 1995).

The BJA must apply the PSOB Act and Public Law 107-37 liberally and the Court is well within its rights to determine if the BJA has done so. "It has long been a 'familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes'." *Demutiis v. United States*, 48 Fed.Cl. 81, 86 (2000), aff'd in part by 291 F.3d 1373 (2002) citing *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). See also *Monell v. New York City Dept. of Soc. Servs*., 436 U.S. 658 (1978)(remedial statute should be "liberally and beneficially construed"). "The PSOBA is likewise remedial in nature and thus should not be applied grudgingly, but rather should be construed liberally to avoid frustration of its beneficial legislative purposes." *Demutiis v. United States*, 48 Fed.Cl. 81 (2000) aff'd by 291 F.3d 1373, 1380 (2002); *Groff* at 79 ("avoid incongruous or harsh results") citing *Baltimore & Philadelphia Steamboat, Co. v. Norton,* 284 U.S. 408, 414 (1932).

While the BJA routinely moves for judgment on the administrative record and seeks to have its discretion viewed in light of that record, it cannot simultaneously seek exclusion from that record, evidence that it has in its possession or becomes aware of simply because *it* deems

that evidence to be irrelevant to its final agency determination. To do so would ignore fair play in a one-sided review of any claim submitted and runs counter to the interests of justice. By controlling what is in the "record" to be reviewed by the Court, the BJA can potentially improperly limit the Court to only that evidence that it wishes the Court to see.

In this case, plaintiff has filed a complaint that the BJA acted arbitrarily and capriciously, among other defects. By its very definition, this calls into question the BJA's policies and calls for a review of how consistently and uniformly it is applying those policies. This requires a limited comparison to its analysis in other similar cases. In this case, plaintiff has limited his inquiry further still, to 911 cases involving the decedent's status as a public safety officer.

As identified previously, those cases involve 3 retired FDNY firefighters who were no longer active firefighters, nor even *members* of a public agency; and 13 Port Authority building personnel working at the World Trade Center in operations such as architects, locksmiths, janitors and building managers, rather than as members of a fire department, rescue squad, or ambulance crew.

"An agency decision is arbitrary and capricious if the agency has relied on factors which congress has not intended it to consider, entirely failed to consider an important aspect of the problem, ordered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Northwest Environmental Defense Center v. Bonneville Power Admin.,* 477 F.3d 668 (2007) citing *State Farm,* 463 U.S. 29, 43 (1983).

"An agency is entitled to change its course when its view of what is in the public's interest changes. However, 'an agency changing its course must supply a reasoned analysis indicating

that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute." *Northwest Environmental Defense*, citing *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970) (footnotes omitted), *quoted in State Farm,* 463 U.S. at 57; *see also Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 808 (1973) (plurality opinion) ("Whatever the ground for the [agency's] departure from prior norms, ... it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate.") (emphasis supplied); *W. States Petroleum Ass'n v. EPA,* 87 F.3d 280, 284 (9th Cir.1996) (stating that an agency "must clearly set forth the ground for its departure from prior norms").

## II. THE JERICHO FIRE DEPARTMENT CERTIFIED THAT WINUK WAS A PUBLIC SAFETY OFFICER KILLED IN THE LINE OF DUTY

Officials from the Jericho Fire Department certified that Glenn Winuk was a member of the Jericho Fire Department who was killed in the line of duty. The JFD put this in writing not once, but 4 times.[4]

Indeed the JFD honored Winuk with a permanent memorial near the fire house and recognized his line of duty death at a ceremony each year. (AR 151-52)

JFD Chief Lottes provided two letters (March 31, 2002 - AR 55; and May 1, 2002 - AR 53-53) on official JFD letterhead that claimed Winuk was acting for the JFD when he was killed and articulated the factual predicates. The BJA however, found that these did not count since

[4] It only took 3 certification letters from the Port authority for the BJA to finally accept its certification.

they were not sent directly to the BJA and were somehow unclear.

