U.S. Department of Justice

Office of Justice Programs

---

*Washington, D.C. 20531*

**PUBLIC SAFETY OFFICERS' BENEFITS ACT CLAIM DETERMINATION**

**Case Number:** 01-911-0430

**Decedent:** Douglas Gene Karpiloff, The Port Authority of New York and New Jersey

**Case Summary:** On Tuesday, September 11, 2001, shortly before 9:00 a.m., American Airlines Flight 11 crashed into the north tower of the World Trade Center, and burst into flames. Fifteen minutes later, a second plane, United Flight 175, crashed into the south tower. The impact of both crashes caused the World Trade Centers to collapse. It is estimated that approximately four hundred emergency personnel were killed during rescue attempts. The Port Authority of New York and New Jersey Emergency Services Officer (ESO) Douglas Gene Karpiloff died of injuries sustained in the line of duty.

**Survivors:** The Port Authority of New York and New Jersey Emergency Services Officer Douglas Gene Karpiloff is survived by his spouse, , and his children and . Because was over 18 years old, not a full-time student, and capable of self-support, she is not eligible for the benefit. Because was over 18 years old, and a full-time student, his benefit will be made directly to him. No other beneficiaries were identified.

**Determination:** This claim was certified as ready for determination on May 31, 2006. Based on the certification submitted by The Port Authority of New York and New Jersey pursuant to Public Law 107-37, the Claim for Death Benefits pursuant to September 11, 2001 Terrorist Attacks submitted by his spouse, and an analysis of the facts of this case, it is determined that the death of Port Authority of New York and New Jersey ESO Douglas Gene Karpiloff **is covered** under Public Law 107-37. The Port Authority of New York and New Jersey ESO Douglas Gene Karpiloff died as a direct and proximate result of a personal injury sustained in the line of duty.

Based on the evidence presented in this case we have concluded that The Port Authority of New York and New Jersey ESO Douglas Gene Karpiloff's spouse, and child , will each be awarded $125,000.00. The entire benefit is $250,000.00 which is the total benefit amount for a death occurring on September 11, 2001.

**PSOB Claim No. 01-911-0430** **Emergency Services Officer Douglas Gene Karpiloff**

**Prepared by:** ______________________ 6/30/2006
Benefits Specialist Date
Public Safety Officers' Benefits Office

**Approved by:** ______________________ 6/30/06
Director Date
Public Safety Officers' Benefits Office

**Concurrence by:** ______________________ 30 June 2006
Office of General Counsel Date
Office of Justice Programs

U.S. Department of Justice

Office of Justice Programs

*Washington, D.C. 20531*

**PUBLIC SAFETY OFFICERS' BENEFITS ACT CLAIM DETERMINATION**

**Case Number:** 01-911-0431

**Decedent:** Robert Henry Lynch, The Port Authority of New York and New Jersey

**Case Summary:** On Tuesday, September 11, 2001, shortly before 9:00 a.m., American Airlines Flight 11 crashed into the north tower of the World Trade Center, and burst into flames. Fifteen minutes later, a second plane, United Flight 175, crashed into the south tower. The impact of both crashes caused the World Trade Centers to collapse. It is estimated that approximately four hundred emergency personnel were killed during rescue attempts. The Port Authority of New York and New Jersey Emergency Services Officer (ESO) Robert Henry Lynch died of injuries sustained in the line of duty.

**Survivors:** The Port Authority of New York and New Jersey Emergency Services Officer Robert Henry Lynch is survived by his spouse, ; and his children . Becaus is over 18 years old, her benefit will be made payable to her. Because is a minor, his benefit will be made payable to his mother, ; and benefits will be made payable to their mother, with instructions to use the proceeds for the use and care of the minor children and to act as custodian of their benefits. No other beneficiaries were identified.

**Determination:** This claim was certified as ready for determination on May 31, 2006. Based on the certification submitted by The Port Authority of New York and New Jersey pursuant to Public Law 107-37, the Claim for Death Benefits pursuant to September 11, 2001 Terrorist Attacks submitted by his spouse, and an analysis of the facts of this case, it is determined that the death of Port Authority of New York and New Jersey ESO Robert Henry Lynch **is covered** under Public Law 107-37. The Port Authority of New York and New Jersey ESO Robert Henry Lynch died as a direct and proximate result of a personal injury sustained in the line of duty.

