IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SEYMOUR WINUK, individually<br>as the father of<br>GLENN WINUK, deceased,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 06-770C<br>(Judge Horn) |

DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

Pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully opposes the cross–motion for judgment upon the administrative record, filed by plaintiff, Seymour Winuk, and respectfully submits its reply in support of its motion for judgment upon the administrative record. As we demonstrated in our motion for judgment upon the administrative record, the decision of the United States Department of Justice, Office of Justice Programs, Bureau of Justice Assistance ("BJA"), denying the plaintiff's claim for benefits pursuant to Public Law 107-37, 115 Stat. 219, 219, and the Public Safety Officers' Benefits Act ("PSOBA"), 42 U.S.C. § 3796 et seq., is in accordance with law, not arbitrary and capricious, and supported by substantial evidence. Accordingly, this Court should enter judgment upon the administrative record in favor of the United States.

Our statement of facts appears in full in our motion for judgment upon the administrative record. Briefly, on September 11, 2001, Glenn Winuk died tragically in the collapse of the World Trade Center. Joint Stip. Fact ¶ 1, AR 51. Although he had been an active member of the Jericho Fire Department ("JFD") for many years, at the time of his death, Glenn Winuk held only

an associate membership that, pursuant to the JFD bylaws, prohibited him from engaging in any firemanic activities upon behalf of the JFD. Joint Stip. Fact ¶ 1; AR 266.

In December 2003, Glenn Winuk's parents filed a claim with the BJA for death benefits pursuant to the PSOBA. In July 2004, the PSOBA office determined that the Winuks' claim failed to satisfy the requirements of either the PSOBA or Public Law 107-37.

The Winuks appealed the PSOBA office's decision to an independent hearing officer who, after holding a hearing, agreed that the Winuks' claim did not meet the requirements of Public Law 107-37. AR 9. However, the hearing officer also determined that, although Glenn Winuk's associate status in the Jericho Fire Department prevented him from engaging in firemanic activities, he nevertheless could and did provide emergency medical services upon behalf of the Jericho Fire Department. AR 8. The hearing officer found that those services were authorized by the Jericho Fire Department and accepted by the New York City Fire Department ("FDNY"). The hearing officer then concluded that Glenn Winuk was a public safety officer who died in the line of duty on September 11, 2001. Id.

Pursuant to 28 C.F.R. § 32.24(h), the Director of BJA reviewed the hearing officer's decision. On September 1, 2006, the BJA issued its final decision finding that Glenn Winuk was not a public safety officer within the meaning of either the Public Law 107-37 or the PSOBA. AR 42. The BJA also determined that, even if Glenn Winuk had been a public safety officer, he did not die in the line of duty.

## I. The BJA Correctly Held That No Agency Certified That Glenn Winuk Was A Public Safety Officer Who Died In The Line Of Duty

Contrary to Mr. Winuk's contention, Pl. Motion at 12, the JFD never certified Glenn Winuk's eligibility pursuant to Public Law 107-37. As we demonstrated in our motion for

judgment upon the administrative record and in our response to the Court's order dated February 22, 2007, Public Law 107-37 provides expedited payment of a Federal benefit when a public agency certifies that the decedent was a public safety officer employed by the agency and killed in the line of duty in connection with the September 11, 2001 terrorist attack. 115 Stat. at 219. As a practical matter, the BJA treats such certifications as prima facie evidence that the decedent was an officially recognized or designated member of either the firefighting or emergency services agency. In other words, the certification effectively replaces the fact-finding that the PSOBA office would normally undertake in a traditional PSOBA claim. As the Director of the PSOBA office stated in her affidavit:

> Generally, the certification, upon which the Public Law authorizes BJA to rely, substitutes for the need for detailed information, evidence, and fact-finding related to whether the decedent was a public safety officer (and of what kind), and whether the decedent died as a proximate result of a personal injury sustained in the line of duty.

Response to the Court's February 22, 2007 order, Attachment B, Affidavit of Hope Janke (emphasis added). In this respect, the certification must be unequivocal so that the agency can rely fully upon the certification or attestation. See BLACK'S LAW DICTIONARY, 7th ed. (defining "certification" as an attested statement and defining "attest" as "to make solemn declaration in words or writing to support a fact"). Thus, the certification requirement is clear upon its face. To the extent that the Court determines "certification" is ambiguous, the BJA's interpretation of that term must be accorded deference. See 42 U.S.C. § 3782(a) (authorizing the BJA to establish such rules, regulations, and procedures, as are necessary to carry out its functions).

