# In the United States Court of Federal Claims

**No. 06-770C**
**Filed: June 20, 2007**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | | |
| | * | |
| **SEYMOUR WINUK,** Individually as the father of **Glenn Winuk,** Deceased, | * | **Motion for Judgment Upon the Administrative Record; Public Safety Officers' Death Benefits Act, 42 U.S.C. §§ 3796-3796c; Expedited Payment for Heroic Public Safety Officers, Public Law 107-37; "Certification" by Public Agency.** |
| **Plaintiff,** | * | |
| **v.** | * | |
| **UNITED STATES,** | * | |
| **Defendant.** | * | |
| * * * * * * * * * * * * * * | | |

**Andrew J. Maloney,** Kreindler & Kreindler, LLP, New York, N.Y., for plaintiff.

**Claudia Burke,** Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her were **Peter D. Keisler,** Assistant Attorney General; **Jean E. Davidson,** Director, Commercial Litigation Branch; and **Franklin E. White, Jr.,** Assistant Director. Of counsel were **Rafael A. Madan,** General Counsel, and **Jason P. Cooley,** Attorney Advisor, Office of the General Counsel, Office of Justice Programs, United States Department of Justice, Washington, D.C.

## O P I N I O N

**HORN, J.**

## FINDINGS OF FACT

This case involves the tragic death of Glenn Winuk, a public spirited partner at the law firm of Holland & Knight, LLP and, at the time, an associate member of the Jericho, New York, Fire Department. According to the joint stipulations, prior to his death, and since 1979, Mr. Winuk had served, in one capacity or another as a volunteer member of the Jericho Fire Department. He had been trained as a firefighter and had been certified by New York State as an emergency medical technician (EMT). In 1998, he had changed his status from active firefighter to associate member. In response to the September 11, 2001 terrorist attacks on the World Trade Center in New York City, Mr. Winuk helped to evacuate

personnel from his own office building, which was located adjacent to the World Trade Center. He was last seen that day donning emergency medical service (EMS) equipment and running toward the World Trade Center. In March, 2002, rescue workers recovered Mr. Winuk's body in the vicinity of the bodies of other rescue workers from what would have been the lobby of the south tower of the World Trade Center. Rescue workers found in his wallet a photo identification card identifying him as a member of the Jericho Volunteer Fire Department. He was wearing surgical gloves, either wearing or holding a stethoscope, and was found beside an EMT bag.[1]

On December 17, 2003, Seymour and Elaine Winuk, Glenn Winuk's parents, filed a claim with the Bureau of Justice Assistance, Office of Justice Programs, United States Department of Justice (hereinafter BJA and DOJ), for death benefits under the Public Safety Officers' Death Benefits Act of 1976, 42 U.S.C. §§ 3796-3796c (2000) (hereinafter PSOBA), its implementing regulations, 28 C.F.R. § 32 et seq. (2001), and its supplemental public law, Expedited Payment for Heroic Public Safety Officers Act, Pub. L. No. 107-37, §§ 1-2, 115 Stat. 219 (2001). Initially, Seymour Winuk, the deceased's father, and Jay Winuk, his brother, filed the complaint in this court. Subsequently, the complaint was revised to include in the caption only Seymour Winuk.

On July 20, 2004, the BJA issued an initial determination that the claim filed by Glenn Winuk's parents failed to satisfy the requirements of the PSOBA and that Glenn Winuk was not covered under the Act. The BJA determined that it had not received proper certification from a public agency stating that Mr. Winuk was a public safety officer "employed by any of the agencies that responded to the September 11, 2001 terrorist attack." Finally, the BJA concluded that "Mr. Winuk was not, and did not have the authority to act as, a 'public safety officer' within the meaning of the PSOB Act at the time of his tragic death."

The Winuks appealed the BJA determination and Daniel Skoler, an independent hearing officer, was appointed to adjudicate the appeal from the adverse claim determination made by the BJA. The hearing officer was not a Department of Justice employee, but was under contract with the BJA to conduct an independent review of the initial BJA determination. After holding a hearing, on September 10, 2005, the hearing officer issued his decision. The hearing officer concluded that the Winuks were entitled to receive PSOBA death benefits under the PSOBA and implementing regulations. The hearing officer found that:

---

[1] Mr. Winuk's heroic efforts were recognized by, among many others, New York City Mayor Rudolph W. Giuliani, the National EMS Memorial Service, the International Association of Fire Chiefs, United States Senator Hillary Clinton, United States Representative Peter King and New York State Senator Marcellino.

Glenn Winuk's EMT assistance to the New York City Fire Department (FDNY) in responding to the 9-11 emergency:

(i) was provided as an officially recognized member of the Jericho Fire Department within the meaning of [t]he Public Safety Officers Benefits Act [42 USC § 3796b(7)] unaffected by "associate member" restrictions which prevented him from engaging in firefighting activities (as opposed to emergency medical technician assistance), and

(ii) his conduct in offering and contributing EMT assistance in the South Tower response effort of the New York City Fire Department met the authorizing conditions required by New York law to join in and assume the powers, privileges and immunities of FDNY firefighters engaged in that operation.

Among the factual findings in support of the decision made by the hearing officer were the following:

1. Glenn Winuk, on the date of his death and while rendering (or endeavoring to render) emergency medical technician (EMT) services to injured victims in the South Tower of the World Trade Center, was an associate member of the Jericho Fire Department of Jericho, New York, a legally organized volunteer fire department.

2. As a current associate member of the Jericho Fire Department, Glenn Winuk was not authorized to engage in firefighting activities but he was authorized to represent and to engage in medical assistance and rescue activities for the Jericho Department [sic] and its rescue squad and thus was a "public safety officer" potentially under the coverage and within the meaning of the PSOB Act and its regulations [28 CFR § 32.2(j)].

3. Glenn Winuk's training, previous record of participation in mutual aid operations for other departments, and ability on September 11 to bring himself within New York Fire Department security perimeters and staging areas for rendition of rescue services at the South Tower constitute prima facie evidence that he presented himself and his credentials to FDNY command personnel directing emergency operations in the South Tower and offered assistance in those efforts.

4. Glenn Winuk's actual rendition of EMT services at the South Tower, as evidenced by materials and implements found with his person, coupled with the knowledge of FDNY onsite command personnel directing rescue operations of the acute need for qualified EMT assistance to respond to unmet victim needs constitutes compelling evidence that such command personnel gave permission to Glenn Winuk to lend EMT assistance within the

meaning and scope of New York Municipal Law § 209-i (Emergency Service by Volunteer Firemen).

5. The single document of record from the New York City Fire Department containing an unexplained and unsupported assertion by command personnel not present in the South Tower that Glenn Winuk, in providing EMT services there on September 11, was not acting under the Department's direction, is not deemed sufficiently persuasive to rebut claimants' prima facie case of compliance with New York Municipal Law § 209-i.

6. Glenn Winuk's death, in the course of providing EMT services for NYFD rescue operations responding to the 9/11 terrorist attack in compliance with the offer-and-assistance requirements of New York Municipal Law § 209-[i], was the proximate result of injury sustained in line of duty by a public safety officer under the benefit eligibility provisions of the [PSOBA].