Nonetheless, upon further review of the bylaws, Robert Biancanello, Chairman of the Board of Fire Commissioners for the JFD provided another letter to the BJA addressed to its hearing examiner, Daniel Skoler, on April 7, 2005. (AR 234-235).

> **Pursuant to P.L. 107-37, signed by the President on September 18, 2001, to provide for the expedited payment of certain benefits for a public safety officer who died as a direct and proximate result of a traumatic injury sustained in the line of duty as described in Section 1201(a) of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. § 3796(A)) in connection with the terrorist attacks on September 11, 2001, I am hereby certifying that Glenn Winuk should be considered to have been a public safety officer killed in the line of duty, and his death resulted from traumatic injuries.**

The hearing officer determined that this letter was a certification, but that since it was written during the pending appeal, it was too late to receive the expedited review and payment under Public Law 107-37. AR 11, fn 12.

Not surprisingly, defendant's motion makes no reference to this letter (see e.g. defendant MOL at pp.9-10), perhaps because it would then have to admit this language substantially tracks identical language used by FDNY Fire Commissioner Scopetta in his May 24, 2002 certification letter (AR 81-82) and Port Authority Executive Director Kenneth J. Ringler, Jr. On January 24, 2006 (in the PA's third certification (Apx at. 44-45) which were accepted by the BJA as valid certifications and prima facie evidence that those employees were entitled to PSOBA benefits. The BJA must give substantial weight to the factual determination that Winuk was acting in an official capacity, as provided by several officials from the Jericho Fire Department. By ignoring factual determinations of officials, such as those mentioned above, the BJA is self-serving.

*Demutiis v. United States,* 291 F.3d 1373, 1380 (2002).[5] In *Demutiis,* the Court determined that the BJA must give substantial weight to the factual determinations by the public agency, that an off-duty officer was killed in the line of duty, regardless of the belief by the BJA that the determinations were speculative and inconsistent with civilian eyewitnesses. *Demutiis*, at 1380.

While defendant's motion wholly ignores this certification letter from the JFD Chairman, the BJA's opinion addressed it by attempting to inject equivocation by scrutinizing over the words "should be considered" a line of duty death, rather than the BJA's preferred incantation: "is recognized" by the JFD as a line of duty death. (AR 24-25). This argument itself is arbitrary and capricious. The strained effort reveals the BJA's attempt to create doubt where there is none.

Defendant admits that the words used for certification need not be a "formulaic incantation" (Defendant MOL at p.9); (see also infra, *Groff v. United States,* 72 Fed.Cl. 68 (2006)); *Messick v. United States,* 70 Fed.Cl. 319 (2006); *Demutiis v. United States,* 291 F.3d 1373 (2002). The BJA however, went on to do just that. It parsed over one or two words that it believed it could attack as violative of its own special incantative formula, rejected the hearing officer's finding on this 3rd letter and simply concluded there was never any certification.

Stunned by this particular finding by the BJA, the entire JFD Board of Commissioners sent a letter to the BJA, rebutting this arbitrary and capricious effort to castigate the JFD's draftsmanship and stated:

---

[5] "The [BJA] contends that the factual findings in the police reports are highly speculative because they are inconsistent with the statements made by the civilian eyewitnesses, and that the Bureau therefore properly ignored them. That contention, however, goes to the weight the Bureau could give those findings, not to whether it could ignore them. . . . Although the Bureau may have some discretion to determine the weight to be accorded those findings and evidence, it must accord them at least 'substantial' weight and cannot ignore them."