Based on the evidence presented in this case we have concluded that The Port Authority of New York and New Jersey ESO Robert Henry Lynch's spouse, will be awarded $125,000.00, and his children will each be awarded $25,000.00. The entire benefit is $250,000.00 which is the total benefit amount for a death occurring on September 11, 2001.

**Prepared by:** ______________________ 6/30/2006
Benefits Specialist
Public Safety Officers' Benefits Office
Date

**Approved by:** ______________________ 6/30/06
Director
Public Safety Officers' Benefits Office
Date

**Concurrence by:** ______________________ 30 June 2006
Office of General Counsel
Office of Justice Programs
Date

U.S. Department of Justice

Office of Justice Programs

*Washington, D.C. 20531*

## PUBLIC SAFETY OFFICERS' BENEFITS ACT CLAIM DETERMINATION

**Case Number:** 01-911-0432

**Decedent:** Pete Negron, The Port Authority of New York and New Jersey

**Case Summary:** On Tuesday, September 11, 2001, shortly before 9:00 a.m., American Airlines Flight 11 crashed into the north tower of the World Trade Center, and burst into flames. Fifteen minutes later, a second plane, United Flight 175, crashed into the south tower. The impact of both crashes caused the World Trade Centers to collapse. It is estimated that approximately four hundred emergency personnel were killed during rescue attempts. The Port Authority of New York and New Jersey Emergency Services Officer (ESO) Pete Negron died of injuries sustained in the line of duty.

**Survivors:** The Port Authority of New York and New Jersey Emergency Services Officer Pete Negron is survived by his spouse, and his children Because are minors, their benefits will be made payable to their mother, with instructions to use the proceeds for the use and care of the minor children and to act as custodian of their benefits. No other beneficiaries were identified.

**Determination:** This claim was certified as ready for determination on May 31, 2006. Based on the certification submitted by The Port Authority of New York and New Jersey pursuant to Public Law 107-37, the Claim for Death Benefits pursuant to September 11, 2001 Terrorist Attacks submitted by his spouse, and an analysis of the facts of this case, it is determined that the death of Port Authority of New York and New Jersey ESO Pete Negron <u>is covered</u> under Public Law 107-37. The Port Authority of New York and New Jersey ESO Pete Negron died as a direct and proximate result of a personal injury sustained in the line of duty.

Based on the evidence presented in this case we have concluded that The Port Authority of New York and New Jersey ESO Pete Negron's spouse, will be awarded $125,000.00, and his children will each be awarded $62,500.00. The entire benefit is $250,000.00 which is the total benefit amount for a death occurring on September 11, 2001.

**PSOB Claim No. 01-911-0432** **Emergency Services Officer Pete Negron**

**Prepared by:** ______________________ 6/30/2006
Benefits Specialist Date
Public Safety Officers' Benefits Office

**Approved by:** ______________________ 6/30/06
Director Date
Public Safety Officers' Benefits Office

**Concurrence by:** ______________________ 30 June 2006
Office of General Counsel Date
Office of Justice Programs

U.S. Department of Justice

Office of Justice Programs

*Washington, D.C. 20531*

**PUBLIC SAFETY OFFICERS' BENEFITS ACT CLAIM DETERMINATION**

**Case Number:** 01-911-0433

**Decedent:** David Ortiz, The Port Authority of New York and New Jersey

**Case Summary:** On Tuesday, September 11, 2001, shortly before 9:00 a.m., American Airlines Flight 11 crashed into the north tower of the World Trade Center, and burst into flames. Fifteen minutes later, a second plane, United Flight 175, crashed into the south tower. The impact of both crashes caused the World Trade Centers to collapse. It is estimated that approximately four hundred emergency personnel were killed during rescue attempts. The Port Authority of New York and New Jersey Emergency Services Officer (ESO) David Ortiz died of injuries sustained in the line of duty.

**Survivors:** The Port Authority of New York and New Jersey Emergency Services Officer David Ortiz is survived by his spouse, , and his children . Because is over 18, his benefit will be made directly to him. Because is a minor, her benefit will be made payable to her mother, , with instructions to use the proceeds for the use and care of the minor child and to act as custodian of her benefit. No other beneficiaries were identified.