Here, the record contains only equivocal statements made by the JFD — so equivocal that, contrary to Mr. Winuk's contention, Pl. Motion at 5, even the hearing officer, upon whose

reasoning Mr. Winuk chiefly relies, found that the PSOBA office's determination that there had been no certification "appears to be the proper assessment." AR 9. Specifically, the BJA considered five documents submitted by the JFD, many of which demonstrate a firm belief that Glenn Winuk should be recognized for his heroism but none of which contains an unequivocal certification pursuant to Public Law 107-37:

- On March 31, 2002, John Lottes, Chief of the JFD stated in a letter to the Twin Towers Fund, "my view is that Glenn Winuk should be recognized by all as having been 'lost in the line of duty' while acting as a rescuer representing the Jericho Fire Department." AR 55.
- On May 2, 2002, in a letter written to Glenn Winuk's brother, Jay Winuk, Chief Lottes stated, "[i]n my opinion, Glenn was acting as a *bona fide* agent of the Jericho Fire Department, acting directly on its behalf, while assisting [the New York Fire Department] FDNY with rescue and emergency scene operations in the South Tower of the World Trade Center." AR 53-54.
- In the March 31, 2004 report of public safety officer's death form, signed by JFD Chairman Marmann, the JFD notified the BJA of Glenn Winuk's death but, when given the opportunity to identify Glenn Winuk as a "firefighter" did not do so, and similarly declined the opportunity to characterize Glenn Winuk's death as "in the service" of the JFD. Finally, the JFD declined to describe Glenn Winuk's employment as full-time, part-time, or volunteer, but, rather, stated Glenn Winuk was an "associate, non-active member of the JFD." AR 45.
- By letter dated April 7, 2005, Robert Biancanello, Chairman of the JFD Board of Fire Commissioners stated "I am hereby certifying that Glenn Winuk <u>should be</u>

considered to have been a public safety officer killed in the line of duty . . . ." AR 234 (emphasis added). Chairman Biancanello then explained that, although Glenn Winuk had once been an "active member" of the JFD, he was, at the time of his death an "associate member," and presumably based his conclusions upon his understanding that, "[w]e are informed that Glenn continued to maintain his active status as an [emergency medical technician] EMT . . . and was current at the time of his death." Id. Chairman Biancanello then referred the BJA to the JFD legal counsel, Joseph Frank, for further discussion. Id.

- General counsel Frank's opinion letter dated January 10, 2006 specifically stated that JFD bylaws prohibited Glenn Winuk from engaging in any firefighting or emergency response activities while on "associate" status. AR 302-03.

The BJA correctly held that none of these statements constituted a certification under Public Law 107-37. As the BJA explained, neither Chief Lottes's two letters nor Chairman Biancanello's letter "contained a clear or precise statement of how the Jericho Fire Department officially considers the decedent or demonstrates that the decedent satisfied the standards of the PSOB Act." AR 25. As we have demonstrated, the certification required pursuant to Public Law 107-37 is intended to attest that the decedent qualifies as a public safety officer who died in the line of duty, pursuant to the PSOBA. A proper certification renders unnecessary any PSOBA office investigation. As such, Chief Lottes's letters merely express the author's "view" that Glenn Winuk "should be recognized" as having acted upon behalf of the JFD or was acting as a "bona fide" agent of the JFD — neither of which constitutes an unequivocal statement attesting to those facts required by Public Law 107-37. Similarly, Chairman Biancanello's statement that Glenn Winuk "should be considered to have been" a public safety officer fully recognizes that

Glenn Winuk was in fact not a public safety officer but, in these tragic circumstances, "should be considered to have been" so, despite the fact that he does not satisfy the requirements described under the PSOBA.