The hearing officer concluded that, although Mr. Winuk's status as an associate member of the Jericho Fire Department prevented him from engaging in "firemanic"[2] activities, this did not exclude him from providing emergency medical services upon behalf of the Jericho Fire Department. He also found that Mr. Winuk's provision of emergency medical services had been authorized by the Jericho Fire Department and concluded that prima facie evidence established that the New York Fire Department had accepted his mutual aid on September 11, 2001, as permitted under New York General Municipal Law 209-i (1999). The hearing officer, however, noted a "debatable" issue as to whether the evidence submitted by Jericho Fire Department officials amounted to the requisite public agency certification of Mr. Winuk's status as a public safety officer acting upon behalf of a public agency, as required under the Patriot Act for special, expedited treatment of PSOBA claims. Nevertheless, after reviewing all the facts presented, the hearing officer concluded that Glenn Winuk was a public safety officer for purposes of the PSOBA and, therefore, his beneficiaries were entitled to benefits.

On August 2, 2005, New York Governor George Pataki signed New York State legislation titled "An ACT in relation to granting active duty status in the Jericho volunteer fire department to Glenn J. Winuk," which reads:

Notwithstanding any other provision of law, Glenn J. Winuk, who served as a firefighter and emergency medical technician with the Jericho volunteer fire department for a period of 19 years, and who died on September 11, 2001 while participating in the rescue efforts in the south tower of the World Trade Center, and who, at the time of his death, was an associate member of the

---

[2] "Firemanic Activities" are defined in the by-laws of the Jericho Fire Department to include "drills, inspections, schools, fires, meetings, parades and such other activities as the Board of Fire Commissioners may by resolution include."

> Jericho volunteer fire department, shall be deemed to have been an active member of the Jericho volunteer fire department at the time of his death with full active employment status . . . or any other right or privilege as any other active member of the Jericho volunteer fire department with full active employment status.

2005 N.Y. Sess. Laws ch. 368, § 1 (NY S.B. 3764, enacted Aug. 2, 2005).

Pursuant to 28 C.F.R § 32.24(h) (2001), the Director of the BJA exercised his authority to review the decision of the hearing officer. On September 1, 2006, the Director issued and signed a Final Agency Determination, which rejected the findings of the hearing officer and denied the Winuks' claim under the PSOBA. The Director determined that Mr. Winuk did not qualify for benefits under the PSOBA or Public Law 107-37.

The BJA Director concluded that "[t]he relevant public agency never provided a certification within the meaning of Public Law 107-37, that the decedent was a public safety officer employed by it who died in the line of duty," and thus the Winuks were not entitled to benefits under the PSOBA. In making this determination, the BJA evaluated the evidence in the record, including what was offered as certification by the local agency, namely two letters written by the Chief of the Jericho Fire Department, addressed to persons outside of the BJA, and another letter written by Chairman Biancanello of the Jericho Fire District, addressed to independent hearing officer Skoler. The BJA Director found that none of these letters provided a "clear and unequivocal official statement to BJA of how the public agency actually considers the individual and the individual's activity at the time he suffered his fatal injury . . . ." The BJA Director stated that the "clear and unequivocal official statement to BJA . . . must be sufficiently precise to enable BJA to determine that the individual satisfied the standards of the PSOB Act." The Director concluded that he was "left with, at best, equivocation as to the application of Public Law 107-37 to the decedent." (footnote omitted).

In making the determination that Mr. Winuk was not a "public safety officer" within the meaning of the PSOBA, the BJA Director rejected the hearing officer's conclusion that Mr. Winuk was a certified EMT authorized to engage in emergency medical services on behalf of the Jericho Fire Department. The BJA Director discredited the hearing officer's finding based upon new evidence from the New York State Department of Health, which indicated that Mr. Winuk had not been certified as an EMT-Basic since 1988 and a new letter from private, outside counsel for the Jericho Fire District, Joseph Frank, submitted in response to a questionnaire sent in a letter to him by Jason P. Cooley of the BJA, on January 10, 2006, while the BJA Director was reviewing the case. Neither document was part of the record at the time the hearing officer issued his decision. The letter from Mr. Frank indicated, according to the BJA, that Mr. Winuk was "*not* legally authorized by the Jericho Fire Department to engage in emergency medical services on its behalf" because he was an associate member of the Jericho Fire Department at the time of the 9/11 events. In his decision, the Director of the BJA also explained his allocation of weight to the various items of evidence before him. He afforded more weight to the standard DOJ form, Report

of Public Safety Officer's Death, filled out and submitted to the BJA by Jericho Fire District Chairman David Marmann, and the letters from private, outside General Counsel Frank and Chairman Biancanello, all of which were addressed directly to the BJA, and he gave less weight to the two letters from former Chief of the Jericho Fire Department, John Lottes, which were not addressed to the BJA.

The BJA Director next determined that, even if Mr. Winuk had been a public safety officer, he did not die in the line of duty, as required by the PSOBA implementing regulations at 28 C.F.R. § 32.2(c)(2) (2001). Because according to the BJA Director, Mr. Winuk was neither "obligated" nor "authorized" to act upon behalf of the Jericho Fire Department, due to his associate member status, the BJA Director found that his death did not occur "in the line of duty." Reasoning that because "GML [General Municipal Law] § 209-i applies only to *active* volunteer members of the fire company," (emphasis in original; footnote omitted), and the record does not establish that Mr. Winuk was an active volunteer member of the Jericho Fire Department, the Director found that Mr. Winuk was neither authorized nor obligated under GML § 209-i to provide mutual aid to the New York Fire Department upon behalf of the Jericho Fire Department. Moreover, the Director found that Mr. Winuk's acts were not accepted by "the officer in command" of the New York Fire Department, as required by GML 209-i. In reaching this conclusion, this time, the BJA Director relied upon a letter addressed not to the BJA, but to Mr. Winuk's brother, from New York Fire Department Chief, Daniel Nigro, which stated that "[a]lthough he was not a member of this Department and was not acting pursuant to the Department's direction that day, the Department nevertheless is honored to write this letter in recognition of his heroic efforts."

The BJA Director further concluded that other PSOBA awards given to three New York Fire Department firefighters, who were later determined to have been retired firefighters at the time of their deaths, should provide no guidance or precedent for deciding the Winuk claim. While the three retired firefighters were certified as Fire Safety Directors or Deputy Fire Safety Directors at the time of the PSOBA Claim Determination, it was only after the BJA Determination was issued that the agency discovered that the men were in fact retired on September 11, 2001. In distinguishing these cases from Winuk's case, the BJA rationalized that the retired firefighters were properly certified and they were awarded benefits before the New York State legislature declared that they should be deemed as having been active firefighters at the time of their deaths.

Finally the BJA Director gave no "special evidentiary weight" to the New York State legislative Act, passed in 2005, prior to the Director's decision, which stated that Mr. Winuk should be considered as having been an active member of the Jericho Fire Department at the time of his death. To support this conclusion, the Director stated that this law was not "evidence [or] findings of fact presented by State, local, [or] Federal administrative [or] investigative agencies," as is required by 28 C.F.R. § 32.5 (brackets in original).

On November 13, 2006, Seymour Winuk, the father of Glenn Winuk, filed a complaint in this court, seeking review of the BJA Director's denial of benefits under

PSOBA. In his complaint, plaintiff alleges that the BJA failed to consider state and local law as contemplated by the PSOBA, and that the BJA acted arbitrarily and capriciously and failed to follow its own precedents when it denied plaintiff's claim, even though plaintiff had provided ample evidence reflecting substantial compliance with PSOBA and Public Law 107-37.