> Thus, the documents submitted by Mr. Biancanello and Mr. Marmann would constitute the certification of Mr. Winuk as having died in the line of duty. **Your interpretation of the words "*should*** recognize Mr. Winuk as a public safety officer and member of the Jericho Fire Department killed in the line of duty" to **mean something other than what was stated and meant**; that we were certifying that he was an associate member of the Jericho Fire Department on September 11, 2001, and that he was in fact killed while performing rescue work at Ground Zero acting as a member of our Department, **would seem unfair. Any reasonable review of that certification and other correspondence from us, leaves no doubt that we considered him to be acting as one of our own and that we certified him as bona fide agent, under both the PSOB Act and Public Law 107-37. There was and is no equivocation on our part**. We were not certain how you would interpret "associate membership" under our bylaws and state and federal law, and took pains to make certain that you had all the facts, but we were not trying to walk away from the heroism of Mr. Winuk or the rights of his family to make a claim under this federal program.
>
> To further clarify any ambiguity, the Jericho Fire District believes that the March 31, 2003 PSOB form submitted to the BJA should be amended. Indeed, Mr. Winuk's status, is not only subject to our bylaws, but to New York State law. As you know, New York State law clearly and specifically recognized him as a member of the Jericho Fire Department who was killed in the line of duty on September 11, 2001. See Exhibit A, p.2

Having certified Mr. Winuk, the BJA, by its own admission, was required to consider this as prima facie evidence that Winuk was entitled to an award. (Defendant MOL at 8). Indeed, because the certification cited Public Law 107-37 and involved a rescue worker killed in the line of duty on 911, the BJA, in its own view, was not required to investigate any further and could simply grant a PSOB award as it apparently did in 3 retired FDNY cases and 12 of 13 PA cases.[6] (Defendant Motion at pp.8-9; AR 24-25, 41).

While the BJA has evidently acted as a rubber stamp upon receipt of nearly identical

[6] No where in Public Law 107-37 does the statute authorize the BJA to forgo any inquiry, in fact, it expressly says that the line of duty must comport with Section 1202(a) of the Act (§ 3796(b)). It does however, impose a 30 day period from certification to payment, which arguably limits the inquiry with respect to time.

certification letters from the FDNY that included 3 retired firefighters and the Port Authority that included 13 employees who were not firefighters, ambulance crews or members of a rescue squad, it elected to investigate the Winuk Public Law 107-37 certification. To plaintiff's knowledge, only Winuk and the PA Raggio cases were "investigated" by the BJA. The inconsistency is an arbitrary departure from its apparent policy and contrary to the overwhelming majority of 911 cases that the BJA approved under Public Law 107-37. *Northwest Environmental Defense Center*, *supra*, 477 F.3d 668 (2007); *Atchinson, supra*, 412 U.S. at 808.

This appears to be yet *another* example of an arbitrary and capricious review of the Winuk claim.

## III. WINUK WAS A PUBLIC SAFETY OFFICER

The Act defines a public safety officers as:

> (a) an individual serving a public agency in an official capacity, with or without compensation, as a law enforcement officer, as a firefighter, as a chaplain, or as a member of a rescue squad or ambulance crew. 42 § 3796(b)

Absent from this definition is any language that requires the individual to be in an "active" status. Indeed, § 3796(b)(4) defines a firefighter as including:

> "a designated member of a legally organized volunteer fire department . . . member of a rescue squad or ambulance crew;"

The BJA concedes that Winuk was a member of the JFD at the time he was killed. The BJA however, imposes its own additional requirement into the statute that the member maintain an "active" status.

Not all PSOBA claims fall neatly within a traditional firefighter or rescue worker killed at the scene of a dangerous incident to which he or she was responding to. Nor was the Act

intended to be so strictly and narrowly construed. This Court has overturned the BJA's claim denials in several of these cases, where "status" was ambiguous.

This Court reversed a BJA denial in *Messick v. United States*, 70 Fed.Cl. 319 (2006) involving a 14 year old boy who was struck by a car on his bicycle while riding to the firehouse responding to an alarm. The boy was not an "active" member of the fire department, but enjoyed an "apprentice" membership and participated in other fire department activities. The court awarded him PSOBA benefits notwithstanding his membership status, because like Winuk, he was a member who, although with limitations, was still authorized to participate in the non firematic functions. In fact, one of his authorized activities was rendering first aid to victims.