**Determination:** This claim was certified as ready for determination on May 31, 2006. Based on the certification submitted by The Port Authority of New York and New Jersey pursuant to Public Law 107-37, the Claim for Death Benefits pursuant to September 11, 2001 Terrorist Attacks submitted by his spouse, and an analysis of the facts of this case, it is determined that the death of Port Authority of New York and New Jersey ESO David Ortiz **is covered** under Public Law 107-37. The Port Authority of New York and New Jersey ESO David Ortiz died as a direct and proximate result of a personal injury sustained in the line of duty.

Based on the evidence presented in this case we have concluded that The Port Authority of New York and New Jersey ESO David Ortiz's spouse, will be awarded $125,000.00; and his children, , will each be awarded $62,500.00. The entire benefit is $250,000.00 which is the total benefit amount for a death occurring on September 11, 2001.

**PSOB Claim No. 01-911-0433** **Emergency Services Officer David Ortiz**

**Prepared by:** ______________________ 6/30/2006
Benefits Specialist Date
Public Safety Officers' Benefits Office

**Approved by:** ______________________ 6/30/06
Director Date
Public Safety Officers' Benefits Office

**Concurrence by:** ______________________ 30 June 2006
Office of General Counsel Date
Office of Justice Programs

MICHAEL J. MILNER
Chairman

DAVID J. MARMANN
Vice Chairman

LAWRENCE F. BACHTELER, Jr.

ARTHUR J. KROLL

TED KETSOGLOU

# JERICHO FIRE DISTRICT

424 NORTH BROADWAY
JERICHO, NEW YORK 11753-2105
(516) 931-3546 Fax: 931-2385

BETTY SIMON
Treasurer

MARGE BLAIS
District Secretary

JOHN J. O'BRIEN
District Supervisor

February 22, 2007

Domingo S. Herraiz
Director, Bureau of Justice Assistance
U.S. Department of Justice
Washington, DC 20531

Dear Mr. Herraiz:

We have been provided with a copy of your September 1, 2006 Final Agency Determination that denied a PSOB award in the Winuk case, claim No. 01-911-0421 by counsel for the Winuk family. The Board of Fire Commissioners of the Jericho Fire District is disappointed by your decision because it believes that benefits should be provided to the Winuk family under this federal program.

The letters and forms that were interpreted by you as the certification letters should be viewed in the context of the rather unorthodox approach that was taken in order to develop the claim due to the unusual and special circumstances of the 9-11 tragedy. Mr. Winuk was an associate member of the Jericho Fire Department on September 11, 2001. After these events unfolded then Chief Lottes of the Jericho Fire Department was called upon or on his own accord wrote a letter in support of Mr. Winuk as having died in the line of duty. The communications of Chief Lottes written outside of official channels contributed to confusing the position of the Jericho Fire Department and Jericho Fire District. Subsequently, a letter was sent by Chairman of the Board Robert Biancanello and the PSOB form was submitted under the name of Chairman David Marmann. Thereafter your office requested and received a written

communication from District Counsel Joseph F. Frank, Esq. The communications from Mr. Biancanello, Mr. Marmann and Mr. Frank were official submittals of the Board of Fire Commissioners of the Jericho Fire District, the governmental board that oversees the Jericho Fire Department and its volunteer firefighters.

Thus, the documents submitted by Mr. Biancanello and Mr. Marmann would constitute the certification of Mr. Winuk as having died in the line of duty. Your interpretation of the words "should recognize Mr. Winuk as a public safety officer and member of the Jericho Fire Department killed in the line of duty" to mean something other than what was stated and meant; that we were certifying that he was an associate member of the Jericho Fire Department on September 11, 2001, and that he was in fact killed while performing rescue work at Ground Zero acting as a member of our Department, would seem unfair. Any reasonable review of that certification and other correspondence from us, leaves no doubt that we considered him to be acting as one of our own and that we certified him as our bona fide agent, under both the PSOB Act and Public Law 107-37. There was and is no equivocation on our part. We were not certain how you would interpret "associate membership" under our bylaws and state and federal law, and took pains to make certain that you had all the facts, but we were not trying to walk away from the heroism of Mr. Winuk or the rights of his family to make a claim under this federal program.