Notably, Chairman Biancanello's statement relied upon his mistaken understanding that Glenn Winuk's EMT certification was "current" at the time of his death. AR 234. Contrary to Mr. Winuk's contention, the record contains substantial evidence that Glenn Winuk did not possess any current certifications. AR 305 (requesting documentation regarding Glenn Winuk's certification "at any level" including the first responder level) and AR 306 (the State of New York Department of Health response that Glenn Winuk's last remaining certification had lapsed); See Cartwright v. United States, 16 Cl. Ct. 238, 240-41 (1989) ("The question for this court in not whether plaintiff could convince a reasonable person of her entitlement, but whether the BJA's denial is adequately supported by the record.").[1]

Contrary to Mr. Winuk's contention, Pl. Motion at 13, these statements from the JFD lie in stark contrast to the certifications given by the FDNY in three firefighter claims raised by Mr. Winuk during the proceedings before the BJA. Specifically, by letter dated May 24, 2002 and addressed to the BJA, FDNY Fire Commissioner Nicolas Scopetta stated "I am hereby certifying that the following public safety officers listed on the attachment, were killed in the line of duty,

[1] Mr. Winuk has attached additional appendix materials that purport to support his contention that Glenn Winuk maintained current certification of some kind. They do not support such a contention (nor can they be considered by this Court because they were not raised before the agency, see Howard v. United States, 229 Ct. Cl. 507, 509-10 (1981) (in PSOBA cases, factual issues "are for the factfinder")), as they merely describe the kinds of training available to first responders. There is no evidence in the record that Glenn Winuk maintained any first responder certifications. Indeed, the only record evidence relied upon by Mr. Winuk indicates that Glenn Winuk possessed a certificate of completion from the American Heart Association Heart Saver Plus program. Based upon the evidence before it, the BJA reasonably concluded that this does not constitute an EMT or a first responder certification. AR 247.

and their deaths resulted from traumatic injuries." AR 81. The BJA awarded benefits upon claims filed pursuant to this unequivocal certification (which described each employee's position as "fire safety director") in July 2002. AR 357-62. Now, Mr. Winuk contends that the BJA acted arbitrarily by awarding benefits to the families of these firefighters but not to Mr. Winuk. Specifically, Mr. Winuk notes that these firefighters were retired and were allegedly similarly situated with Glenn Winuk. However, the parties have already stipulated that the BJA office of general counsel was not aware that the firefighters were in fact retired until after the benefits were paid. Joint Stip. of Fact ¶ 15 (stating "[n]either the record in this case nor the record in any of the three firefighters' claims contains any post-decision information . . . both parties have become aware that the three firefighters were in fact retired. Only after the benefits were paid did the Office of Justice Programs, office of the general counsel learn that those firefighters were retired. This information was not relevant to the BJA's determination in this case.") (emphasis added); see also Office of Justice Programs Instruction No. 1310.72.B (Apr. 4, 2001) (requiring the concurrence of the office of general counsel for PSOB office determinations). Therefore, to the extent that the PSOBA office may have erred in awarding benefits, any BJA approval of the decision was done without knowledge of the true circumstances.[2] Surely, Mr. Winuk does not intend to suggest that the BJA should allow a similar error to take place in the adjudication of his claim.

As a final matter, Mr. Winuk contends that the BJA acted arbitrarily and capriciously when it denied benefits upon the Winuk claim but granted benefits to 13 Port Authority of New York and New Jersey employees who, according to Mr. Winuk, were allegedly similarly situated

---

[2] There is no evidence in the BJA's record of the FDNY firefighter claims regarding the firefighter's "retired" status. Joint Stip. of Fact ¶ 15.

with Glenn Winuk. First, it is important to note that this argument was never raised before the agency at any level and has been waived. See e.g., Metz v. United States, 466 F.3d 991, 999 (Fed. Cir. 2006). Accordingly, the Court may not consider Mr. Winuk's argument regarding any claim determinations other than the three FDNY firefighter claims he presented to the BJA.

This Court reviews Public Safety Officer Benefits Act ("PSOBA") cases upon the administrative record, pursuant to RCFC 52.1. See Groff v. United States, 72 Fed. Cl. 68, 80 (2006) (citing Bannum v. United States, 404 F3d. 1346, 1354-55 (Fed. Cir. 2005) (discussing the difference between administrative record review (now Rule 52.1) and summary judgment (Rule 56)). "In reviewing an administrative denial of benefits under the PSOBA, this Court must confine itself to the administrative record created in the proceedings below." Demutiis v. United States, 48 Fed. Cl. 81, 86-87 (2000), aff'd, 291 F.3d 1373 (Fed. Cir. 2002).