In response to the plaintiff's complaint, defendant filed a motion for judgment upon the administrative record. In its motion, defendant argues that the BJA's determinations that (1) no public agency certified Mr. Winuk pursuant to Public Law 107-37; (2) Mr. Winuk was not a public safety officer within the meaning of the PSOBA; and (3) Mr. Winuk did not die in the line of duty within the meaning of the PSOBA, were made in accordance with the law and are supported by substantial evidence. Plaintiff cross-moved for judgment upon the administrative record.

## DISCUSSION

In this court, Seymour Winuk seeks review of the denial of death benefits by the Director of the BJA for Glenn Winuk's heroic and untimely death on September 11, 2001. This court has jurisdiction to review the decisions of BJA pursuant to 28 U.S.C. 1491 (2000). See United States v. Mitchell, 463 U.S. 206, 216 (1983); Yanco v. United States, 258 F.3d 1356, 1358-59 (Fed. Cir. 2001), cert. denied, 534 U.S. 1114 (2002). Plaintiff has standing to bring an action on behalf of the deceased as a parent of the deceased pursuant to 42 U.S.C. § 3796(a)(5).

Judicial review of BJA decisions is limited to the following inquiries:

> (1) whether there has been substantial compliance with statutory requirements and with the requirements of implementing regulations;
> (2) whether there has been an arbitrary or capricious action on the part of the government officials involved; and
> (3) whether the decision denying the claim is supported by substantial evidence.

Yanco v. United States, 258 F.3d at 1362 (citing Chacon v. United States, 48 F.3d 508, 511 (Fed. Cir. 1995)); see also Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 414-17 (1971); Greeley v. United States, 50 F.3d 1009, 1010 (Fed. Cir. 1995) (quoting Morrow v. United States, 227 Ct. Cl. 290, 296, 647 F.2d 1099, 1102, cert. denied, 454 U.S. 940 (1981)).

The Public Safety Officers' Death Benefits Act states:

> In any case in which the Bureau of Justice Assistance (hereinafter in this subchapter referred to as the "Bureau") determines, under regulations issued pursuant to this subchapter, that a public safety officer has died as the direct and proximate result of a personal injury sustained in the line of duty, the Bureau shall pay a benefit of $250,000, adjusted in accordance with subsection (h) of this section . . . .[3]

42 U.S.C. § 3796(a) (2000).

Following the terrorist attacks of September 11, 2001, Congress enacted Public Law 107-37, Expedited Payment for Heroic Public Safety Officers Act, allowing for automatic payment of benefits to the survivors of public safety officers who were injured or died in the line of duty in relation to the September 11, 2001 terrorist attacks. The post-9/11 Act provides that

> upon certification by a public agency that a public safety officer employed by such agency was killed or suffered a catastrophic injury as a direct and proximate result of a personal injury sustained in the line of duty as described in section 1201(a) of [the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796, 3796(a))] in connection with the rescue or recovery efforts related to the terrorist attacks of September 11, 2001, the Director of the Bureau of Justice Assistance shall authorize payment to qualified beneficiaries, said payment to be made not later than 30 days after receipt of such certification . . . .

Expedited Payment for Heroic Public Safety Officers, Pub. L. No. 107-37, §§ 1-2, 115 Stat. 219 (2001).

About five weeks later, the USA PATRIOT Act was signed into law. Section 611(a) of the USA PATRIOT Act re-enacted all the provisions of Public Law 107-37 into law, except it clarified that "section 1201" meant section 1201 of the PSOB Act and it generalized "the terrorist attacks of September 11, 2001" to "a terrorist attack." Although neither Public Law 107-37 nor section 611 of the USA PATRIOT Act amends the PSOB Act, the provisions of section 611 were codified (unofficially) at 42 U.S.C. § 3796c-1, right after the unofficial codification of the PSOB Act's death and disability benefit provisions.

---

[3] Section 3796(h) provides that: "On October 1 of each fiscal year beginning after June 1, 1988, the Bureau shall adjust the level of the benefit payable immediately before such October 1 under subsection (a) of this section, to reflect the annual percentage change in the Consumer Price Index for All Urban Consumers, published by the Bureau of Labor Statistics, occurring in the 1-year period ending on June 1 immediately preceding such October 1." 42 U.S.C. § 3796(h) (2000 & Supp. II 2002).

Thus, section 3796c-1 offers a federal benefit practically identical to that offered by the PSOB Act.

Public Law 107-37 provides that certain of its terms have the same definitions as those terms under the PSOB Act. The applicable definitions for "public agency" and "public safety officer" read as follows:

> (8) "public agency" means the United States, any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands of the United States, Guam, American Samoa, the Trust Territory of the Pacific Islands, the Commonwealth of the Northern Mariana Islands, and any territory or possession of the United States, or any unit of local government, department, agency, or instrumentality of any of the foregoing; and
>
> (9) "public safety officer" means --
>
> (A) an individual serving a public agency in an official capacity, with or without compensation, as a law enforcement officer, as a firefighter, as a chaplain, or as a member of a rescue squad or ambulance crew . . . .

Public Safety Officers' Death Benefits Act, 42 U.S.C. § 3796b.

When an individual is certified by a public agency as a public safety officer who died in the line of duty in connection with the September 11, 2001 terrorist attacks, the BJA intended that the certification be considered prima facie evidence of entitlement to benefits under Public Law 107-37. Such intended practice is clear from the language of the Act in the use of the words "shall authorize payment," and is consistent with the intent of the Act, which was passed shortly after the 9/11 tragedy to allow for expedited payment of benefits for public safety officers who were killed or who suffered a catastrophic injury in the line of duty in connection with the terrorist attacks of September 11, 2001. Pub. L. 107-37, § 1.

Public Law 107-37 was enacted as the result of a catastrophic national tragedy. It was introduced in the House of Representatives as H.R. 2882 just two days after the terrorist attacks on the World Trade Center, the Pentagon, and Western Pennsylvania, on September 13, 2001. The bill passed unanimously in the House and in the Senate, and was signed into law on September 18, 2001. The legislative history of Public Law 107-37 reflects the tragic circumstances which led to its enactment and the desire of members of the legislature to somehow lessen the suffering of the families of the heroes lost to the attacks. This desire to begin the healing process for these families is repeated throughout the legislative history.[4]

---

[4] "The purpose of this resolution is simple and clearly warranted: that is, to provide swift aid and comfort to the survivors of the public safety officers who perished in the wake

Courts have expressed similar sentiments, for example, the PSOBA is "remedial in nature and thus should not be applied grudgingly, but rather should be construed liberally to avoid frustration of its beneficial legislative purposes." Demutiis v. United States, 48 Fed. Cl. 81, 86 (2000), aff'd as modified, 291 F.3d 1373 (Fed. Cir. 2002). Consistent with this approach the regulations implementing the statute pronounce that the Bureau shall resolve any reasonable doubt arising from the circumstances of the officer's death or permanent disability in favor of payment of the death or disability benefits. 28 C.F.R. § 32.4 (1999); see Bice v. United States, 61 Fed. Cl. 420, 430 (2004); Davis v. United States, 46 Fed. Cl. 421, 427 (2000); see also Balt. & Phila. Steamboat Co. v. Norton, 284 U.S. 408, 414 (1932) (remedial laws "are deemed to be in the public interest and should be construed liberally in furtherance of the purpose for which they were enacted and, if possible, so as to avoid incongruous or harsh results.") (citations omitted).