Likewise, the BJA rejected the claim for a female student who was training to become an EMT when she was killed while the emergency vehicle she was riding in was struck. The BJA concluded that her status was ambiguous and that she was not officially recognized as a functional part of the public agency yet. The Court reversed this decision in *Hillensbeck v. United States*, 69 Fed.Cl. 369 (2006) finding that as a student, she had been assigned to an EMS group and was bound by its rules, regulations and policies and was authorized to part-take in limited duties when she was killed.

Here Winuk was among those who were killed on September 11 for which Public Law 107-37 of the Patriot Act was passed relaxing the standards and criteria further than even the normal liberal review of the PSOBA. <u>See</u> <u>e.g.</u> *Groff* at 81-82.

## IV. <u>WEIGHING EVIDENCE</u>

The BJA evidently likes to have its cake and eat it too. In one breath it argues that it is required to give substantial weight to the certifying agency on factual findings, but then fails to

do so when it comes to each and every fact determined by the JFD. The BJA then says that the agency's legal conclusions need not be given any weight, yet the BJA then afforded substantial weight to its interpretation of the JFD's "general counsel's opinion letter." (Defendant's MOL at pp. 11-12). "The BJA was permitted to (and did) accord substantial weight to general counsel Frank's opinion." *(emphasis added)* Id at 12.

While "fact findings by the public agency . . . are entitled to substantial weight as the BJA reviews a PSOBA claim . . . legal conclusions made by the public agency whose public safety officer has died are not entitled to the same deference by the BJA when those conclusions concern the PSOBA eligibility of the decedent's survivors." *Groff* at 84[7]; 28 C.F.R. § 32.5.

Contrary to the BJA's self-serving description of counsel Frank's opinion, Mr. Frank did articulate reservations about providing any opinions other than that the new Winuk Law was controlling and that the BJA's query was hypothetical. He filled out the BJA questionnaire without analyzing the bylaws or referring to the custom and practice of associate members who were trained in EMS functions, believing it was academic.

The JFD Board of Commissioners however, made clear two things: the bylaws can be interpreted in more than one way, and that it was not equivocating in certifying Winuk as a line of duty death. If a bylaw can be interpreted fairly in more than one way, the BJA is required to give the benefit of the doubt to approving the claim. "The PSOBA regulations specify that '[t]he Bureau shall resolve any reasonable doubt arising from the circumstances of the officer's death . .

[7] In *Groff*, the BJA erred when it only reviewed decedent pilot's employment contract with a third party and did not inquire or consider his actual services to the California Department of Forestry and Fire Protection ("CDF") where he served in a "similar relationship" as a "functional equivalent" of a firefighter, and where the CDF certified him as one of their own.

. in favor of payment of the death . . . benefit." *Davis v. United States*, 50 Fed.Cl. 192, 210 (2001). See also, *Bice v. United States*, 61 Fed.Cl. 420, 429 (2004)(formerly "found at 28 C.F.C. § 32.4, it requires the Bureau to resolve 'any reasonable doubt arising from the circumstances of the public safety officer's death' in favor of the claimant for benefits.). In *Davis*, an off duty officer driving home after work was killed by a driver being chased by another police vehicle. The BJA denied the claim after determining that the officer, being off duty, could not be determined to have been killed in the line of duty. *Id.* at 210. The court found that the BJA failed to comply with the PSOBA in the interpretation of "line of duty" and failed to accord substantial weight of state and local investigative agencies by not applying the reasonable doubt rule. *Id.* The court found that the circumstantial evidence known was sufficient as a matter of law to develop a reasonable doubt regarding how the accident occurred and that the BJA should have, in light of the circumstances, determined that the reasonable doubt inured to the benefit of the claimants. *Id.* The persuasive evidence included, *inter alia*, habits of the officer killed with regard to wearing a seatbelt and approaching vehicles, showing that the officer could have likely attempted to stop the fleeing vehicle thereby acting in the line of duty, even though off-duty at the time. *Id.* at 211.[8]