To further clarify any ambiguity, the Jericho Fire District believes that the March 31, 2004 PSOB form submitted to the BJA should be amended. Indeed, Mr. Winuk's status, is not only subject to our bylaws, but to New York State law. As you know, New York State law clearly and specifically recognized him as an active member of the Jericho Fire Department who was killed in the line of duty on September 11, 2001.

Mr. Frank's January 10, 2006 letter to BJA attorney Jason P. Cooley, Esq., made clear that the BJA's questions were hypothetical and academic because of the established New York State law specific to Mr. Winuk. Mr. Frank made it clear that as a matter of both law and fact, indeed as a matter of fairness, Mr. Winuk is qualified to and should receive the PSOB recognition he deserves for his heroism on September 11, 2001.

With regard to Mr. Cooley's questions which Mr. Frank answered as hypothetical and in essence, unnecessary in part because of the aforementioned New York State law, Mr. Frank answered by providing an interpretation of some elements of the Jericho Fire Department bylaws. We believe that the amendment of New York State law in order to make the status of Mr. Winuk that of an active volunteer firefighter on the date of death makes any discussion of the bylaws that would interpret his status as otherwise moot.

Counsel for the Winuk family has advanced the position that Mr. Frank was wrong to interpret the bylaws to mean that an associate member was not subject to respond to any emergency calls of the fire department based upon bylaw language that stated associate members are not to respond to "firematic calls". Counsel for Mr. Winuk has taken the position that our by-laws *do not prohibit* associate members from responding to non-firematic calls, such as the need to provide first aid. We have always interpreted that provision as meaning that associate members are not to perform any of the duties of an active volunteer firefighter, but we can understand his argument.

However, again we believe that any such discussions are pure academic exercises since New York State law governs whether or not a person is an active volunteer firefighter and the legislature has spoken for us on this matter.

Of course, whether or not Mr. Winuk was acting under the immediate direction and control of the New York City Fire Department ("FDNY") and was assisting them at the tragedy scene on September 11, 2001 as a volunteer firefighter is a function of the evidence uncovered

at this tragedy and the position taken by FDNY. We are aware that a number of organizations have recognized Mr. Winuk's line of duty sacrifice and he has been bestowed with membership in the FDNY Honor Legion. When a volunteer firefighter elects to offer his or her assistance to another fire department under Section 209-i of the General Municipal Law, the fact of his service and the acceptance of that service is a matter between the volunteer and the fire department that has accepted his services. The home department, in this case the Jericho Fire Department, plays no role in approving the offer and acceptance of services. The volunteer firefighter is not required to obtain permission from the home department (Jericho Fire Department) in such case.

Once again it is important to note that since the special legislative act determined that Mr. Winuk was *an active volunteer firefighter killed in the line of duty* on September 11, 2001, it seems to us that the state legislature has made the factual determination that an offer of assistance was given by Mr. Winuk and accepted by FDNY on that fatal day. It is time for government officials, sworn by oath to uphold the intent of the PSOB Act and the laws of this state, to accept that determination and stop equivocating.

We are aware that some have advanced the position that the Jericho Fire District and Jericho Fire Department have hedged on certifying Mr. Winuk because of a concern that might be created relative to monetary obligations that such determination might create for the Jericho Fire District. However, the simple fact of the matter is that Section 209-i of the General Municipal Law places the obligation to provide benefits to a firefighter injured, rendered ill or killed under such circumstance upon the fire department and municipality that accepts the services of the volunteer. Thus, the official act of New York State in finding Mr. Winuk to have been a an active member of the Jericho Fire Department killed in the line duty at the World Trade Center on September 11, 2001 would place the obligation to provide volunteer firefighter death benefits under New York State law upon FDNY and New York City. We cannot speak to

what happened at the scene of September 11, 2001 relative to an offer of assistance and an acceptance of that assistance by the officer in charge, but the circumstances of the special legislative declaration would lead us to believe that New York State has acknowledged that FDNY received and accepted an offer of life saving services on that day from Mr. Winuk and that the statements of Chief Nigro of FDNY relative the actions of the incident commander and officers at the scene should be discounted. Chief Nigro, FDNY and New York City may have a state statutory obligation to the family of Mr. Winuk under the Volunteer Firefighters Benefits Law and his statements should be considered in light of that potential claim.