Mr. Winuk has not pointed to any evidence, record or otherwise, that supports his assertion that he raised the issue of the Port Authority claims before the BJA issued its final decision. None of the communications in the record contains any reference to these Port Authority claims. Indeed, communications between BJA and Mr. Winuk's counsel confirm that Mr. Winuk only inquired about these claims on October 3, 2006, after the BJA decision was issued. See Def. Resp. to Court's Feb. 22, 2007 order, Attachment B (Declaration of Hope Janke at ¶ 2 n.1). By contrast, when Mr. Winuk raised claims regarding three New York firefighters, those claims were addressed by the BJA and, accordingly, are included in the record. See AR 41-42; Gov't March 7, 2007 Notice of Supplementation.

Indeed, contrary to his suggestion, Mr. Winuk was given multiple opportunities to submit information to the BJA and, in fact, continued to submit information and argument through August 2006 — less than one month before the BJA issued its final decision. However, at no

time during this extended period of communication between Mr. Winuk and the BJA did Mr. Winuk ever raise the Port Authority claims as in any way relevant to his claim. To permit him to do so now flies in the face of the basic principle that a party has not exhausted its administrative remedies and has waived its ability to raise an issue before this Court if it declines to raise the issue first before the agency. See Murakami v. United States, 398 F.3d 1342, 1354 (Fed. Cir. 2005). Therefore, because the Port Authority documents were not considered by the BJA in the first instance, they cannot be considered now.

To be clear, to the extent that the Court considered it appropriate (either by supplementation of the administrative record, or by other means) to consider the Port Authority documents or any other extra-record facts or materials, we respectfully request a remand so that the BJA may, in the first instance, consider the new issues raised for the first time before this Court. See Florida Power and Light v. Lorion, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."). In any event, the Port Authority claim decisions do not demonstrate any arbitrary or capricious treatment of Mr. Winuk's claim, nor do they purport to encompass every September 11-related claim. Indeed, as we demonstrated in our response to the Court's February 22, 2007 order, claims that are adjudicated upon a proper certification under Public Law 107-37 necessarily lack extensive analysis. Therefore, Mr. Winuk's expectation that the BJA should consider each and ever past claim for each and every new claim fails to appreciate the exigencies of the claims-decision process. Nevertheless, to the extent that the Court does consider these extra-record, unconsidered claims, and to the extent that

the Court does not remand the matter to the BJA, we respectfully request an opportunity to provide the Court with any additional materials that might complete the agency's view of these other claims. Although we firmly believe this to be unnecessary because the administrative record is complete regarding Mr. Winuk's claim, Mr. Winuk nevertheless seems intent upon placing us in the continual and difficult position of having to respond to newly-raised arguments never raised before the agency in an administrative review case.[3]

In any event, it is important to clarify the administrative process that pertained to the Port Authority claims. First, on October 2, 2002, the FDNY submitted a certification to the BJA stating (without specifying any particular kind of public safety officer), that "the attached list of thirteen employees of the [Port Authority], a public agency, were serving in their official rescue capacity and were killed in the line of duty . . . ." Pl. App. 23. Then, in another letter dated October 18, 2002 (but, according to the facsimile stamp, not received by BJA until March, 2003), Port Authority Chief of Department Joseph Morris stated, "I am hereby certifying that the following public safety officers listed in the attached were killed in the line of duty . . . ." Pl. App. 25.[4] On January 23, 2003, apparently without the benefit of the Port Authority's October 18, 2002 letter, the BJA, by letter, notified the Port Authority that the listed employees were not public safety officers pursuant to the statutory definition. At the time of that letter, only one of

---

[3] Mr. Winuk notes this Court's decision in Groff v. United States, 72 Fed. Cl. 68, 81 (2006) (currently on appeal), Pl. Motion at 9 n.3, but fails to acknowledge that benefits were paid upon the private ambulance workers' claims discussed in Groff based upon unequivocal certifications. Those certifications were not contained in the administrative record in Groff, because the Groff plaintiff raised only the award decision and not the underlying certification.

[4] The version of this letter in the BJA claim files is facsimile-stamped April 2003. We are unaware of any copy received by facsimile in March 2003. In any event, BJA did not receive a facsimile of the letter until after it communicated with the Port Authority in January 2003.

the Port Authority employees' families (the Eugene Raggio family) had filed a claim. Indeed, it was not until after the Port Authority submitted another certification (made on January 23, 2006), which did specify the particular kind of public safety officer, that BJA deemed acceptable that the remaining 12 claims were filed. Pl. App. 44. And, as we have demonstrated, once a proper certification is received, Public Law 107-37 requires the BJA to award benefits. Therefore, contrary to Mr. Winuk's suggestion that BJA failed to "investigate" 12 of the 13 Port Authority claims, Pl. motion at 16, the 12 claims that were received after a proper certification required no additional analysis or investigation.