The first step in statutory construction is "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)). The inquiry ceases "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" Id. (quoting Robinson v. Shell Oil Co., 519 U.S. at 340). In interpreting the plain meaning of the statute, it is the court's duty, if possible, to give meaning to every clause and word of the statute. See TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (quoting Duncan v. Walker,

---

of the terrorist attacks on the World Trade Center in New York City." 147 Cong. Rec. H16933 (daily ed. Sept. 13, 2001) (statement of Rep. Sensenbrenner). "I would certainly hope that the law would be able to respond to this tragedy so that these payments can be made promptly rather than having months or perhaps even years of litigation before a certificate issues and the payment is to be made." 147 Cong. Rec. H16933 (daily ed. Sept. 13, 2001) (statement of Rep. Sensenbrenner). "Currently, the Department of Justice provides a one-time payment benefit of $100,000 to these families. However, the paperwork involved in processing them can be complicated and unnecessarily time-consuming involving months of delays. . . . When this legislation is passed, the families of these victims will not have to endure this heart-wrenching process. Instead, once the Federal Government has certified that the public safety officer has gone down in the line of duty, the victim's family will automatically receive their benefit. There will be no bureaucratic or unnecessary delays in this process." 147 Cong. Rec. H16935 (daily ed. Sept. 13, 2001) (statement of Rep. Moran). "We have before us a unique opportunity to provide much-needed relief for the families of the brave men and women who sacrificed their own lives for their fellow Americans. . . . In the face of this national tragedy, it is important that we begin to process quickly this measure of relief for the families of these brave Americans who selflessly gave their lives so that others might live through the attacks of September 11." 147 Cong. Rec. S17020-S17021 (daily ed. Sept. 13, 2001) (statement of Sen. Leahy).

533 U.S. 167, 173 (2001)); Williams v. Taylor, 529 U.S. 362, 404 (2000) (describing as a "cardinal principle of statutory construction" the rule that every clause and word of a statute must be given effect if possible). Similarly, the court must avoid an interpretation of a clause or word which renders other provisions of the statute inconsistent, meaningless, or superfluous. See Duncan v. Walker, 533 U.S. at 174 (noting that courts should not treat statutory terms as "surplusage"). "[W]hen two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective." Radzanower v. Touche Ross & Co., 426 U.S. 148, 155 (1976); see also Hanlin v. United States, 214 F.3d 1319, 1321 (Fed. Cir.), reh'g denied (2000).

When the statute provides a clear answer, the court's analysis is at an end. See Barnhart v. Sigmon Coal Co., 534 U.S. at 450. Thus, when the "statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" Johnson v. United States, 529 U.S. 694, 723 (2000) (quoting United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989) (quoting Caminetti v. United States, 242 U.S. 470, 485 (1917))). In such instances, the court should not consider "conflicting agency pronouncements" or "extrinsic evidence of a contrary intent." Weddel v. Sec'y of Dep't of Health and Human Servs., 23 F.3d 388, 391 (Fed. Cir. 1994) (noting that courts must not defer to agency interpretation contrary to the intent of Congress evidenced by unambiguous language) (citing Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 476 (1992) and Darby v. Cisneros, 509 U.S. 137, 147 (1993))), reh'g denied and en banc suggestion declined (1994). "[O]nly language that meets the constitutional requirements of bicameralism and presentment has true legal authority." Weddel v. Sec'y of Dep't of Health and Human Servs., 23 F.3d at 391 (citing INS v. Chadha, 462 U.S. 919 (1983)). "'[C]ourts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point.'" Shannon v. United States, 512 U.S. 573, 583-84 (1994) (quoting Int'l Bhd. of Elec. Workers, Local Union No. 474 v. NLRB, 814 F.2d 697, 712 (D.C. Cir. 1987)). Consequently, if a statute is plain and unequivocal on its face, there is usually no need to resort to the legislative history underlying the statute. See Whitfield v. United States, 543 U.S. 209 (2005) ("Because the meaning of [the statute's] text is plain and unambiguous, we need not accept petitioners' invitation to consider the legislative history . . . ."), reh'g denied sub nom. Hall v. United States, 544 U.S. 913 (2005); but see Chamberlain Group, Inc. v. Skylink Techs., Inc., 381 F.3d 1178, 1196 (Fed. Cir. 2004) ("Though 'we do not resort to legislative history to cloud a statutory text that is clear,' Ratzlaf v. United States, 510 U.S. 135, 147-48 (1994), we nevertheless recognize that 'words are inexact tools at best, and hence it is essential that we place the words of a statute in their proper context by resort to the legislative history.'" (quoting Tidewater Oil Co. v. United States, 409 U.S. 151, 157 (1972))), cert. denied, 544 U.S. 923 (2005).

Moreover, the United States Supreme Court has held that the specific terms of a statute supersede general terms within that statute or within another statute that would otherwise control. See Fourco Glass Co. v. Transmirra Prods. Corp., 353 U.S. 222, 228-29 (1957). ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling." (quoting D. Ginsberg & Sons v. Popkin, 285 U.S. 204, 208 (1932)); see also Bulova Watch Co. v. United States, 365 U.S. 753, 761 (1961). A more

specific statute will not be superseded by a more recent, general statute unless there is a clear indication of the intent to do so. Morton v. Mancari, 417 U.S. 535, 550-551 (1974) (holding specific controlling over general, irrespective of priority of enactment). Therefore, for a subsequently enacted statute to be held controlling, the circumstances must explicitly indicate the congressional intent to do so. United States v. United Cont'l Tuna, 425 U.S. 164, 168 (1976) (holding that ". . . repeals by implication are not favored.") The principle is particularly applicable in situations in which a party seeks to have a specific statute superseded by a more general one. Southwest Marine of San Francisco, Inc. v. United States, 896 F.2d 532, 533 (Fed. Cir. 1990). The view of a later Congress on a statute, however, does not control how to interpret an earlier enacted statute, O'Gilvie v. United States, 519 U.S. 79, 90 (1996), although subsequent legislation "does have persuasive value," Bell v. New Jersey, 461 U.S. 773, 784 (1983), and "is entitled to great weight in statutory construction," Red Lion Broad. Co. v. FCC, 395 U.S. 367, 380-81 (1969).

"If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984) (footnote omitted). The Supreme Court also has written that "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." United States v. Mead Corp., 533 U.S. at 226-27; see also Yanco v. United States, 258 F.3d at 1362.

Elaborating on the Chevron doctrine, the United States Supreme Court in Mead stated:

> When Congress has "explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," Chevron, 467 U.S., at 843-844, and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute. See id., at 844; United States v. Morton, 467 U.S. 822, 834 (1984); APA, 5 U.S.C. §§ 706(2)(A), (D). But whether or not they enjoy any express delegation of authority on a particular question, agencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered. "[T]he well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance,'" Bragdon v. Abbott, 524 U.S. 624, 642 (1998) (quoting Skidmore, 323 U.S., at 139-140), and "[w]e have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer

> . . . ." Chevron, supra, at 844 (footnote omitted); see also Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 565 (1980); Zenith Radio Corp. v. United States, 437 U.S. 443, 450 (1978). The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position, see Skidmore, supra, at 139-140.