There was substantial evidence submitted to the hearing officer that demonstrated the distinction between a "firematic" activity, which the BJA concedes is <u>defined</u> as firefighting (AR 19 fn 11), and emergency medical services (EMS). The letter from FDNY EMT Lisa Gloffke (AR100-01) and the testimony of former FDNY Commissioner Tom Von Essen (AR 172-173)

---

[8] The BJA conveniently deleted the reasonable doubt language that deferred to claimants <u>after</u> it decided Winuk's claim. See Defendant's MOL at fn 8.

and FDNY/JFD firefighter John Navaretta, a lawyer and firefighter who reviewed the JFD bylaws (AR 124-56), made clear that while many fire departments have incorporated EMS units within their fire houses (i.e. FDNY and JFD), they are separate and distinct functions, and require separate and distinct training and skills. EMS may be called to a non-fire emergency and render first aid while firefighters remain in the station. The EMS personnel do not have the same physical fitness requirements, nor physical training and fire apparatus skill sets. The EMS functions are considered less dangerous and do not usually involve putting the EMS worker in harms way, unlike the firefighter. Id.

The JFD advertised its call for volunteers in the two separate and distinct categories, making it clear a volunteer could choose to train for one or the other, or in some cases, like Glenn Winuk, both. The JFD bylaws did not prohibit an associate member from performing first aid and EMS rescue work because it was not considered dangerous such that it would require constant safety drills and physical fitness training and testing.

While defendant begrudgingly concedes there may be a distinction, it characterizes this evidence as "speculative" without contradicting it or supplying reasons for its skepticism and instead merely relies on its interpretation of counsel Frank's opinion that firemanic activities somehow applied equally to emergency medical activities. (Defendant MOL at p. 11). Neither the BJA nor counsel Frank cite any support for the opinion. Had the JFD bylaw committee sought to prohibit an associate from performing emergency medical services, it knew how to say so. Exclusio unis, inclusio alteris. That which is excluded from authorization when changing status, presumptively leaves the other conduct that was previously authorized and not excluded, to continue to be authorized after the change to associate status.

Nowhere in the bylaws is an associate described as "inactive" and nowhere do they or even counsel Frank, assert that Winuk was not authorized to act on behalf of JFD in any manner (see Defendant MOL at p. 12). To the contrary, an associate is still authorized to participate in the activities that are not expressly prohibited. All that was prohibited was participating in firematic activities. The JFD bylaws actually define firematic activities at AR p. 277, to include "drills, inspections, schools,[9] fires, meetings, parades and such other activities as the board of Fire Commissioners may by resolution include." There was no resolution precluding first aid, EMS, search and rescue, washing trucks, rolling hoses, cleaning the fire house, maintaining equipment, directly traffic at an emergency scene and much more. Only active firefighters can ride on "fire apparatus" and fight a fire, to be sure, these functions are considered dangerous and require constant rigorous training to protect oneself from injury and legal liability. Other activities by the various membership status reduced the required training and time commitment, and the consequent authority, as specifically defined in the bylaws. The other authorized membership activities were otherwise left in tact.

Once again the JFD Board of Commissioners concedes that it is reasonable for each side to interpret the associate member description either way, but it is academic and hypothetical in their mind due to the new "Winuk Law" making Mr. Winuk an active member as a matter of law.

Defendant cites to a New York State Controller opinion to define "firemanic" is misplaced. That opinion relates to the financing and funding of fire departments, which plaintiff has already described has been merged with most fire departments to place ambulance and rescue

[9] "Schools" are further defined in the bylaws at AR 266 to mean "fire schools" and apparatus rides to mean "fire" apparatus.

crews in closer proximately to potential victims and save money on housing apparatus and crews. (FDNY Von Essen AR 172-73).