We have been advised of the BJA awards on the three claims of retired FDNY firemen killed on September 11, 2001 and do not understand why you would bestow benefits on them and not Mr. Winuk. They were entitled to this honor and their families were entitled to the benefits. The same is true for Mr. Winuk and the Winuk family. We are aware of no state statute that would permit a fire chief to deputize a retired firefighter, and do not understand why a strict interpretation of state law and local bylaws is applied to the Winuk claim while a certification of the FDNY official is relied upon in the case of the retired firefighters. We chose to deal with the Justice Department in a straight forward, honest and truthful manner pointing out the bylaw and other issues that were involved in this claim while FNDY simply certified these retired members and obtained benefits for their families. To differentiate those claims on a clearly worded certification, regardless of how lacking in truth and full disclosure the certifications for the paid claims were is unfair to the Winuk family and the memory of Glenn Winuk. An associate volunteer firefighter and retired paid firefighters rushed to the aid of their fellow Americans on September 11, 2001. You concede that all were heroes, but you have chosen to recognize only the retired formerly paid firefighter and ignored the volunteer firefighter. All of these men deserve to be recognized and benefits should be bestowed on all of their families. If you wish to

have a very strict and unbending program, then apply that criteria universally, but if you are going to use a liberal interpretation, be liberal to all.

The Winuk family should not pay a price because the Jericho Fire District provided you with full disclosure on all relevant facts and circumstances. These decisions are not made in a vacuum. All of the facts and circumstances of that fatal day must be taken into account. All of the determinations made on PSOB benefits claims for that day must be considered together along with decisions made on claims from previous tragic events. You are correct that there are a wide range of heroic actions that are not covered under your program, but this is not one of them.

We had thought that all of the factual questions were put to rest with the New York State special legislation, but your decision has told us otherwise. We do not understand why Congress and the President are given the discretion to pass legislative actions that impact how the September 11, 2001 tragedy would be dealt with by the country *after it had occurred*, but state legislators and the governor of one of the states impacted by the tragedy or not given the same discretion.

We ask your assistance in seeing that the Winuk family receives the proper recognition of the sacrifice of Glenn Winuk in the form of a proper finding under the PSOB program.

Very Truly Yours,

Michael J. Milner – Chairman

David J. Marmann – Vice Chairman

Lawrence F. Bachteler, Jr. – Commissioner

Arthur Kroll - Commissioner

Theodore Katsoglou - Commissioner



196031
v1

American Heart Association®

*Learn and Live*℠

# THE AMERICAN HEART ASSOCIATION TEAMS UP WITH THE FIRE DEPARTMENT OF NEW YORK FOR ADVANCE LAUNCH OF NEW SELF-DIRECTED CPR TRAINING WORKING TOGETHER TO SAVE LIVES

**NEW YORK, NY, April 12, 2005** ... The American Heart Association is pleased to announce that the Fire Department of New York (FDNY) will participate in an advance launch of the American Heart Association's new program — Family & Friends CPR Learning Program — a revolutionary approach to teaching the basic skills of CPR (cardiopulmonary resuscitation). Each Family & Friends Kit contains everything needed for a self-directed educational experience that can be completed within 30 minutes. In addition, once a person learns CPR via Family & Friends Kit, he or she can share this knowledge and skill to help other friends and family members learn CPR. Everyone in a single household can learn the lifesaving skills of CPR with one kit.




The FDNY will introduce the Family & Friends Kit to students attending the FDNY High School for Fire and Life Safety, and other students attending schools located in Thomas Jefferson High School at 400 Pennsylvania Avenue, East New York, Brooklyn on April 12. They also plan on introducing this program to community and service groups in May. In addition, FDNY members will also provide traditional Friends & Family CPR training in various neighborhood settings such as community centers, places of worship, community boards, etc. FDNY, working together with the American Heart Association, is committed to increasing community CPR training throughout New York City, thereby strengthening the second link in the Chain of Survival and helping save lives.