Only the Eugene Raggio claim, which had been filed before the proper certification, went through the full administrative process. And, based upon a proper certification from the Port Authority, the Raggio benefits were also granted. Indeed, rather than demonstrate inconsistency, this process demonstrates that the BJA takes very seriously the certification process. Only the final Port Authority statement demonstrated that the employees would have satisfied the requirements of the statutory definition of public safety officer.

## II. The BJA Correctly Held That Glenn Winuk Was Not A Public Safety Officer Who Died In The Line Of Duty

### A. The BJA Correctly Held That Glenn Winuk Was Not A Public Safety Officer

As we demonstrated in our motion for judgment upon the administrative record, the PSOBA defines a public safety officer as an individual serving a public agency in an official capacity as, among other things, a firefighter or member of an ambulance crew or rescue squad. 42 U.S.C. § 3796b(8). The statute does not, however, define "serving in an official capacity." Thus, the BJA, the agency authorized by Congress to implement the statute, has stated that, to serve a public agency in an official capacity, the decedent must be an employee or volunteer, or

have some similar relationship of performing services as a part of the agency. In other words, the decedent must be officially recognized or officially designated as functionally within or part of the public agency. The United States Court of Appeals for the Federal Circuit has held that this interpretation is reasonable. Chacon v. United States, 48 F.3d 508, 512 (Fed. Cir. 1995) (deferring to the agency's reasonable interpretation and citing U.S. Dep't of Justice, Legal Interpretations of the Public Safety Officers' Benefits Act 9 (1981)).

Mr. Winuk correctly notes that, when it determines whether the decedent was officially recognized by the agency, the BJA must give "substantial weight" to the factual findings made by the public agency, but need not accord the same weight or any weight at all to an agency's legal conclusions. Pl. Motion at 18; see Demutiis v. United States, 291 F.3d 1373, 1379 (Fed. Cir. 2002) (citing the pre-2006 version of 28 C.F.R. § 32.5). However, Mr. Winuk then confuses this inquiry by misinterpreting the regulation and misunderstanding the BJA's correct application of it. Specifically, Mr. Winuk contends that the BJA incorrectly weighed the JFD general counsel's opinion letter, which stated, among other things, that an associate firefighter (such as Glenn Winuk) was not permitted to engage in any activities— either fire-related or EMT-related. AR 300. Mr. Winuk incorrectly contends that the BJA should have accorded little or no weight the JFD opinion letter because it constitutes a "legal conclusion." Pl. Motion at 18-19. This conclusion misunderstands both the record evidence in this case and the United States Court of Appeals for the Federal Circuit's decision in Demutiis.

As we demonstrated in our motion for judgment upon the administrative record, the JFD bylaws restrict associate members from engaging in any firemanic activities, riding upon fire trucks, attending fire schools or parades, and voting in meetings. AR 266. Although the bylaws do not specifically define "firemanic" for purposes of the "associate member" section, they do, as

Mr. Winuk notes, define the term for purposes of member responsibilities, explaining that, at least for purposes of membership, firemanic activities include drills, inspections, schools, fires, meetings, parades, or anything else the JFD board of fire commissioners determines should be included. AR 277. Mr. Winuk attempts to stretch this definition to suggest that Glenn Winuk was not permitted to fight fires but was permitted to provide emergency medical services. However, as Mr. Winuk must concede, the JFD bylaws are silent regarding whether emergency services are or are not firemanic activities. Indeed, Mr. Winuk fails entirely to acknowledge that the bylaws prohibit associate members from riding upon firetrucks or attending fires — both prohibitions which, if observed, would make it difficult if not impossible to provide emergency services upon behalf of the JFD.[5]

In order to clarify and explain its own bylaws, the JFD itself explicitly referred the BJA to its general counsel, who then explained that the restriction upon firemanic activities prohibits associate members from engaging in any fire-related or emergency medical-related activities. AR 235, 302-03. Contrary to Mr. Winuk's contention, the BJA properly accorded weight to this opinion, particularly when there was no contrary record evidence. Moreover, Mr. Winuk misunderstands the United States Court of Appeals for the Federal Circuit's decision in Demutiis, when he contends, incorrectly, that Demutiis prevents the BJA from according weight to the JFD general counsel's opinion. In discussing 28 C.F.R. § 32.5, Demutiis explains that little or no weight must be accorded a public agency's legal conclusions regarding whether the