United States v. Mead Corp., 533 U.S. at 227-28 (omissions in original and footnotes omitted); see also Household Credit Servs., Inc. v. Pfennig, 541 U.S. 232, 239, 242 (2004); Lacavera v. Dudas, 441 F.3d 1380, 1383 (Fed. Cir. 2006), cert. denied, 127 S. Ct. 1246 (2007); California Indus. Prods, Inc. v. United States, 436 F.3d 1341, 1352-57 (Fed. Cir. 2006); Rotech Healthcare Inc. v. United States, 71 Fed. Cl. 393, 421, appeal dismissed, 214 Fed. Appx. 973 (Fed. Cir. 2006).

Chevron deference requires that a court ask the following questions when reviewing an agency's construction of a statute: First, the court must ask "whether Congress has directly spoken to the precise question at issue." Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 842-43. If the congressional intent is clear, then the court looks no further, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43 (footnote omitted). However, if Congress is silent, or if it has left the statute "ambiguous with respect to the specific issue," the court must ask the second question: "whether the agency's answer is based on a permissible construction of the statute." Id. at 843 (footnotes omitted).

With respect to an agency's statutory construction: "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question had arisen in a judicial proceeding." Id. at 843 n.11 (citations omitted). However, "[d]eference does not mean acquiescence." Presley v. Etowah County Comm'n, 502 U.S. 491, 508 (1992). "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 843 n.9 (citations omitted). Thus, this court should defer to an agency's construction of the statute if it "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' express intent." Rust v. Sullivan, 500 U.S. 173, 184 (1991) (citing Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 842-43). The converse is likewise true that the court should only defer to the agency's interpretation if it is not in conflict with the congressional intent.

The BJA Director determined that the letters provided on behalf of plaintiff as certification that he qualified for PSOBA benefits did not qualify as such because key letters stated that Glenn Winuk "should be considered" and "should be recognized" as a public

safety officer who died in the line of duty, and did not contain a clear or precise statement to certify Mr. Winuk as having been a public safety officer who died in the line of duty in connection with the terrorist attacks of September 11, 2001. The BJA Director rejected as certification two letters from Chief Lottes of the Jericho Fire Department, dated March 31, 2002 and May 1, 2002, because they were not addressed to the BJA and because one letter used the term "should be recognized" as qualifying and the other also was not a clear certification. (emphasis added). The Director also discounted a letter submitted directly to the BJA on April 7, 2005, by Chairman Biancanello of the Jericho Fire District, because the language of the letter similarly stated "Glenn Winuk should be considered to have been a public safety officer killed in the line of duty," which, the Director believed, did not contain a clear or precise statement and, thus, was not a certification within the meaning of the Act. (emphasis added). The BJA Director found that evidence presented in Glenn Winuk's case would rebut even a proper certification by a public agency. In his final determination, the Director of the BJA stated that "[a] certification consistent with Public Law 107-37 does not need to be a formulaic incantation, but it must provide a clear and unequivocal official statement to BJA . . . ."

In keeping with the BJA Director's own acknowledgment, noted above, that a certification in conformance with Public Law 107-37 should not be a "formulaic incantation," his rejection of certification statements because the letters were not addressed to the BJA seems narrow minded and improper. Moreover, Congress did not specify in the PSOBA, including Public Law 107-37, specific statutory words which would result in the requisite certification for the purposes of qualifying for benefits under the Act, nor is there such specific direction in the regulations promulgated by the BJA. Public Law 107-37 simply states that certification must be "by a public agency" and must state that "a public safety officer employed by such agency was killed . . . as a direct and proximate result of a personal injury sustained in the line of duty . . . in connection with the rescue or recovery efforts related to the terrorist attacks of September 11, 2001 . . . ." Expedited Payment for Heroic Public Safety Officers, Pub. L. No. 107-37, §§ 1-2, 115 Stat. 219.

The administrative record contains an example of a certification which was accepted by the BJA. In a letter sent from FDNY Fire Commissioner Nicholas Scoppetta to BJA Director Richard Nedelkoff, Commissioner Scoppetta states, "I am hereby certifying that the following public safety officers listed on the attachment, were killed in the line of duty, and their deaths resulted from traumatic injuries." The BJA took this certification, which simply identified the individuals as public safety officers, as *prima facie* evidence that the listed individuals were entitled to benefits under Public Law 107-37. As noted above, it was later determined that three of the individuals listed by Chairman Scoppetta were, in fact, retired firefighters on September 11, 2001. The BJA argued that the circumstances surrounding the determination in the case of the retired firefighters can be distinguished because the BJA did not discover the status of these individuals until after it had already made its award determination. Thus, for the BJA's purposes, these words were considered "precise" enough to qualify automatically as proper certification, such that the BJA awarded benefits to the beneficiaries of the retired firefighters without further, probing inquiry into the cases.

For the purposes of determining whether an agency has properly certified an individual under the Act as being a public safety officer who died in the line of duty, the BJA should have considered the substance of the certifications over their form. To that end, the two letters from former Jericho Fire Department Chief John Lottes, submitted for the record to the BJA, which were not challenged on authenticity grounds, although not addressed to the BJA, nonetheless should have been considered for their substance. Writing on March 31, 2002, on behalf of the Jericho Fire Department as Chief of the Department, Lottes acknowledged Glenn Winuk as a public safety officer representing the Jericho Fire Department who died in the line of duty in a letter to the Deputy Director of the Twin Towers Fund.[5] Again, in a letter to Jay Winuk on May 1, 2002, Chief Lottes reiterated this view of Glenn Winuk's role on 9/11 at the Twin Towers.[6] The doctrine of "substance-over-form" is pervasive throughout United States Supreme Court jurisprudence. See, e.g., Carey v. Saffold, 536 U.S. 214, 232 (2002) ("[F]ederal courts must not privilege form over substance"); United States v. R.F. Ball Constr. Co., 355 U.S. 587, 593 (1958) ("Substance, not form or labels, controls the nature and effect of legal instruments."), reh'g denied, 356 U.S. 934 (1958). The purpose of the Public Law 107-37 certification is to determine whether the local agency considered the individual to be a public safety officer, thus, the information provided by Chief Lottes should have been sufficient, without further inquiry into words such as "should" used in the correspondence.

Even if Chief Lottes' letters were discounted by the BJA Director regarding certification of Glenn Winuk's status under Public Law 107-37, Glenn Winuk also was "certified" in the letter from Chairman Robert Biancanello.[7] Chairman Biancanello's

---

[5] The letter states: "As Chief of the Jericho Fire Department and as someone familiar with Glenn's actions on September 11 and his firefighting career, my view is that Glenn Winuk should be recognized by all as having been lost 'in the line of duty' while acting as a rescuer representing the Jericho Fire Department. . . . Glenn was a highly capable firefighting professional and a caring and dedicated member of the community. He gave his life to save others. The firefighters, EMS workers and other recovery workers at Ground Zero certainly recognized his 'rescuer' status and heroism by giving him full fireman honors as they carried his remains from the site." (emphasis added).

[6] The letter states: "In my opinion, Glenn was acting as a *bona fide* agent of the Jericho Fire Department, acting directly on its behalf, while assisting FDNY with rescue and emergency scene operations in the South Tower of the World Trade Center."