The defendant's reliance on a letter it received from the New York State Department of Health is also misplaced. That letter addressed only Mr. Winuk's certification currency for an "EMT" as opposed to a First Responder on medical emergency services or first aid. To the extent that plaintiff, counsel or witnesses used "EMT" and "EMS" interchangeably, that is a mistake. There is a difference. EMS is the global description used to capture all levels of first aid. EMT refers to a technician who has a higher level of training and certification criteria. New York State has 5 different levels of certification, with EMTs being level 2 or higher (AR 253-55). During the 1980s, Winuk maintained the annual requirements for level 2 EMT (AR 306). During the 1990s, through the time of his death, he maintained the lower level 1 certification for a First Responder for emergency medical services and first aid. This was true while he was listed as an "active" member of the JFD from 1988-1998 and responded to the first World Trade Center bombing (1993), the Avianca plane crash and the New York City subway bombing (AR 132-36) and rendered first aid and also true while he was an associate member from 1998-2001. This required he participate in bi-annual training in CPR, hemorrhage control and other first aid techniques. This level was provided by the American Heart Association ("AHA") to Mr. Winuk. AR 247. In addition to the AHA, other similar certifications are run for fire departments such by the Red Cross, among other organizations. Fire departments routinely hire these nationally recognized entities to conduct the first aid training, using independent programs like the AHA, Red Cross or local paramedic instructors provide this training. Apx at 76-84. This training alone, qualified Mr. Winuk as a first aid rescue worker.

Like Christopher Kangas in *Messick,* Winuk could and did (AR 135) provide first aid care to victims at emergency scenes. *See Messick* at p. 321.

While Mr. Winuk's time that he could devote to annual training diminished due to his full time work commitments as a lawyer, his dedication and commitment to public service did not wane and was the reason he remained a member of the JFD and the reason he kept up his EMS credentials, rather than resigning. He remained the functional equivalent of an active associate member.

This Court has looked to similar evidence to find that a contract pilot, killed while piloting for the California Department of Forestry and Fire Protection (CDF), was "serving a public agency in an official capacity" or its functional equivalent, such that the pilot's survivors could recover under the PSOBA. *Groff v. United States,* 72 Fed.Cl. 68, 88 (2006). In *Groff*, the Court found that the BJA failed to give substantial weight to the factual findings that provided "official recognition" such that the decedent's survivors could recover under the PSOBA. *Id.* The evidence the Court found persuasive in *Groff* is similar to the evidence at hand: state Governor issued a Statewide proclamation designating the pilot as a firefighter and hero, the pilot's name was added to a State firefighter's memorial and national firefighter's memorial, and letters by a CDF official provided that the pilot was acting in an official capacity. *Id.* The Court found that the PSOBA did not specifically exclude contract firefighters.

## V. <u>WINUK DIED WHILE PROVIDING MUTUAL AID TO THE FDNY</u>

The BJA acknowledges that a volunteer firefighter, rescue worker or EMS personnel, can, under certain circumstances, be authorized to provide mutual aid to another public safety group outside his or her district within the State of New York. NY General Municipal Law § 209-i.

(AR 258-60). This law requires that the volunteer report to a commander of a "fire company" or "fire department." In other words, of the dozens of engine, ladder and rescue companies of the FDNY that reported to the World Trade Center, a volunteer like Mr. Winuk could report to one of several dozen company commanders or higher to seek permission to assist them. Many of those officers were also killed at the World Trade Center. (AR 12).

Hearing Officer Skoler summarized much of the evidence that shows that Winuk complied with the mutual aid requirements. Mr. Winuk had prior training and experience in providing mutual aid, and first aid in particular, on several prior occasions, including in New York City. (AR 12). In each case, he complied with the need to check in with the commanding officer and receive permission to assist, rather than free lance at those scenes. Id. On September 11, 2001, he was given access to and remained in an area of the World Trade Center that had been secured by FDNY and NYPD and was being evacuated. (AR 13). Mr. Winuk's body was found with all the tools of an EMS first responder, an EMT bag, wearing surgical gloves, with a stethoscope, possessing a JFD photo ID and found among other FDNY rescue workers. (AR 13). His remains were carried from the scene with an American flag draped over his body as a distinction afforded to rescue workers killed in the line of duty at the site. (AR 55; 241-242). The FDNY Fire Commissioner on the scene, Tom Von Essen, testified that the FDNY needed all the qualified help they could get and were indeed accepting offers of assistance from trained professionals. (AR 172-173). As Chief Lottes May 1, 2002 letter confirmed, the JFD was called to assist the FDNY on September 11 and for the days that followed. (AR 53-54).