Each year, more than 250,000 people across the country die from cardiac arrest. Nationally, the survival rate for cardiac arrest is 5 percent. In New York City, it is 3.1 percent. However, survival rates can improve if steps are taken to improve the links in each community's chain of survival.

The four links are an effective 9-1-1 Emergency Medical Services (EMS) system, early CPR, early defibrillation and early advanced medical care. The second link, CPR, is one that every individual can learn. Since approximately 70 percent of cardiac emergencies occur in the home, chances are if an individual ever needs to perform CPR it will be to help save the life of a loved one, family member or friend. Knowing CPR can be the difference between life and death, buying valuable time until the patient is defibrillated.

This joint FDNY/American Heart Association effort will include free CPR training made available by the American Heart Association during its annual CPR Week program, April 8–16, at sites throughout the city, as well as free CPR training in schools and communities provided by the FDNY's new Community CPR Training Unit.

"The FDNY and the American Heart Association sincerely believe that a substantial number of deaths can be prevented if trained members of the community can provide critical CPR measures until emergency professionals and lifesaving equipment arrive on the scene," says Fire Commissioner Nicholas Scoppetta.

The American Heart Association played a vital role in the discovery of CPR, and in more than 30 years since CPR was first reported in medical journals, the association has trained millions of Americans to perform it.

"We welcome this opportunity to work with the FDNY to help save lives in New York City," says Jane Chesnutt, Chairman of the American Heart Association's New York City Board of Directors and Editor-in-Chief of Woman's Day. "This unique partnership emphasizes the American Heart Association's unyielding commitment to strengthening the chain of survival and recovery— here in New York City and across the United States," says Chesnutt.

**To learn where you can take a free CPR class during CPR week, or to find out about other CPR classes in your area, call 1-877-AHA-4CPR today.**

**Andrew Maloney**

**Subject:** Rensselear, NY



American Heart Association. Learn and Live.

## Rensselaer Firefighters and Citizen Embrace Role as Lifesavers, Earn Recognition from the American Heart Association

**For Immediate Release: September 9, 2004**

RENSSELAER - The American Heart Association honored four City of Rensselaer firefighters and one citizen today for their recent heroic, lifesaving actions. Firefighters Bob Fink, Mike Mann, Rick Mollenkoph and Dick Slauson received certificates during an American Heartsavers Celebration, which lauded them for responding to someone in sudden cardiac arrest by performing CPR or using an automated external defibrillator (AED). Margaret Mackey of Rensselaer also was honored.



*Firefighter Dick Slauson with Ariana*

"There's no doubt about it, these firefighters and Margaret Mackey are heroes," said Don Deyo, Chairman of the American Heart Association's Capital Region Board of Directors and Vice President, Senior Portfolio Manager at HSBC Bank USA. "They saved lives. The funny thing is, they're also everyday people who used a few simple skills to achieve something extraordinary. They demonstrated why every Capital Region resident should enroll in a Heartsaver AED course. Knowing the warning signs of a heart attack or cardiac arrest, or knowing how to perform CPR, can certainly pay off. It can keep people alive."

**DID YOU KNOW?**

The American Heart Association provided the first CPR guidelines in 1966 and has updated them every six years. Our courses have trained millions of volunteers and created a national network prepared for Basic Life Support emergencies.

read more...

**Find a Class Near You**

To find a CPR class near you, please enter your ZIP code or state and then select Submit.

ZIP Code:

*Or* State:

Submit

"Eighty percent of our calls are EMS calls," said James Van Vorst, chief of the Rensselaer Fire Department, who thanked Brayton Brothers Construction for donating two defibrillators to the Rensselaer Fire Department. "Last year, we had 897 EMS calls; so it's crucial that our employees are trained in CPR and can use a defibrillator."

Fink, Mann, Mollenkoph, Slauson and Mackey came to the rescue of people in sudden cardiac arrest, which is most often caused by an irregular heart rhythm called ventricular fibrillation. This irregular rhythm causes the heart's electrical impulses to become chaotic, causing the victim to collapse, lose consciousness and stop breathing. Unless a normal heart rhythm is restored, death follows in a matter of minutes. In fact, the American Heart Association estimates that for every minute without defibrillation, a person's chance of survival decreases by seven to ten percent.