---

[5] Mr. Winuk also contests the BJA's determination that Glenn Winuk, as an associate member, was not an "active" member of the JFD. However, as we have demonstrated, the JFD itself, described Glenn Winuk as "inactive." AR 45. Moreover, the bylaws discuss "active" members, AR 275, and describe the obligations of "members"—obligations that do not apply to associate members. AR 276. Accordingly, and for all the other reasons noted by the BJA, the BJA reasonably concluded that associate members were not active members.

decedent was a public safety officer or whether he was killed in the line of duty. See Demutiis, 291 F.3d at 1379-80. These are conclusions that must be made by the BJA, not by public agencies. However, here, the JFD general counsel was not providing legal conclusions regarding the very heart of this claim. Rather, he was providing the JFD's interpretation of its own bylaws. Certainly, for purposes of the regulation, this constitutes a factual determination which must be accorded substantial deference.

Indeed, although we vigorously oppose this Court's consideration of the JFD's February 22, 2007 letter, provided to the BJA while this case was before this Court, Pl. App. at 70, even the JFD acknowledges that there is no distinction between emergency medical services and firefighter services and, although "[c]ounsel for Mr. Winuk has taken the position that our by-laws do not prohibit associate members from responding to non-firematic calls, such as the need to provide first aid," the JFD nevertheless, has "always interpreted that provision as meaning that associate members are not to perform any of the duties of an active volunteer firefighter, but we can understand his [counsel's] argument." Id. Even if the Court considers this document, which was obviously not raised before the BJA and the submission of which reflects a profound disregard for the basic tenets of administrative law practice before the agency and this Court, the document nevertheless reflects that Mr. Winuk's contention is merely a legal argument propounded by his counsel and is not supported by the JFD bylaws or any interpretation of those bylaws ever made by the JFD.

Accordingly, because Glenn Winuk was not, in fact, authorized by the JFD to perform any activities, emergency medical or fire-related, Mr. Winuk's reliance upon this Court's decisions in Messick ex rel. Estate of Kangas v. United States, 70 Fed. Cl. 319 (2006) (currently on appeal) and Hillensbeck v. United States, 69 Fed. Cl. 369 (2006), is misplaced. In both

Messick and Hillensbeck, this Court held that both decedents – in Messick a 14-year-old apprentice firefighter and in Hillensbeck, a student EMT – were authorized to perform at least some functions upon behalf of certain public agencies. See Messick, 70 Fed. Cl. at 330-331 (holding that a recognized apprentice firefighter who was authorized to attend fire scenes and perform certain other tasks, was a public safety officer); Hillensbeck, 69 Fed. Cl. at 380-81 (holding that a student EMT interning with a public agency was an officially recognized part of the public agency). Here, according to the JFD members and bylaws, Glenn Winuk was not authorized to engage in any fire or emergency medical-related rescue activities upon behalf of the JFD. Indeed, his associate membership left him with only ceremonial rights to participate in JFD activities.

In any event, as we have demonstrated, contrary to Mr. Winuk's incorrect assertion, Glenn Winuk was not certified to participate in any emergency-related activities. The BJA requested the New York State Department of Health to provide any current certifications held by Glenn Winuk, including first responder certifications and EMT certifications. AR 305. New York State responded that Glenn Winuk held no certifications after 1988. AR 306. Although Glenn Winuk did hold a current American Heart Association Heart Saver Plus certificate at the time of his death, AR 247, this certificate does not amount to a state certification.

B. The BJA Correctly Held That Glenn Winuk Did Not Die In The Line of Duty

______As we have demonstrated, BJA regulations provided that an action is "in the line of duty" if it is one the public safety officer is "obligated or authorized by rule, regulation, condition of employment or service, or law to perform" 28 C.F.R. § 32.2(c)(2). Also, as we have demonstrated, the general counsel's opinion letter and Chairman Marmann provided unequivocal

statements that associate members of the Jericho Fire Department are non-active members who do not provide firefighting and/or emergency services upon behalf of the department. AR 45, 302-03. Accordingly, because the public agency did not authorize Glenn Winuk's activity, he did not die in the line of duty.