[7] Also of note also is a BJA case involving thirteen Port Authority officials who assisted in the rescue efforts on September 11, 2001, and lost their lives as a result of their heroic acts, in which the BJA rejected two "certifications," but finally took the third submission. Included in the appendix of plaintiff's response brief is a set of documents obtained from the BJA regarding this Port Authority case. The beneficiaries of the Port Authority officials submitted two certifications to the BJA in their application for benefits

certification letter was sent to Daniel Skoler, the BJA hearing officer, and at least should have corrected the formulaic deficiency identified by the BJA Director that the two earlier letters were not sent to the BJA. This third letter also uses the word "should," and states: "I am hereby certifying that Glenn Winuk should be considered to have been a public safety officer killed in the line of duty, and his death resulted from traumatic injuries. At the time of his death, Glenn was an associate member of the Jericho Fire Department . . . ." As discussed above, when evaluating the sufficiency of the letters submitted as certifications in plaintiff's case, the BJA Director rejected Chief Lottes' letters and found that the inclusion of the word "should" in one of Chief Lottes' letters and in Board Chairman Biancanello's letter creates equivocation and did not provide a "clear and unequivocal official statement to the BJA."

The word "should" is defined by the American Heritage Dictionary as the "[p]ast tense of shall.... Used to express obligation or duty ...." American Heritage Dictionary of the English Language (4th ed. 2000), available at http://www.bartleby.com/61/83/S0368300.html. See also Merriam-Webster Online Dictionary (2007), available at http://www.m-w.com/cgi-bin/dictionary (should: "past of shall ... used in auxiliary function to express obligation, propriety, or expediency ...."). Synonyms for "should," in Roget's New Millennium Thesaurus, include "be made, be necessitated, be obliged, be ordered, be required, got to ... have to ...." Roget's New Millennium Thesaurus (1st ed. 2007), available at http://thesaurus.reference.com/browse/should. Thus, "should" is a mandatory and imperative, rather than a permissive term. See also, e.g., United States v. Anderson, 798 F.2d 919, 924 (7th Cir. 1986) (stating that "should" is mandatory language and thus the phrase "the judge should not conduct *ex parte* proceedings" imposes a mandatory rule of conduct upon a judge, as does the language of Canon III(C)(1) of the Code of Judicial Conduct, stating that "'a judge should disqualify himself in a proceeding ... where ... he has ... personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding' *'requires* recusal' of a judge who has extrajudicial knowledge of disputed evidentiary facts of a case.").

Therefore, recognizing the mandatory nature of the word "should," the court finds that the certification in Chairman Biancanello's letter which states "I am hereby certifying that Glenn Winuk should be considered to have been a public safety officer killed in the line of duty, and his death resulted from traumatic injuries," when combined with Jericho Fire Department Chief Lottes' two communications, one of which stated "Glenn Winuk should

---

under Public Law 107-37. The applications were rejected because the BJA did not believe that the Port Authority officials were public safety officers within the meaning of the Act and raised questions regarding "equivocation" as to whether these officials were properly certified under Public Law 107-37. One of the Port Authority officials' beneficiaries appealed the decision of the BJA, and the hearing officer determined that he was in fact entitled to benefits under Public Law 107-37. The Port Authority then issued a subsequent, third certification for all of the Port Authority officials and the BJA Director found that they were entitled to automatic benefits.

be recognized by all as having been lost 'in the line of duty' while acting as a rescuer representing the Jericho Fire Department," and the second of which stated "Glenn was acting as a *bona fide* agent of the Jericho Fire Department, acting directly on its behalf, while assisting FDNY [Fire Department New York (City)] with rescue and emergency scene operations in the South Tower of the World Trade Center," qualify Glenn Winuk's beneficiary for benefits under the PSOBA. Chairman Biancanello's statement, along with Chief Lottes' two letters, are clear. From these communications, the court concludes that the Jericho Fire Department considered Glenn Winuk as one of its own, and certified that he was operating on its behalf during the events of 9/11. Because the intent of the 9/11 Act was to expedite the process by which the beneficiaries of public safety officers receive benefits under the 9/11 Act once local certification is established, and because under the statute the BJA is directed to expedite payment without further inquiry upon the requisite certification by a public agency pursuant to the 9/11 Act (Public Law 107-37), the inquiry should have been concluded with the two communications from Chief Lottes and the communication from Chairman Biancanello.

The BJA Director placed significant weight on a letter submitted by private, outside counsel to the Jericho Fire District, Joseph Frank, in response to questions posed by the BJA, after the hearing officer's decision, but during the period of review of the hearing officer's decision by the BJA Director. Mr. Frank's letter described Glenn Winuk as an "inactive" member of the Jericho Fire District who did not respond to the World Trade Center attack on behalf of the Jericho Fire Department. Although not acknowledged in the opinion by the BJA Director, Mr. Frank's letter states that he considered the questions to which he was responding from the BJA as "purely academic and not applicable to this case," because, as he indicated he had previously discussed with the BJA, that New York State had "passed special legislation declaring Mr. Winuk post 9-11, to have been an active member of the Jericho Fire Department as of September 11, 2001 . . . ." Mr. Frank also indicated that he believed that "the Board of Fire Commissioners of the Jericho Fire District would be required to defer to that legislative action," although acknowledging that the federal government will have to decide whether to defer to the state legislative action.

On August 2, 2005 the New York State legislature passed the legislation referred to by Mr. Frank in his letter, a special measure, 2005 NY S.B. 3764, which states:

> THE PEOPLE OF THE STATE OF NEW YORK, REPRESENTED IN SENATE AND ASSEMBLY, DO ENACT AS FOLLOWS:
>
> Section 1. Notwithstanding any other provision of law, Glenn J. Winuk, who served as a firefighter and emergency medical technician with the Jericho volunteer fire department for a period of 19 years, and who died on September 11, 2001 while participating in the rescue effort in the south tower of the World Trade Center, and who, at the time of his death, was an associate member of the Jericho volunteer fire department, <u>shall be deemed</u>

> to have been an active member of the Jericho volunteer fire department at the time of his death with full active employment status, and the family of Glenn J. Winuk shall be eligible for all benefits, commendations, awards, or any other right or privilege as any other active member of the Jericho volunteer fire department with full active employment status. (emphasis added).
>
> Section 2. This act shall take effect immediately.

2005 N.Y. Sess. Laws ch. 368, § 1 (NY S.B. 3764, enacted Aug. 2, 2005).

The intent of this simple, straightforward statute is clear and unambiguous. There can be no doubt that the New York State legislature intended to afford Glenn Winuk local certification as an active member of the Jericho Fire Department at the time of his death in the 9/11 tragedy.