Hearing Officer Skoler correctly found that the evidence was "a rather convincing case of New York Municipal Law § 209-i offer/acceptance compliance." (AR 14). Mr. Skoler further

rejected the self-serving letter of Chief Nigro in light of the FDNY Commissioner's testimony that said Nigro was not accurate. (AR 14). Mr. Von Essen implied that the City was worried about liability and workers' compensation claims when Nigro wrote his letter seven months after the event. Id. It is clear that Nigro had no first hand knowledge of Mr. Winuk's actions and the BJA evidently never contacted Chief Nigro for an explanation, preferring instead, to simply rely on it without further inquiry. It was however, a well publicized fact that dozens of non-FDNY and non-NYPD rescue workers assisted that morning and literally hundreds more later that day and over the next several weeks, including the undersigned. The BJA inquiry morphed Chief Nigro's legal opinion "into a finding of fact" to which it believes it should rely on. (Defendant MOL at 156).

The BJA attempts to undermine the validity of authority for the § 209-i mutual aid law by arguing it requires the firefighter, rescue worker, or "first aid squad" (AR 260) maintain an "active" status. Once again the statute does not mention the word "active." Instead, the cross-referenced section that is referred to by the BJA not surprisingly, speaks to workers' compensation benefits for the volunteer which has different standards for job related injuries than the PSOBA and of course the broader Patriot Act Public Law 107-27. Here, Winuk's American Heart Association CPR - first aid certification was current and "active" at the time he was killed. This afforded him the functional equivalent status as an active associate member of the JFD with regard to first aid rescue squad activities.

The JFD made factual findings that the offer and acceptance took place in its certification and other letters. The BJA gave no deference whatsoever to this public agency on these factual findings, when it should have been afforded substantial weight. *Demutiis,* 291 F.3d at 1380.

The BJA described the convincing mutual aid offer and acceptance evidence as "speculative," but once again offered nothing in rebuttal except Chief Nigro's letter.[10] This is wholly insufficient and further indicative of an arbitrary and capricious review. The BJA simply labeled evidence that undermined its argument as "speculative" without further explanation or support from concrete contrary evidence. The BJA implied that the only convincing proof would have to come as direct evidence from the FDNY officer who accepted the Winuk offer - even if that officer was killed. Circumstantial evidence however, can be as powerful as direct evidence, as every jury is instructed when engaging in a fact finding endeavor. Of all the BJA's arguments and its superficial rejection of evidence, the attack on mutual aid clearly exposes an over-reaching attempt to justify its improper review in this case.

## VI. THE WINUK LAW

It is rare for legislatures and governors to pass legislation that are specific for one person. It is rarer still these days that it is done in a unanimous and bi-partisan way - in which the Winuk Law was. The statute is crystal clear and not ambiguous. It restored Mr. Winuk's status from "associate" to "active" firefighter under New York law.

The law was passed for one very specific reason, not because legislators agreed that Winuk did not qualify for PSOBA benefits, but because they were unanimously disturbed by the BJA's focus on Winuk's status as the only real reason for rejection. In declaring Winuk "active," it believed that the issue would be put to rest as a matter of law. It is improper for the BJA to draw an adverse inference from post death certifications and legislation. *Groff*, *supra*, at 86.

---

[10] The legal authorization and "active" status issue here is legal argument, not a finding of fact. Nonetheless, the BJA morphed it into a finding of fact in order to rebut the mutual aid offer acceptance circumstantial evidence.