Fink, Mann, Mollenkoph, Slauson and Mackey were honored this morning for responding in two situations:

**On June 29,** while on duty at Engine 4, Slauson heard the county tones dispatching an ambulance for a cardiac arrest. Slauson responded to the scene, arriving just as the dispatcher sent out the call. He found 18-month-old Ariana Solomon lying on the top step of the front porch - she was not breathing; she had no pulse; she was ashen in color; her eyelids were half open; her pupils were fixed; and she had formula coming from her mouth and nose. Slauson immediately administered CPR with mouth-to-nose resuscitation. After four cycles of CPR, the child began to breathe on her own.

Fink and Mollenkoph from Engine 3 then arrived on the scene. Mollenkoph suctioned Ariana's nose and mouth, and Fink assisted with the equipment and administered oxygen. Rensselaer Volunteer Ambulance then transported the patient to the hospital.

"It's awesome to meet the people who saved my daughter's life," said Ariana's mother, Sheba Bryan. "They really went all out for her."

"To know that there are people out there to save lives, like they did for my daughter, is wonderful," said Daniel Solomon, Ariana's father. "I'm just so grateful that they're there."

**On July 23,** Engines 2 and 3 were dispatched to assist a 53-year-old male

with chest pains. While en route, they were notified by radio that the patient was in full cardiac arrest.

Mollenkoph, Mann and Fink all arrived and found the street and house crowded with people. They carried their equipment inside the house and found the patient lying on the living room floor. His next-door neighbor, Margaret Mackey, was giving him CPR. She stepped back and explained that the patient was not breathing so she'd been breathing for him. The firefighters immediately went to work.

Mann checked for a pulse and, not feeling one, started chest compressions. Fink set up an Ambu Bag with oxygen and started ventilations, and Mollenkoph hooked up a semiautomatic defibrillator. After the defibrillator pads were attached to the patient, it was put on analyze mode to determine if the heart was in a shock-able rhythm. The defibrillator recommended cardiac shock, so Mollenkoph shocked the patient and then again placed the defibrillator on analyze mode. It advised resuming CPR.

After several cycles of CPR, the defibrillator recommended cardiac shock, and a shock was administered. A pulse was then detected and CPR was stopped but ventilations continued. At that time, paramedic Kevin Diggs from Empire Ambulance arrived and placed the patient on a cardiac monitor. Diggs started an IV and administered drugs. Soon, the patient was breathing on his own.

"Two people are alive today because Bob Fink, Mike Mann, Rick Mollenkoph, Dick Slauson and Margaret Mackey knew exactly how to help somebody in sudden cardiac arrest," Deyo said. "I truly hope their actions inspire other people to enroll in a Heartsaver AED course and arm themselves in the fight against heart disease. You never know when it might be your turn to save a life. Will you be ready?"

To find out more about Heartsaver AED, call the American Heart Association at 1-800-MY-HEART or use our CPR class locator in the upper right-hand portion of this page to find a training center in your area.


©2007 American Heart Association, Inc. All rights reserved. Unauthorized use prohibited.

**Andrew Maloney**

**Subject:** FW: Emailing: presenter Feds encourage the training through AHA

SEARCH
ADVANCED SEARCH

DONATE HELP CONTACT SITE INDEX HOME

American Heart Association.
*Learn and Live.*

## Second Round of Rural AED Grants Awarded

AED
Automated External Defibrillator

For the second year, the U.S. Department of Health and Human Service's Health Resources and Services Administration (HRSA) awarded $11.6 million in grants to help rural communities purchase automated external defibrillators (AEDs). The program was authorized by the Rural Access to Emergency Devices Act (signed into law by President Clinton in November 2001) and was spearheaded by the American Heart Association. Under the program, grants are made available to community partnerships consisting of local emergency responders, police and fire departments, hospitals and other community organizations to purchase AEDs and train potential responders in their use. In general, the grants are issued directly to state health or EMS departments. View a full list of grantees.

Use of Personal Information | Copyright | Ethics Policy | Conflict of Interest Policy | Linking Policy | Careers
©2007 American Heart Association, Inc. All rights reserved. Unauthorized use prohibited.