Mr. Winuk continues to ignore that New York General Municipal Law 209-i, which allows a "volunteer firefighter" within New York State to perform services in another fire company, provided that his services are "offer[ed]" to and "accepted" by the "officer in command," applies only to "active" firefighters who fall within the scope of this provision. GML 209-i(3) (citing Volunteer Firefighters' Benefits Law definition). Contrary to Mr. Winuk's contention, Pl. Motion at 25, this definition is not merely a "cross-reference." Rather, the statute states, "[a]s used in this section, the term "volunteer fireman" means a "volunteer fireman" as such term is defined in section three of the volunteer firemen's benefit law," which, in turn, defines "volunteer fireman" as an active firefighter. Mr. Winuk's contention that this statutory definition, which is explicitly referenced in GML 209-i, does not apply to this case, is, therefore, wholly without merit. Second, even assuming for the sake of argument that Glenn Winuk had been an active firefighter on September 11, 2001 (a conclusion that is flatly contradicted by the record), Mr. Winuk's statement that the JFD made "factual findings that the offer and acceptance took place," is beside the point. No member of the JFD witnessed any such offer and acceptance, they merely speculated that it could have taken place. Speculation regarding what might have happened does not constitute a factual finding that must be accorded deference. See, e.g., Tafoya v. United States, 8 Cl. Ct. 256, 263 (1985).

As we stated in our motion for judgment upon the administrative record, we fully

recognize that the particular exigencies created by September 11, 2001, make difficult a final determination upon Glenn Winuk's possible offer and the FDNY's possible acceptance. Therefore, as the BJA reasonably noted, because any finding of actual offer and acceptance would be merely speculative, the BJA properly declined to speculate. Id. And, in any event, as we have demonstrated, pursuant to GML 209-i, the FDNY was not permitted to accept any services offered by non-active volunteer firefighters.

C. The BJA Correctly Considered The 2005 New York State Law

The BJA correctly considered and did not accord "any special evidentiary weight" to the 2005 New York State law providing that Glenn Winuk, "who at the time of his death, was an associate member of the Jericho volunteer fire department, shall be deemed to have been an active member of the Jericho volunteer fire department at the time of his death." AR 40; AR 262 (Ch. 368, Laws of New York, eff. Aug. 2, 2005). Specifically, Mr. Winuk contends that the BJA ignored the 2005 New York statute. Pl. Motion at 25. The BJA did no such thing. The BJA properly considered the statute and determined that, if anything, the statute acknowledged that, at the time of his death, Glenn Winuk was not a public safety officer. That the statute goes on to "deem" him an active member simply reinforces that his associate status did not, at the time of his death, permit him to provide fire or emergency medical-related services upon behalf of the JFD. In this respect, contrary to Mr. Winuk's contention, the BJA fully complied with its obligation, discussed in Demutiis, to consider factual submissions from public agencies.

In Mr. Winuk's view, anytime the facts of a particular claim are sympathetic but otherwise do not satisfy the requirements of the PSOBA, a state can simply override the BJA's statutory authority to interpret and implement the PSOBA. As we have already demonstrated, if

a public agency makes factual findings, those findings are to be accorded substantial weight (under the previous version of the regulation). Legal conclusions need not be accorded any weight. Here, to the extent that New York State made a retroactive factual finding that contradicts the facts at the time of Glenn Winuk's death and all of the factual findings that followed, that factual finding was considered by the BJA, which reasonably determined that it could not be weighed more heavily than the many other JFD factual findings to the contrary. AR 40-41. To do so would undermine Congress's unequivocal intent that the BJA, which is responsible for disbursing payments, be solely responsible for weighing facts and making legal determinations regarding the PSOBA. In this regard, Congress has the authority to change the PSOBA to include retroactive payment to, for example, the families of chaplains killed in the line of duty, but the BJA does not have the obligation to treat a state law similarly, particularly when states are not authorized to disburse PSOBA funds. Accordingly, the BJA's consideration of the New York State law was in accordance with law.

## CONCLUSION

For these reasons, we respectfully request that the Court grant our motion for judgment upon the administrative record.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

Of Counsel:
RAFAEL A. MADAN
General Counsel

JASON P. COOLEY
Attorney Advisor
Office of the General Counsel
Office of Justice Programs
Department of Justice
810 7th Street, N.W.
Washington, D.C. 20531

April 12, 2007

s/ Claudia Burke
CLAUDIA BURKE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L St., N.W.
Washington, D.C. 20530
Tel: (202) 353-9063
Fax: (202) 514-7965

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 12th day of April, 2007, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S CROSS-MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT UPON THE AGENCY RECORD," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Claudia Burke