This very specific statute regarding Glenn Winuk's status follows chronologically a 1999 New York General Municipal law found at section 209-i that states:

> § 209-i. Emergency service by volunteer firemen
>
> 1. Whenever a volunteer fireman is within this state, but outside the area regularly served by the fire company or fire department of which he is a member and has knowledge of a fire or other emergency at or near the place where he is for the time being, such volunteer fireman may report to the officer in command of the paid or volunteer fire company or paid or volunteer fire department, or in command of one of the paid or volunteer fire companies or one of the paid or volunteer fire departments, engaged in the handling of any such fire or other emergency and, on an individual basis, offer his services to assist such fire company or fire department. After his services are so accepted, the volunteer fireman shall then be entitled to all powers, rights, privileges and immunities granted by law to volunteer firemen during the time such services are rendered, in the same manner and to the same extent as if he were a volunteer member of the fire company or fire department which he is assisting, including benefits under the volunteer firemen's benefit law. Any such commanding officer shall have power, in his discretion, to so accept the services of a volunteer fireman unless the legislative body of the city or the village, the board of fire commissioners or other governing board of the fire district, or the town board of the town in relation to (a) the fire companies serving territory outside villages and fire districts or (b) a town fire department, as the case may be, by resolution heretofore or hereafter adopted, has forbidden the acceptance of any such services pursuant to this section. Any such resolution shall continue in effect until amended or repealed by the adoption of a subsequent resolution. The officer in charge of any fire company or fire department shall be notified

> promptly of the adoption of any such resolution and of any amendment or repeal thereof.

N.Y. General Municipal Law (Firemen and Policemen) § 209-i (McKinney 1999) (footnote omitted).

As discussed above, post-9/11 enacted, specific PSOBA sections included in Public Law 107-37 indicate that "upon certification by a public agency that a public safety officer employed by such agency was killed . . . as a direct and proximate result of a personal injury sustained in the line of duty . . . in connection with the rescue or recovery efforts related to the terrorist attacks of September 11, 2001, the Director of the Bureau of Justice Assistance shall authorize payment to qualified beneficiaries . . . ." Expedited Payment for Heroic Public Safety Officers Act, Pub. L. No. 107-37, § 1, 115 Stat. 219 (2001) (emphasis added). This places the certification designation in the hands of the local public agency, not at the BJA. By virtue of the later in time 2005 New York special legislation, which included specific language regarding Glenn Winuk, he was denominated as an active member of the Jericho Volunteer Fire Department at the time of his death within New York State by the state authority. Similarly, notwithstanding the training dictates of the New York statute, N.Y. Comp. Codes R. & Regs. tit. 10, part 800 (2001), the special measure regarding Glenn Winuk, 2005 NY S.B. 3764, stated that when he died on September 11, 2001, he was a "firefighter and emergency medical technician with the Jericho volunteer fire department," and "shall be deemed to have been an active member" of that Department. This New York, person-specific, unique statue was a later in time statute which was not inconsistent with the earlier New York State statute on EMT certification and it did not alter generally applicable rules or regulations at the state or local level. Although federal agencies or courts may not be required to give automatic deference to state or local legislation or actions, in the instant case the 9/11 amendment to the PSOBA directs placing the responsibility for certification in local hands and not at the BJA. The statute and other evidence provided, should have been enough for the BJA to follow the dictates of the 9/11 legislation and award benefits to the plaintiff. The BJA Director's failure to do so was an abuse of discretion, and his dedication to overturning the hearing officer's decision in this case was inconsistent with the purposes of the PSOBA and the 9/11 amendments thereto. The BJA Director should have deferred to the local designation of certification provided by Jericho fire officials and legislation passed in 2005 by New York State on Glenn Winuk's behalf, especially in the absence in the PSOBA of a statutory or of a regulatory definition of service to a public agency in an official capacity.

The BJA Director gives some credence to the letters from Chief Lottes and Chairman Biancanello when he states that: "[e]ven if one of the letters, or all of them combined, from Chief Lottes and/or Chairman Biancanello, were to be interpreted as containing the substance of what is required of a certification under Public Law 107-37 ...." However, he goes on to write, "other (contrary) evidence and considerations in this claim make it untenable to accept such an interpretation as an unequivocal certification of compliance with the standards contained in the PSOB Act or otherwise dispositive of the claim." In so stating, the BJA Director seems to be referring to the previously discussed

letter from attorney Frank, the private, outside counsel to the Jericho Fire District and to the form, "Report of Public Safety Officer's Death" submitted to the BJA by the Jericho Fire District, dated March 31, 2004 and signed by David Marmann, Chairman of the Jericho Fire District. This document, submitted to the BJA on March 31, 2004, lists Glenn Winuk under "other," with the addition of the words "Associate Non-Active Member of Jericho Fire Department." The BJA Director gave this great weight and states that this document was not rescinded or amended from its original submission, and "certifies . . . the decedent's 'employment status when injury occurred . . . .'" To rely heavily, as it appears the BJA Director did, on a summary form filled out by one individual, Mr. Marmann, who checked or circled boxes, even though he added the words "Associate Non-Active Member" on the form, in light of the other letters submitted, in light of the Glenn Winuk-specific New York State legislation and the intent of the 9/11 amendments to the PSOBA, is inappropriate.

Defendant argues that Public Law 107-37 does not expand the scope of individuals who are eligible for benefits under the PSOBA, while at the same time acknowledging that the statute "authorizes the BJA to rely upon a public agency's certification in lieu of conducting its own factual investigation . . . ." Moreover, one of the implementing regulations of the PSOBA, promulgated by the BJA, and operative in this case, although more recently changed, provides that, "The Bureau will give substantial weight to the evidence and findings of fact presented by State, local, and Federal administrative and investigative agencies." 28 C.F.R. § 32.5 (2001). In Demutiis v. United States, 291 F.3d 1373, 1379 (Fed. Cir. 2002), the United States Court of Appeals for the Federal Circuit wrote that the agency must give substantial weight to the evidence and findings of fact presented by the public agency, although it need not give the same, or any, weight to the agency's legal conclusions. For cases arising under the 9/11 amendments to the PSOBA, following a public agency's certification of eligibility status, the statute directs the BJA Director to pay the authorized beneficiaries. See Groff v. United States, 72 Fed. Cl. 68, 80-81 (2006), appeal filed, No. 07-5006 (Fed. Cir. Oct. 18, 2006).

Recently, the United States Court of Appeals for the Federal Circuit issued a PSOBA decision in Messick v. United States, No. 2006-5087, 2007 WL 1120391 (Fed. Cir. Apr. 17, 2007), reh'g denied (May 11, 2007), finding in favor of the government. PSOBA cases, however, are fact specific, and Messick is distinguishable from the present case on the facts. Messick concerned whether a fourteen-year old apprentice firefighter in the Brookhaven, Pennsylvania Volunteer Fire Department, Christopher Kangas, qualified as a firefighter for purposes of the PSOBA. Id. at *1. Christopher Kangas died in a traffic accident on the way to responding to a fire, and his mother brought the PSOBA claim. Id. The trial judge in Messick (the undersigned) found that the apprentice firefighter performed support services as a member of a team that engaged in the suppression of fires, and concluded that he was, therefore, a firefighter for purposes of the PSOBA. Id. at *4.

The Federal Circuit disagreed. The Federal Circuit noted that the PSOBA did not define whether the term "firefighter" covered "a minor apprentice firefighter prohibited by law from engaging in certain firefighting activities." Id. at *6. The issue, then, was whether the BJA's decision to exclude a minor apprentice firefighter from the definition of firefighter

represented "a permissible construction of the statute." Id. (quoting Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984)). The Federal Circuit concluded that the BJA's interpretation of the term "'firefighter,' as one who is 'authorized to actively engage in the suppression of fires,'" was a permissible construction of the statute. Id. at *6.