The BJA did not like what it considered a "legal fiction" and felt out maneuvered. So it simply ignored the new law. The BJA's fear that States will suddenly rise up and pass laws to "eviscerate" the BJA's role, demonstrates its hyperbolic insecurity and is wholly overstated. (Defendant Motion at p. 13). Even with the "active" status label, the BJA would still have to evaluate all the other normal criteria under the statute to determine if PSOBA benefits were warranted. But at its core, the "active" versus "associate" status is the only argument the BJA has and makes repeatedly throughout its many pages of opposition. It is therefore the reason it refuses to apply the Winuk law in this case.

One final comment on Public Law 107-37. It was passed after the events of 911 yet arguably changed some of the ground rules and procedural criteria for 911 rescue workers killed that day. In addition, the PSOB Act itself was amended in 2002 to create a remedy for a "Chaplin" who was killed in the line of duty. This truly rare event unfortunately actually occurred with the highly publicized death of FDNY Reverend Mychal Judge who was killed while administering last rights at the World Trade Center. Without this amendment, Fr. Judge's family would not have been entitled to file a claim. In the BJA's criticism of the New York Winuk Law, it selectively postulates that such post 911 legislation creates a "legal fiction" because it is applying different standards and procedures after PSOBA claims have already accrued. Plaintiff supports the legislature's ability to increase the liberal standards and procedures that benefit claimants after the fact, as Public Law 107-37 and the "Chaplin" amendment evidently do, because they are not ex post facto laws that deprive claimants of any right that had already accrued, rather, it benefits claimants by expanding those rights. The BJA seems to have no problem with the "legal fiction" legislated from Congress, only similar

legislation when it comes from New York.

Ironically, the BJA argues that the federal statute is controlling and it need not look to New York law to determine if the Act was complied with. But of course because the federal statute makes no mention of "active" versus "inactive" or refers to status, the BJA must look elsewhere to make its argument. Not surprisingly, the BJA looks to New York law when it suits them i.e., the New York volunteer firefighter benefits law and counsel Frank's purported interpretation of the JFD bylaws, allegedly under New York law - though no law is cited.[11]

The PSOB Act, however, clearly envisions that the BJA will look to local public agencies for certification based on local law. Consequently, local law must be given great deference. The BJA failure to give proper deference to the New York law known as the "Winuk Law," further demonstrates its arbitrary and capricious conduct in reviewing this case.

## CONCLUSION

The BJA's review of the Winuk claim failed to afford substantial weight to the public agency's certification and findings; the BJA failed to afford reasonable doubt over the JFD bylaws and failed to apply the interpretation of the PSOB Act broadly and liberally; the BJA's conclusion on claimant's providing mutual aid and being killed in the line of duty is not supported by substantial evidence; the BJA's review of the Winuk claim was arbitrary and capricious, standing alone, and is wholly inconsistent and arbitrary when compared to several other 911 claims; the BJA failed to apply New York Law and improperly ignored the Winuk

---

[11] The bylaws may imply a reference to New York law as it relates to the legal annual requirements for firefighters to engage in structure fires. This argument would be sound, as it relates to traditional firefighting as noted above, but not EMS duties that have separate and more minimal training criteria and requirements.

Law; Winuk's claim substantially complied with the PSOB Act and its implementing regulations in that he was a trained member of a public safety organization and served as the functional equivalent of an active EMS rescue worker.

For the reasons above, defendant's motion should be denied and plaintiff's cross-motion for judgment in his favor granting PSOB Act benefits should be granted.

Dated: New York, New York
March 26, 2007

Respectfully submitted,

By: [signature]

Andrew J. Maloney III
Kreindler & Kreindler LLP
100 Park Avenue
New York, NY 10017
212-687-8181
*Attorneys for Seymour Winuk,*
*as Plaintiff and Administrator to the Estate of Glenn Winuk, Deceased*