**Andrew Maloney**

**Subject:** AHA and Fire Depts.

SEARCH

ADVANCED SEARCH

DONATE HELP CONTACT SITE INDEX HOME

American Heart Association. Learn and Live.

## News Release

**For Immediate Release**
Contact: Karen Leach, (512) 433-7117
Communications Director, Texas Affiliate

**American Heart Association Funds 796 Life-Saving Devices in Rural and Suburban Texas Counties**

The American Heart Association Texas Affiliate today awarded more than $800,000 in matching grants to help rural communities place 796 automated external defibrillators (AEDs) in their first-responder vehicles. These life-saving devices are used to restart the heart when a person suffers from sudden cardiac arrest.

The grants were made to 189 different agencies in 93 counties. The majority of these life-saving devices will be placed in law enforcement vehicles, such as police and sheriff deputy cars, and in fire and EMS vehicles.

"In rural areas, often the sheriff's deputy or fire department volunteers arrive on the scene critical minutes before the ambulance gets there. In many cases, having an AED onboard these first-responder vehicles means that a cardiac arrest victim will get the shock needed to restart their heart within the first couple of minutes of collapse. In some remote areas of Texas, the ambulance response time can be much longer," says David Loose-Mitchell, Ph.D., president of the American Heart Association Texas Affiliate.

He adds that, in cases of cardiac arrest, the most crucial factor is often the time between when the heart stops and when it is restarted with an AED. While CPR can keep blood flowing to the brain until the AED arrives, it can't restore the normal heart rhythm. The longer the person waits for the AED, the less chance that the normal rhythm will be restored.

"Each minute we lose waiting for an AED means a 10% less chance that the patient will survive," says Dr. Loose-Mitchell. "If we can get an AED to these folks in under 5 minutes, we can save thousands of lives every year."

Each year, 18,000 Texans suffer sudden cardiac arrest, either from heart disease or from trauma such as drowning or electrical shock. Currently, more than 95% of those victims die before reaching a hospital.

"It is our goal to change that statistic. We believe widespread and strategic deployment of AEDs is the single best method for achieving this goal," says Kelly Curry, a quality management specialist with Lubbock's Covenant Health System, who co-chaired the American Heart Association's Texas AED Placement Program. Lt. Rip (Ralph) Faulkner of the El Paso Fire Department shared chairmanship duties.

"We put this program on the fast track," Faulkner says, "because we want to get those AEDs out there in emergency responder vehicles, where they can save lives, as quickly as we can."

The grant award requires each agency to purchase their AEDs within 90 days of the award. Except for a few agencies where training will be needed, the AEDs can be put into use within 24 hours of delivery.

"The American Heart Association Texas Affiliate has made emergency response a priority in its programs," notes Pat Ayala of El Paso, Chair of the Board of Directors for the Texas Affiliate. "Not only are we helping to fund AEDs in first responder vehicles, we're spending $1.5 million to put thousands of CPR-trained citizens into Texas communities through our CPR in Schools program. In 2002, the Texas Affiliate is investing nearly $2.4 million dollars to ensure that we do a better job of saving lives. That's in addition to the more than $8 million we're spending on Texas research programs and the $11 million on prevention, treatment and professional education programs."

Other members of the Texas AED Placement Program committee included Steven C. Ellerbe, D.O., of Liberty, Carl Voskamp of Victoria, Greg Wolf of

Collinsville, Ron Hilliard of Austin, Kelly Curry of Lubbock, Frank Marshall of Conroe, Thomas Tenner, Jr., PhD, Lubbock, Douglas E. Ross of Austin, and Alejandro Garcia FF/LP of Wichita Falls.

The American Heart Association nationally spent about $382 million during fiscal year 2000 - 2001 on research support, public and professional education, and community programs. Nationwide, the organization has grown to include more than 22.5 million volunteers and supporters who carry out its mission in communities across the country. The association is the largest nonprofit voluntary health organization fighting heart disease, stroke and other cardiovascular diseases, which annually kill about 950,000 Americans.

For more information about heart disease and stroke, call 1-800-AHA-USA1 or visit our Web site at americanheart.org.

Use of Personal Information | Copyright | Ethics Policy | Conflict of Interest Policy | Linking Policy | Careers
©2007 American Heart Association, Inc. All rights reserved. Unauthorized use prohibited.