BJA had concluded that the apprentice firefighter in Messick was not authorized to actively engage in the suppression of fires and, therefore, was not a firefighter for purposes of the PSOBA. Id. at *7. The Federal Circuit considered this BJA decision to be reasonable, based on state law which prevented minors under 16 years of age like Christopher from riding to fires in a fire truck, entering burning buildings, and using high pressure hoses and ladders at fire scenes, although the use of such hoses and ladders in training was permitted. Activities at actual fires for minor apprentice firefighters was limited by state law to first aid, clean-up, and food service support. Id. at *7. The BJA had concluded that a support role on the firefighting team of this nature was insufficient to be designated a firefighter for purposes of the PSOBA. Id.[8]

The issue in the present case does not concern an apprentice firefighter whose duties are constrained by state law because he was a minor. The present case concerns whether a public agency provided the requisite certification that Mr. Winuk was a public safety officer who died in the line of duty. In this regard, Chairman Biancanello of the Jericho Fire Department submitted a letter on April 7, 2005, which stated that "Glenn Winuk should be considered to have been a public safety officer killed in the line of duty." Chairman Biancanello's letter is consistent with the earlier, March 31, 2002 letter from Jericho Fire Department Chief Lottes, which stated that "Glenn Winuk should be recognized by all as having been lost 'in the line of duty' while acting as a rescuer representing the Jericho Fire Department. . . ." As discussed above, the BJA Director considered the use

---

[8] Circuit Judge Newman dissented in Messick. Judge Newman noted the trial court's findings that Christopher performed duties that were a necessary and integral part of the firefighting team, and which freed senior firefighters for other tasks at the fire scene. Id. at *9. Christopher's duties included attending the scene of a fire (to which Christopher was en route when he had his fatal accident), offloading fire equipment, attaching non-pressurized hoses, administering first aid, providing food service, rolling up hoses, removing debris from fire scenes, proving hazardous materials support, and participating in search and rescue operations. Id. at *10. Judge Newman's dissent included the following concerns: (1) Christopher's support role was involved in the suppression of fires, and to conclude otherwise ignores the legislative history of the PSOBA, as well as the definition of firefighters in civil service laws; (2) substantial weight was not given to state findings recognizing apprentices as firefighters and designating Christopher as a fallen firefighter, as required by BJA regulations; (3) the legislative history of the PSOBA, BJA regulations, and case law compel a liberal not restrictive interpretation of the statute; and (4) a BJA interpretation of the PSOBA that excludes apprentice firefighters who die while serving as apprentices is such a departure from the statutory purpose as to warrant no deference. Id. at *9-10.

of the word "should" to be unclear. Dictionaries, which were a legitimate tool in the Messick case, state otherwise. For the ordinary, common meaning of the term "firefighter," the Federal Circuit in Messick consulted the Merriam-Webster's Collegiate Dictionary (10th ed. 2002), the New Shorter Oxford English Dictionary (1993), and Webster's Third New International Dictionary (1981). Id. at *6. Similarly, in the present case, the court has consulted the American Heritage Dictionary of the English Language (4th ed. 2000), the Merriam-Webster Online Dictionary (2007), and Roget's New Millennium Thesaurus (1st ed. 2007). These dictionaries provide, variously, that the term "should" is the past tense of "shall," and that one who "should" take action is "required" to do so. Contrary to the BJA Director's arbitrary conclusion, the ordinary, common meaning of the term "should" is neither unclear nor imprecise. Contrary to the result in Messick, BJA's professed inability to determine the meaning of a sentence which includes the term "should" is unreasonable. Jericho Fire District Chairman Biancanello's April 7, 2005 letter affirmatively certifies that Mr. Winuk was a public safety officer who died in the line of duty, and is supported by Jericho Fire Department Chief Lottes' two letters on Mr. Winuk's status, as discussed earlier.

Defendant nevertheless argues that, in BJA's view, Mr. Winuk was not "serving in an official capacity," as required by the PSOBA, 42 U.S.C. § 3796b(8). Defendant states:

> Here, application of the Chevron analysis employed by the Federal Circuit in Messick dictates that the BJA's interpretation of "serving a public agency in an official capacity" as excluding an associate firefighter who lacked any authority to attend a fire scene or provide firemanic services is entitled to deference. Moreover, to the extent that Mr. Winuk [the father of the deceased] here seeks to define Glenn Winuk as having been authorized to serve the JFD [Jericho Fire Department] in an official capacity as a member of a rescue squad or ambulance crew, the BJA reasonably accorded substantial weight to the JFD general counsel's official opinion that an associate firefighter could not engage in any emergency medical-related activities. The BJA's eminently reasonable legal conclusion that Glenn Winuk was not a public safety officer on September 11, 2001 should be accorded deference by this Court.

To the contrary, Glenn Winuk was a firefighter and EMS rescue worker prior to September 11, 2001, and was providing emergency medical technician, first aid and evacuation to victims on 9/11 when he died. Mr. Winuk had acted as a rescue worker for many years in his status as an active firefighter, and during the emergency presented by 9/11, similarly performed as a rescue worker in his capacity as an associate firefighter for the Jericho Fire Department. At the time of his death, he was wearing surgical gloves, either wearing or holding a stethoscope and was found beside an EMT bag, manifesting active participation, along with many other rescue workers at the 9/11 site. Chairman Biancanello and Chief Lottes of the Jericho Fire District properly certified that Glenn Winuk should be considered to have been a public safety officer killed in the line of duty during the 9/11 tragedy. That should have been the end of it, especially under the 9/11 amendments

to the PSOBA. Moreover, notwithstanding the debate regarding the sufficiency of the certification between the BJA Director and the hearing officer, who had found for the Winuks on their claim, the special legislation enacted by the State of New York unequivocally acknowledged Mr. Winuk as an active member of a local fire department at the time of his death. This statute overrides earlier New York State emergency worker qualification statutes, and should have resolved the doubts, regarding the appropriateness of an award to Mr. Winuk's beneficiaries, of even the BJA Director.

The case of Mr. Winuk is unique from previous cases which have been brought to this court because it is a case which arises under the amendments (Public Law 107-37) to the earlier enacted PSOBA, together with the fact that New York enacted specific legislation to establish Mr. Winuk's individual status as "an active member of the Jericho volunteer fire department at the time of his death . . . ." 2005 NY S.B. 3764, § 1. In light of the beneficent and remedial nature of the PSOBA, which was designed by the legislature to resolve doubts in favor of the applicant for benefits, United States Supreme Court guidance that remedial laws "should be construed liberally in furtherance of the purpose for which they were enacted and, if possible, so as to avoid incongruous or harsh results," Balt. & Phila. Steamboat Co. v. Norton, 284 U.S. at 414 (citations omitted), and the intent of the post-9/11 amendments to the PSOBA, which were designed to expedite payments to those who were killed in rescue efforts connected with the 9/11 tragedy, this court finds the decision of the BJA Director, reversing the hearing officer, to be arbitrary. Plaintiff, Mr. Winuk's beneficiary, is entitled to the modest award sought as acknowledgment of the tremendous sacrifice made during the 9/11 tragedy by Glenn Winuk.

## CONCLUSION

Plaintiff's motion for judgment on the administrative record is **GRANTED**, and defendant's cross-motion is **DENIED**. The Clerk of the Court is directed to enter **JUDGMENT** for the plaintiff in the amount of $250,000.00, adjusted in accordance with 42 U.S.C. § 3796(h).

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**